E-filing
ADR
ORIGINAL FILED
MAY 24 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (Cal. Bar No. 077785)
aplutzik@bramsonplutzik.com
Michael S. Strimling (Cal. Bar No. 96135)
mstrimling@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

HARWOOD FEFFER LLP
Robert I. Harwood
Samuel K. Rosen
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
(212) 935-7400

LIFSHITZ LAW FIRM
Joshua M. Lifshitz
18 East 41st Street
New York, NY 10017
(212) 213-6222

Attorneys for Plaintiff
SOFIA ZOUMBOULAKIS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SOFIA ZOUMBOULAKIS, Derivatively on Behalf of Nominal Defendant VERIFONE SYSTEMS, INC.,

Plaintiff,

v.

RICHARD A. MCGINN, ROBERT W. ALSPAUGH, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, WENDA HARRIS MILLARD, EITAN RAFF, JEFFREY E. STIEFLER, DOUGLAS G. BERGERON, ROBERT DYKES, and ELMORE WALLER,

Defendant.

and

VERIFONE SYSTEMS, INC.,

Nominal Defendant.

Case No. C13-2379 HRL

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL



COPY

Plaintiff Sofia Zoumboulakis ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant, VeriFone Systems, Inc. ("VeriFone" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

**NATURE AND SUMMARY OF THE ACTION**

1. Verifone develops, sells, and services electronic payment processing technology.

2. Since going public in 2005, Verifone has been consistently plagued by serious corporate governance deficiencies. In 2009, the Company was formally charged by the Securities and Exchange Commission ("SEC") with a massive accounting fraud during 2007 and 2008 that resulted in large restatements of numerous financial metrics. The Company was also investigated by the U.S. Department of Justice ("DOJ"), the New York Stock Exchange, and others in connection with the same issues. Numerous securities class actions were filed against the Company and consolidated into one suit in the U.S. District Court for the Northern District of California, No. 3:07-cv-06140 (the "2007 Action"). Dismissal of the 2007 Action was recently reversed by the U.S. Court of Appeals for the Ninth Circuit and the 2007 Action is pending.

3. There are currently eight directors on VeriFone's board, seven of whom have served since at least 2008. As a result of the accounting scandal in 2007 and 2008, at least these seven directors were on notice that the Company had deficient controls and corporate governance procedures. Nevertheless, the Board failed to implement and supervise adequate internal controls over accounting and disclosure.

4. During 2012, public concerns about the Company's accounting controls resurfaced. In April, analysts for Deutsche Bank published a note questioning VeriFone's accounting practices. The Company responded by issuing a press release categorically denying any impropriety.

5. On February 4, 2013, the Company disclosed that its Chief Financial Officer ("CFO") since 2008 would be leaving the Company.

6. On February 20, 2013, the Company disclosed preliminary financial results for the first quarter of fiscal 2013. The results fell well below analyst estimates. The Company blamed

the poor results on weakness in European sales and other macro factors. At the same time, the Company announced a new policy on revenue recognition that resulted in an inability to recognize revenues in the quarter from business in the Middle East in Africa.

7. The financial press and analysts immediately questioned the legitimacy of the Company's explanations for the results miss. Numerous articles suggested the recent departure of the Company's CFO and the new revenue recognition requirements should be viewed as red flags related to the Company's accounting in prior quarters.

8. In March 2013, the Company announced that its long-time Chief Executive Officer ("CEO") would be resigning and that the Company had violated international sanctions prohibiting business with Iran.

9. Verifone stock has lost nearly one-third of its value in 2013, no corporate governance enhancements have been disclosed, and the true extent of the accounting and disclosure problems has also not been disclosed

10. Defendants are all current or former directors or officers. These defendants were on notice that the Company was susceptible to internal control deficiencies, that accounting controls had been a problem in the past, and that the Company would be seriously harmed by a lack of sufficient controls over accounting and disclosure. Defendants permitted VeriFone to function without sufficient controls and, not only has the Company been gravely harmed already, but the harm is ongoing as the Director Defendants have failed to disclose the true nature of accounting problems and control deficiencies with due candor.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because VeriFone has a substantial presence in California and is headquartered in San Jose, California. Moreover, each defendant has had extensive contacts with California as a director and/or officer of VeriFone

or otherwise, which makes the exercise of personal jurisdiction over them proper.

**THE PARTIES**

**A. Plaintiff**

13. Plaintiff is an owner and holder of Verifone common stock.

**B. Defendants**

14. Nominal defendant VeriFone is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 2099 Gateway Place, San Jose, California. According to its public filings, VeriFone is a leading global provider of payment solutions that enable secure electronic payment transactions and other services at the point of sale. The Company's principal operating subsidiary, VeriFone, Inc., was incorporated in 1981, and shortly thereafter introduced the first ever check verification and credit authorization device used by merchants in a commercial setting.

15. Defendant Richard A. McGinn ("McGinn") has served as a director since 2008 and was named interim CEO in March 2013.

16. Defendant Robert W. Alspaugh ("Alspaugh") has served as a director since 2008. Alspaugh is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

17. Defendant Leslie G. Denend ("Denend") has served as a director since 2005 and was named the interim Chairman of the Board in March 2013. Denend is the Chair of the Compensation Committee and is a member of the Audit Committee.

18. Defendant Alex W. Hart ("Hart") has served as a director of VeriFone since 2006. He is the Chair of the Corporate Governance and Nominating Committee.

19. Defendant Robert B. Henske ("Henske") has served as a director since 2005. Henske is Chair of the Audit Committee, is an Audit Committee financial expert, and is a member of the Compensation Committee.

20. Defendant Wenda Harris Millard ("Millard") has served as a director since 2012. Millard is a member of the Compensation Committee.

21. Defendant Eitan Raff ("Raff") has served as a director since 2007. Raff is a

member of the Corporate Governance and Nominating Committee.

22. Defendant Jeffrey E. Stiefler ("Stiefler") has served as a director of since 2008. Stiefler is a member of the Audit and Compensation Committees.

23. Defendant Douglas G. Bergeron ("Bergeron") is a former director and officer of the Company. Bergeron served as the Company's CEO and a director since the Company was formed in July 2002 until he abruptly resigned on March 12, 2013. Upon Bergeron's resignation, that Company agreed to pay him $1 million per year for a two-year period in his severance agreement and stated that his dismissal was without cause.

24. Defendant Robert Dykes ("Dykes") is a former officer of the Company. Dykes served as an Executive Vice President and the CFO since September 2008 until the Company announced his retirement on February 4, 2013. The Company has not publicly disclosed whether Dykes' left voluntarily or was terminated for cause.

25. Defendant Elmore Waller ("Waller") is a former officer of the Company. Waller joined the Company in 1986, and served as its Vice Chairman since 2011. The Company announced his retirement on February 4, 2013.

26. The defendants referenced in ¶¶ 15-22 shall be collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

27. By reason of their positions as officers, directors, and/or fiduciaries of VeriFone and because of their ability to control the business and corporate affairs of VeriFone, defendants owed VeriFone and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage VeriFone in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to VeriFone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28. Defendants, because of their positions of control and authority as directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with VeriFone, each defendant had knowledge of material non-public information regarding the Company.

29. To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP");

d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

30. According to the Charter of the Audit Committee, the Audit Committee defendants were and are responsible for, among other things:

> Providing assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) and the performance of the Company's internal audit function and independent auditors.

31. According to the Charter of the Corporate Governance and Nominating Committee, the Corporate Governance and Nominating Committee defendants were and are responsible for,

among other things:

e. Identifying individuals believed to be qualified to become Board members, consistent with criteria approved by the Board, and to select, or recommend to the Board, the nominees to stand for election as directors at the annual meeting of stockholders;

f. Identifying Board members qualified to fill vacancies on any committee of the Board (including the Committee) and to recommend that the Board appoint the identified member or members to the respective committee;

g. Establishing procedures for the Committee to exercise oversight of the evaluation of the Board and management; and

h. Developing and recommend to the Board a set of corporate governance principles applicable to the Company, and to review those principles at least once a year.

**SUBSTANTIVE ALLEGATIONS**

32. VeriFone is a global provider of technologies that process electronic payments for goods and services. The Company serves customers including financial institutions, payment processors, industrial concerns, retailers, government organizations and healthcare providers. The Company's technologies process payments from signature and PIN-based debit cards, credit cards, contactless or radio frequency identification, among other sources, at the point of sale via merchant-operated, consumer facing, and self-service systems.

33. On December 14, 2011, the Company released its results for the fourth quarter and full year of 2011. Among other things, the press release stated:

> SAN JOSE, CA - December 14, 2011 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ("Q4 FY11") and fiscal year ended October 31, 2011.
>
> Non-GAAP net revenues for Q4 FY11 were $416 million, compared to $317 million in the previous quarter and $276 million for the comparable period of 2010 ("Q4 FY10"), a 51% year-over-year increase. Q4 FY11 marked the sixth straight quarter that the growth rate exceeded 20% year-over-year, excluding the contribution from the Hypercom business acquired in August.
>
> Non-GAAP net revenues for the full year ended October 31, 2011, were $1,310 million, a 31% increase over the $1,002 million result for the full year ended October 31, 2010. GAAP net revenues were $411 million for Q4 FY11, $317 million for the prior quarter and $276 million for Q4 FY10. For FY11, GAAP net

> revenues totaled $1,304 million, a 30% increase over the $1,002 million total for FY10.
>
> Non-GAAP gross margins were 40% for Q4 FY11, compared to 43% in the prior quarter and 40% in Q4 FY10. Non-GAAP gross margins were 42% for the full year ended October 31, 2011, and 39% for the full year ended October 31, 2010. GAAP gross margins were 31% for the latest quarter, 42% for the prior quarter and 38% for Q4 FY10. GAAP gross margins were 38% for FY11, compared to 37% for FY10.
>
> Non-GAAP net income per diluted share for Q4 FY11 was $0.53, compared to $0.49 in the prior quarter and $0.40 for Q4 FY10, a 33% year-over-year increase. Non-GAAP net income per diluted share for the full year ended October 31, 2011, was $1.92, a 45% increase over the $1.32 figure for the full year ended October 31, 2010. GAAP net income per diluted share for the latest quarter was $1.84, compared to $0.28 in the prior quarter and $0.55 in Q4 FY10. GAAP net income per diluted share was $2.92 for FY11 and $1.13 for FY10.
>
> "We finished 2011 with another year of record revenues and record profit, and are now midway through our multi-year transformation to the world's leading services-driven payment technology provider," said Douglas G. Bergeron, Chief Executive Officer. "Looking to 2012, we are very encouraged by the opportunities at hand throughout our growing, global marketplace."
>
> * * *
>
> ***Guidance for First Quarter 2012 and Full Year***
>
> VeriFone has updated its guidance assuming the pending Point acquisition closes at the end of this month. For the first fiscal quarter ending January 31, 2012, VeriFone expects to report net revenues in the range of $415 million to $420 million. Non-GAAP net income per diluted share is projected to range from $0.50 to $0.52. For the full year of fiscal 2012, VeriFone expects to report net revenues in the range of $1.90 billion to $1.92 billion. Non-GAAP net income per diluted share is expected to range from $2.53 to $2.60 in FY12.

34. On December 23, 2012, the Company filed its Form 10-K with the SEC for the year ended October 31, 2011. The Form 10-K was signed by Director Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler, as well as defendants Bergeron and Dykes. Among other things, the Form 10-K disclosed:

> In prior periods we reported material weaknesses in our internal control over financial reporting, which we have remedied. See Item 9A. Controls and Procedures in our Annual Report on Form 10-K for the fiscal year ended October 31, 2010. These material weaknesses in our internal control over financial reporting contributed to our need to restate previously reported interim financial information for each of the first three quarters of our fiscal year ended October 31, 2007, and to

the delays in the filing of our Annual Report on Form 10-K for fiscal year 2007. We also were unable to file our quarterly reports on Form 10-Q for our fiscal quarters ended January 31, 2008 and April 30, 2008 on a timely basis. We have implemented a number of additional and enhanced processes and controls to improve our internal control over financial reporting.

Although we have implemented improved controls and remedied these material weaknesses, these controls may not be sufficient to detect or prevent errors in financial reporting in future periods and will require continued enhancement to accommodate our rapid growth in operations both organically and from acquisitions.

* * *

Evaluation of Disclosure Controls and Procedures

Disclosure controls are procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, or the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified by the U.S. Securities and Exchange Commission. Based on management's evaluation (with the participation of our Chief Executive Officer (“CEO”) and Chief Financial Officer (“CFO”)), as of the end of the period covered by this report, our CEO and CFO have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)), are designed to and are effective to, provide reasonable assurance that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

* * *

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f) and 15d - 15(f) to provide reasonable assurance regarding the reliability of our financial reporting and consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

Management assessed our internal control over financial reporting as of October 31, 2011, the end of our fiscal year. Management based its assessment on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.

> Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

35. On March 5, 2012, the Company released its results for the first quarter of 2012. The press release stated in part:

> SAN JOSE, CA - March 5, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2012 ("Q1 FY12").
>
> Non-GAAP net revenues for Q1 FY12 were $425 million, compared to $416 million in the previous quarter and $284 million for the comparable period of fiscal 2011 ("Q1 FY11"), a 50% year-over-year increase. GAAP net revenues were $420 million for the latest quarter, $411 million for the prior quarter and $284 million for Q1 FY11.
>
> Non-GAAP gross margins were 43% for Q1 FY12, compared to 40% in the prior quarter and 41% in Q1 FY11. GAAP gross margins were 37% for the latest quarter, 31% for the prior quarter and 39% for Q1 FY11.
>
> Non-GAAP net income per diluted share for Q1 FY12 was $0.58, compared to $0.53 in the prior quarter and $0.43 for Q1 FY11, a 35% year-over-year increase. GAAP net income per diluted share for the latest quarter was a $0.03 loss, compared to $1.84 income in the prior quarter and $0.35 income in Q1 FY11.
>
> "We are delighted with our strong start to fiscal year 2012. We reported record revenues and non-GAAP EPS, the highest non-GAAP operating margin in over five years and continued double-digit organic growth," said Douglas G. Bergeron, Chief Executive Officer. "The Point business is performing ahead of plan. Their 'payment-as-a-service' model is positioned to serve as the new North American paradigm for quickly deploying and maintaining advanced EMV software and mobile wallet software updates for Visa, Isis, Google, PayPal and others."
>
> * * *
>
> ***Guidance for Second Quarter 2012 and Full Fiscal Year***
>
> VeriFone has updated its guidance. For the second fiscal quarter ending April 30, 2012, VeriFone expects to report non-GAAP net revenues in the range of $465 million to $470 million. Non-GAAP net income per diluted share is projected to range from $0.59 to $0.60. For the full year of fiscal 2012, VeriFone expects to

> report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

36. On April 30, 2012, Deutsche Bank released an analyst report on VeriFone. The report alleged, among other things, that the Company was inflating its organic growth through acquisitions. According to the report, VeriFone had been booking sales to the legacy customers of its acquisitions, Hypercom, as "organic growth" when in reality those sales had already be accounted for to the Company's benefit. Due to this accounting chicanery, Deutsche Bank estimated that the Company's actual rate of organic growth was negative .1% since the previous year and would likely only be 4-6% in the coming year. Citing this accounting issue and overstated growth, Deutsche Bank cut its rating on VeriFone stock to sell.

37. Also on April 30, 2012, VeriFone issued a press release reaffirming its previously released guidance and refuting the Deutsche Bank report. The press release stated in part:

> VeriFone Reaffirms Organic Growth Estimates
>
> SAN JOSE, Calif.--(BUSINESS WIRE) -- Apr. 30, 2012 -- VeriFone Systems, Inc. (NYSE: PAY), issued the following statement regarding a report on organic growth calculations that was disseminated this morning from Deutsche Bank.
>
> VeriFone uses a methodology of calculating organic growth prescribed by the vast majority of investors and Wall Street analysts: excluding revenue of all acquired companies, large and small, until 12 months after acquisition.
>
> Deutsche Bank is choosing to include in its calculation the revenue of acquired companies as if VeriFone had owned them for the entire current and year-ago period. We believe this does not reflect the true organic results of VeriFone's business and we reaffirm our expectations for 10-15% organic growth rates for fiscal year 2012 and long-term.

38. On May 17, 2012, the Company filed its definitive proxy statement on Schedule 14A with the SEC in contemplation of the VeriFone Annual Meeting of Stockholders, to be held on June 27, 2012. The proxy statement incorporated by reference, all of the Company's public filings over the previous year. In soliciting votes for the Board's director nominees, the proxy statement disclosed that bonus compensation for VeriFone's named executives was derived in part from the Company's financial achievement during the previous year as derived from its publicly

filed financial statements. In reliance in part on the Company's reported results, defendant Bergeron received over $14 million in total compensation during the year ended October 31, 2011. The proxy also statement stated the following in part:

> REPORT OF THE CORPORATE GOVERNANCE AND NOMINATING COMMITTEE
>
> The primary purposes of the Corporate Governance and Nominating Committee are to (i) identify individuals qualified to become members of the Board of Directors, (ii) develop and recommend to the Board standards to be applied in making determinations as to the absence of material relationships between VeriFone and a director, (iii) develop and recommend to the Board a set of corporate governance principles and (iv) assist management in the preparation of disclosure in this Proxy Statement regarding the operations of the Corporate Governance and Nominating Committee.
>
> The Board has determined, upon the recommendation of the Corporate Governance and Nominating Committee, that Mr. Alspaugh, Dr. Denend, Mr. Hart, Mr. Henske, Mr. McGinn, Mr. Raff, Mr. Rinehart, and Mr. Stiefler were "independent" within the meaning of the rules of the NYSE and the SEC. The Corporate Governance and Nominating Committee currently consists of Mr. Alspaugh, Mr. McGinn and Mr. Raff, as well as Mr. Hart, as chairman. The Board has determined that each member of the Committee is "independent" within the meaning of the rules of the NYSE and the SEC.
>
> On an ongoing basis during fiscal 2011, the Corporate Governance and Nominating Committee evaluated potential candidates for positions on the Board and its committees, in each case in accordance with the criteria set forth in VeriFone's Corporate Governance Guidelines. The Corporate Governance and Nominating Committee approved and recommended to the Board of Directors the eight director nominees currently standing for election at the Annual Meeting.
>
> Over the course of fiscal 2011, the Corporate Governance and Nominating Committee reviewed with management both the long-term and emergency succession plans for the Chief Executive Officer and other key employees.
>
> As part of its duties, in September 2011, the Corporate Governance and Nominating Committee reviewed the Committee's charter and VeriFone's Corporate Governance Guidelines to determine whether any changes to the charter or the guidelines were deemed necessary or desirable by the Committee. After completing this review, the Committee recommended to the Board that no amendments to these documents needed to be made at that time. In March 2011, the Corporate Governance and Nominating Committee also completed its review of existing director compensation guidelines and recommended certain changes to the Board based on such review.

The Committee also conducted an evaluation of its own performance that included an evaluation of its performance compared with the requirements of the charter of the Committee. During fiscal 2011, the Corporate Governance and Nominating Committee performed all of its duties and responsibilities under the Corporate Governance and Nominating Committee Charter.

CORPORATE GOVERNANCE AND NOMINATING COMMITTEE

Alex W. (Pete) Hart, Chairman
Robert W. Alspaugh
Richard A. McGinn
Eitan Raff

REPORT OF THE AUDIT COMMITTEE

The purpose of the Audit Committee of VeriFone is to assist the Board of Directors in fulfilling its oversight responsibility to the stockholders, potential stockholders, the investment community, and others relating to: (i) the integrity of VeriFone's financial statements; (ii) VeriFone's compliance with legal and regulatory requirements; (iii) VeriFone's independent registered public accounting firm's qualifications and independence; (iv) the performance of VeriFone's internal audit function and independent registered public accounting firm; (v) the retention of VeriFone's independent registered public accounting firm; and (vi) the preparation of this report.

The Board of Directors has determined, upon the recommendation of the Corporate Governance and Nominating Committee, that each member of the Audit Committee is "independent" within the meaning of the rules of the NYSE and the SEC. The Audit Committee currently consists of Mr. Alspaugh, Dr. Denend, Mr. Rinehart and Mr. Stiefler, as well as Mr. Henske, as chairman. The Board of Directors has designated each of Mr. Henske and Mr. Alspaugh as an "Audit Committee financial expert" within the meaning of applicable SEC rules.
As set forth in the Audit Committee charter, management is responsible for the preparation, presentation, and integrity of VeriFone's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by VeriFone and for implementing and maintaining internal control over financial reporting. The independent registered public accounting firm is responsible for auditing VeriFone's financial statements and for reviewing VeriFone's unaudited interim financial statements.

In fulfilling their responsibilities, it is recognized that members of the Audit Committee are not full-time employees of VeriFone and are not, and do not represent themselves to be, performing the functions of auditors or accountants. As such, it is not the duty or responsibility of the Audit Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards. Members of the Audit Committee necessarily rely on the information provided to them by management and the independent registered public accounting firm. Accordingly, the Audit Committee's

> considerations and discussions referred to below do not assure that the audit of VeriFone's financial statements has been carried out in accordance with generally accepted accounting principles or that VeriFone's auditors are in fact "independent."
>
> In the performance of its oversight function, the Audit Committee has considered and discussed the audited financial statements with management and the independent registered public accounting firm. The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect. In addition, the Audit Committee has discussed with the independent registered public accounting firm the auditors' independence from VeriFone and its management, including the matters in the written disclosures and letter required by applicable requirements of the Public Company Accounting Oversight Board, a copy of which the Audit Committee has received. All non-audit services performed by the registered public accounting firm must be specifically pre-approved by the Audit Committee or a member thereof.
>
> In reliance on the reviews and discussions referred to above, and subject to the limitations on the role and responsibilities of the Audit Committee referred to above and in the Audit Committee charter, the Audit Committee recommended to the Board the inclusion of the audited financial statements in VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2011, as filed with the Securities and Exchange Commission.
>
> AUDIT COMMITTEE
>
> Robert B. Henske, Chairman
> Robert W. Alspaugh
> Leslie G. Denend
> Charles R. Rinehart
> Jeffrey E. Stiefler

39. On May 24, 2012, the Company released its results for the second quarter of 2012. Among other things, the press release stated:

> SAN JOSE, CA - May 24, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2012 ("Q2 FY12").
>
> Non-GAAP net revenues for Q2 FY12 were $479 million, compared to $425 million in the previous quarter and $293 million for the comparable period of fiscal 2011 ("Q2 FY11"), a 64% year-over-year increase. GAAP net revenues were $472 million for the latest quarter, $420 million for the prior quarter, and $292 million for Q2 FY11.

> In Q2 FY12, non-GAAP net revenues excluding revenues from businesses acquired in the past 12 months increased 15% from the year-ago quarter. Hypercom-brand non-GAAP net revenues increased $8 million sequentially to $81 million in Q2 FY12.
>
> Non-GAAP gross margins were 45% for Q2 FY12, compared to 43% in the prior quarter and 43% in Q2 FY11. GAAP gross margins were 41% for the latest quarter, 37% for the prior quarter and 42% for Q2 FY11.
>
> Non-GAAP net income per diluted share for Q2 FY12 was $0.64, compared to $0.58 in the prior quarter and $0.46 for Q2 FY11, a 39% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.13 income, compared to a $0.03 loss in the prior quarter and $0.27 income in Q2 FY11.
>
> "We are very pleased with our performance, particularly the acceleration in organic growth and the increase in Hypercom-brand sales," said Douglas G. Bergeron, Chief Executive Officer. "We remain confident in our outlook for the year. VeriFone is continuing to prove that widespread incumbency combined with market-leading innovation is a winning formula for the payments marketplace."
>
> * * *
>
> ***Guidance for Third Quarter 2012 and Full Fiscal Year***
>
> For the third fiscal quarter ending July 31, 2012, VeriFone expects to report non-GAAP net revenues in the range of $495 million to $500 million. Non-GAAP net income per diluted share is projected to range from $0.68 to $0.70. For the full year of fiscal 2012, VeriFone expects to report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

40. On September 5, 2012, the Company released its results for the third quarter of 2012. The press release stated the following in part:

> SAN JOSE, CA - September 5, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2012 ("Q3 FY12").
>
> Non-GAAP net income per diluted share for Q3 FY12 was $0.75, compared to $0.64 in the prior quarter and $0.49 for the three months ended July 31, 2011 ("Q3 FY11"), a 53% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.34, compared to $0.03 in the prior quarter and $0.28 in Q3 FY11.
>
> Non-GAAP net revenues for Q3 FY12 were $493 million, compared to $479 million in the previous quarter and $317 million for Q3 FY11, a 56% year-over-year increase. GAAP net revenues were $489 million for the latest quarter, $472 million for the prior quarter and $317 million for Q3 FY11.

> In Q3 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 16% from the year-ago quarter and 21% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 9% both unadjusted and at constant currency, while international Organic non-GAAP net revenues grew 21% from the year-ago quarter and 28% at constant currency.
>
> Non-GAAP gross margins were 45% for Q3 FY12, compared to 45% in the prior quarter and 43% in Q3 FY11. GAAP gross margins were 42% for the latest quarter, 41% for the prior quarter and 42% for Q3 FY11.
>
> Net cash provided by operating activities was $82 million in Q3 FY12 as the total cash balance grew by $49 million in the quarter.
>
> "We are very proud of our performance in Q3. Despite continued volatility around exchange rates, our business remains vibrant in all geographies," said Douglas G. Bergeron, Chief Executive Officer. "In the U.S., growth accelerated as we saw the beginnings of the adoption of EMV-based systems and the first significant payments services deals in the quarter. We are excited about our prospects for 2013 and beyond."
>
> * * *
>
> ***Guidance for Fourth Quarter 2012, Fiscal Year 2012 and Fiscal Year 2013***
>
> For the fourth fiscal quarter ending October 31, 2012 ("Q4 FY12"), Latin America non-GAAP net revenues, which are reported separately, are expected in the range of $65 million to $75 million, approximately $25 million less than the run rate of recent quarters due to isolated events, and are expected to rebound to $90 million to $95 million in the first quarter of fiscal 2013.
>
> VeriFone expects to report total non-GAAP net revenues for Q4 FY12 in the range of $495 million to $500 million and non-GAAP net income per diluted share in the range of $0.75 to $0.77. Such numbers imply full fiscal year 2012 non-GAAP net revenues of $1.893 billion to $1.898 billion and non-GAAP net income per diluted share of $2.73 to $2.75.
>
> The company expects FY13 non-GAAP revenue of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share of $3.25 to $3.30.

41. On December 13, 2012, the Company released its results for the fourth quarter and full year of 2012. The press release stated in relevant part:

> SAN JOSE, CA - December 13, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ("Q4 FY12") and fiscal year ended October 31, 2012.

Non-GAAP net income per diluted share for Q4 FY12 was $0.76, compared to $0.75 in the prior quarter and $0.53 for the three months ended October 31, 2011 ("Q4 FY11"), a 43% year-over-year increase. Non-GAAP net income per diluted share for the full year ended October 31, 2012 ("FY12") was $2.74, a 43% year-over-year increase over the $1.92 figure for the full year ended October 31, 2011 ("FY11"). GAAP net income per diluted share for the latest quarter was $0.24, compared to $0.34 in the prior quarter and $1.84 in Q4 FY11. GAAP net income per diluted share was $0.59 for FY12 and $2.92 for FY11.

Non-GAAP net revenues for Q4 FY12 were $489 million, compared to $493 million in the previous quarter and $416 million for Q4 FY11, an 18% year-over-year increase. Non-GAAP net revenues for FY12 were $1.886 billion, a 44% increase over the $1.310 billion result for FY11. GAAP net revenues were $485 million for the latest quarter, $489 million for the prior quarter and $411 million for Q4 FY11. For FY12, GAAP net revenues totaled $1.866 billion, a 43% increase over the $1.304 billion total for FY11.

In Q4 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 4% from the year-ago quarter and 8% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 22% both unadjusted and at constant currency, while international Organic non-GAAP net revenues declined 3% from the year-ago quarter but increased 2% at constant currency. Organic non-GAAP net revenues increased 11% in FY12 compared to FY11 and 14% at constant currency. For FY12, North America Organic non-GAAP net revenues grew 4% from FY11 both unadjusted and at constant currency, while international Organic non-GAAP net revenues grew 15% from FY11 and 20% at constant currency.

Non-GAAP gross margins were 44% for Q4 FY12, compared to 45% in the prior quarter and 40% in Q4 FY11. Non-GAAP gross margins were 44% for FY12 and 42% for FY11. GAAP gross margins were 41% for the latest quarter, 42% for the prior quarter and 31% for Q4 FY11. GAAP gross margins were 41% for FY12, compared to 38% for FY11.

* * *

***Guidance for First Quarter 2013 and Fiscal Year 2013***

For the first fiscal quarter ending January 31, 2013, VeriFone expects to report total non-GAAP net revenues in the range of $490 million to $500 million and non-GAAP net income per diluted share in the range of $0.70 to $0.73.

For the full year of fiscal 2013, the company continues to expect to report total non-GAAP net revenues in the range of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share in the range of $3.25 to $3.30. Free cash flow, defined as cash flow from operations as presented under GAAP less capital expenditures, is

expected in the range of $285 million to $315 million.

42. On December 19, 2012, the Company filed its Form 10-K with the SEC for the fiscal year ended October 31, 2012. The Form 10-K was signed by Director Defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler, as well as defendants Bergeron and Dykes. Among other things, the Form 10-K disclosed:

> In certain prior periods we reported material weaknesses in our internal control over financial reporting, which we have remedied. See Item 9A. Controls and Procedures in our Annual Report on Form 10-K for the fiscal year ended October 31, 2010. These material weaknesses in our internal control over financial reporting contributed to our need to restate previously reported interim financial information for each of the first three quarters of our fiscal year ended October 31, 2007, and to the delays in the filing of our Annual Report on Form 10-K for fiscal year 2007. We also were unable to file our quarterly reports on Form 10-Q for our fiscal quarters ended January 31, 2008 and April 30, 2008 on a timely basis. We have implemented a number of additional and enhanced processes and controls to improve our internal control over financial reporting.
>
> Although we have implemented improved controls and remedied these material weaknesses, these controls may not be sufficient to detect or prevent errors in financial reporting in future periods and will require continued enhancement to accommodate our rapid growth in operations both organically and from acquisitions. We have devoted additional resources to our financial control and reporting requirements, including hiring additional qualified employees in these areas. We may hire additional employees and may also engage additional consultants in these and other key areas. Competition for qualified financial control and accounting professionals in the geographic areas in which we operate is intense and there can be no assurance that we will be able to hire and retain these individuals.
>
> * * *
>
> Evaluation of Disclosure Controls and Procedures
>
> Disclosure controls are procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, or the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified by the U.S. Securities and Exchange Commission. Based on management's evaluation (with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO")), as of the end of the period covered by this report, our CEO and CFO have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act)), are designed to and are effective to, provide reasonable assurance that information required to be disclosed by us in reports that we file or submit

> under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and is accumulated and communicated to management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.
>
> * * *
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f) and 15d - 15(f) to provide reasonable assurance regarding the reliability of our financial reporting and consolidated financial statements for external purposes in accordance with U.S. generally accepted accounting principles.
>
> Management assessed our internal control over financial reporting as of October 31, 2012, the end of our fiscal year. Management based its assessment on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.
>
> Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

43. Then, on February 4, 2013, the Company announced that defendant Dykes, the Company’s Executive Vice President and Chief Financial Officer (“CFO”) since September 2008, and defendant Waller, were retiring.

44. On this news, Company stock lost approximately 2.5% of its value to close at $34.37 on February 4, 2013.

45. On February 20, 2013, the Company issued a press release announcing its preliminary results for the first quarter of 2013. The press release stated in part:

> SAN JOSE, CA, February 20, 2013 - VeriFone Systems, Inc. (NYSE: PAY) today announced certain preliminary financial results for its first quarter ended January 31, 2013.
>
> VeriFone expects to report Q1 non-GAAP net revenues in the range of $425 million

to $430 million and Q1 GAAP net revenues in the range of $424 million to $428 million. VeriFone expects to report non-GAAP net income per share between $0.47 and $0.50 and GAAP net income per share between $0.07 and $0.10.

The lower than expected results for the first quarter were driven primarily by:

- Continued weak macro-economic conditions in Europe;
- Increased focus and investments throughout 2012 on longer-term service initiatives in multiple jurisdictions at the expense of near-term hardware and software features and customization projects that were reduced or delayed, which resulted in missed revenue opportunities;
- An increase in deferred revenue related to volume shipments made during the quarter to a new mix of customers in the Middle East and Africa. These shipments did not meet first quarter revenue recognition requirements;
- Lower than anticipated revenue from large Brazilian customers, as well as political and economic uncertainty in Venezuela, typically a strong market for VeriFone; and
- Several customers electing to delay major projects beyond the first quarter, as well as the cancelled Washington, D.C. taxi project.

"During the first quarter we faced a number of external headwinds and internal challenges, which impacted our results," said Douglas G. Bergeron, Chief Executive Officer. "While we are disappointed with our performance and execution, we have a firm grasp on the challenges we faced and are taking aggressive steps to strengthen our competitiveness over the long-term. Although the focus on our services efforts impacted some local software and hardware modifications that were required to be competitive, our product platform and architecture are consistently recognized by the industry as being best-in-class. We are confident in our ability and committed to executing against our strategic priorities to drive shareholder value."

The company is executing steps to address the current challenges, including:

- Conducting a comprehensive review of VeriFone's strategic operating plan to ensure near-term product priorities are provided for, even as the company continues to increase its services offerings.
- Increasing management focus and R&D investment on product development and certifications to accelerate the release of in-demand products throughout fiscal 2013; and
- Driving cost efficiencies, including streamlining and better integrating recently completed acquisitions.

"Our industry remains vibrant and offers tremendous opportunity for growth especially around complexity at the point of sale and EMV mandates," continued Bergeron. "We expect EMV to expand the total addressable market in the U.S., and major industry trends such as growth in retail mobility and the increased need for more sophisticated security systems to create additional opportunities for our industry. As the trusted and innovative partner of merchants worldwide, VeriFone is uniquely positioned to capitalize on these trends."

> Bergeron said, "Over the last few years, we have built a portfolio of services, which have gained considerable traction in the market. We are confident this progress will allow us to derive higher overall revenue and margins, develop deeper relationships with our customers and drive more predictable financial results. For example, our Point payments-as-a-service business has enjoyed early success, and we are exporting the model to new regions including Australia, New Zealand, continental Europe and the U.S."
>
> Bergeron concluded, "We are encouraged by the performance of our North America region and payments-as-a-service offerings in the existing Point markets, which both saw quarterly net revenue grow by double-digit percentage points year-over-year. We remain optimistic about our business prospects with upcoming growth drivers such as the U.S. EMV mandate, and we continue to build on our taxi, gas pump and national retailer customer base. We are moving forward and remain committed to expanding our payments-as-a-service business, while continuing to accelerate our product development and certifications. Based upon this, we expect to resume year-over-year net revenue growth in the mid- to high-single digits beginning in fiscal 2014."
>
> The company's updated outlook for the second quarter includes:
>
> - Non-GAAP net revenues in the range of $435 million to $450 million;
>   - Non-GAAP net income per share in the range of $0.45 to $0.50;
>   - The company expects that non-GAAP net revenues and non-GAAP net income per share will grow sequentially in the third and fourth quarters of fiscal 2013.
>
> The company intends to provide updated full fiscal 2013 guidance when it reports financial results for the first quarter 2013 on March 5, 2013 after the market close.

46. The financial press and analysts immediately reacted to the results, and the purported explanation of them, with incredulity. On February 21, 2013, *Reuters* published an article titled "Verifone shares nearly halve, analysts query management," stating in part:

> VeriFone shares slid to $17.93, their lowest in nearly three years, and at least seven analysts cut their price targets on the stock. Deutsche Bank, in a client note, said the company had finally admitted it had failed to execute on its plans to move to a more subscription-based service model.
>
> Several analysts suggested that VeriFone's new chief financial officer had taken a more conservative accounting approach at the company, which already faces a court case for a past accusation of reckless accounting.
>
> The company will likely be sold, SunTrust Robinson Humphrey analyst Andrew Jeffrey wrote in a note, cutting his rating on the stock to "neutral" from "buy".

"Management credibility has been lost," he said. "Market share losses are deeper and more persistent than we had previously believed."

"We believe VeriFone will be acquired before it completes its business model transition."

Deutsche Bank analyst Bryan Keane said he could not suggest who might be interested in buying the company. "...We still think the valuation is expensive, when you look at the free cash flow the company generates," he told Reuters.

VeriFone, based in San Jose, California, sells payments equipment to shops and restaurants. The company is seeking to move more to a service model for its systems, rather than straight equipment sales.

The company might have been aggressively shifting to services from hardware sales and the management took its eye off the ball in terms of product evolution, allowing rival Ingenico SA (INGC.PA) to take market share, analysts said.

Equipment and related software sales brought in $1.34 billion, or 71.8 percent of total revenue, in the year ended October 31. Services revenue doubled to $527 million from a year earlier.

VeriFone largely attributed its lower-than-expected first quarter estimates to weakness in Europe, lower-than-expected revenue from large customers in Brazil, delayed customer spending on major projects, and the cancellation of a Washington, D.C. taxi project.

Deutsche, which rates the stock a "sell", slashed its price target to $15 from $27. The brokerage said past acquisitions had masked what was happening at the company and that it had long been wary of its "aggressive accounting recognition."

"The recent CFO retirement/resignation and the first-quarter revenue recognition requirements could also suggest accounting red flags in prior quarters," Deutsche said, noting the latest quarter's accounts had been signed off by the new CFO.

A U.S. appeals court revived a proposed securities class action against VeriFone in December over its 2007 restatement of results, ruling that the lawsuit properly alleged that VeriFone Chief Executive Douglas Bergeron was "reckless" as to the truth of financial reports.

"I think Douglas Bergeron is well embedded in that company, and it'll take a few more blowups before the board will kick him out," Deutsche's Keane said. "I don't think he's going anywhere anytime soon."

FALL FROM GRACE

Until the latest quarter, VeriFone had met or beaten analysts' quarterly estimates

> for two years.
>
> Analysts on Thursday rejected the company's argument that its problems came from the weak economy. While macro conditions may have had an impact on business in the quarter, the global economy has had far less of an impact on peers such as NCR Corp (NCR.N) and Micros Systems (MCRS.O), said Wedbush analyst Gil Luria, who cut his price target to $22 from $33.
>
> Citi Research analyst Philip Stiller cut his rating on the stock to "neutral" from "buy" and price target to $23 from $47.
>
> "(VeriFone) has a long uphill battle to rebuild trust and belief in the company on top of ongoing execution issues in a rapidly changing payments landscape," he said in a note.
>
> VeriFone warned late on Wednesday that it expected its first quarter adjusted earnings to be 47 to 50 cents per share on revenue of $424 million to $428 million. That is well short of the average analyst profit forecast of 73 cents per share on revenue of $492 million.
>
> The company forecast an adjusted profit of 45 to 50 cents per share in the current quarter, well below the average analyst forecast of 80 cents, according to Thomson Reuters I/B/E/S.
>
> One of the company's biggest problems was the cancellation of the Washington, D.C. contract. VeriFone announced last year that it won a $35 million-plus contract to install and support payment systems in 6,500 taxis in the capital.

47. On February 22, 2013, *Seeking Alpha* published an article titled "VeriFone Now a Falling Knife," stating in part:

> VeriFone management seems to appreciate that results like these require some explanation, but I'm not entirely sure I accept the reasons they've offered.
>
> Management mentioned weak conditions in Europe. Fair enough - we all know that conditions in Europe are pretty tough. Buy why, then, is Europe-based Ingenico not seeing the same trouble?
>
> VeriFone management also talked about a new accounting policy regarding revenue recognition that meant revenue from new distributors in the Mideast and Africa was not recognized this quarter. With a new CFO on board that, too, is a credible explanation. Unfortunately, it also feeds into one of the more persistent bear stories about VeriFone – that the company has been a little too aggressive with its accounting in the past (including its calculation of organic growth). If management was overstating past revenue growth, that could explain why the business has seemingly hit such a hard wall now.

> Other, more routine, business issues also factored into the miss. The Company saw its Washington D.C. taxi project go up in smoke, and revenue from Brazil was weaker than expected.
>
> Last and not least were management's acknowledgments of operational errors. In particular, it sounds like the company made some meaningful mistakes on system upgrades with customers. At the same time, the company appeared to drop the ball on the hardware side of the business, losing share to Ingenico in the process.
>
> **How Deep Do The Problems Go?**
>
> Although management has been pretty confident in its dealings with the Street in recent quarters, I think the company may have more challenges than it wishes to acknowledge. In particular, I think competition from Square in the small business arena and Ingenico in the large business market is hurting VeriFone more than it wants to acknowledge.
>
> At the same time, a couple of large recent acquisitions haven't really added a lot of value. Not only has the company not seen a major pick up in revenue (which really wasn't the expectation at this point in the process), but it looks like the process of integrating the deals and realizing synergies has not gone as well as hoped. Here again, then, we have a direct potential issue with management's ability to execute and operate.
>
> I have to say that I am worried on the execution angle. VeriFone terminals are everywhere (roughly two-thirds share of U.S. customer-facing terminals), so I just don't understand why Square and Intuit were able to get a tablet/smartphone device into the market ahead of them. What's more, in talking to merchants who use Square I have yet to meet one that isn't very happy with the system, and many don't have any interest in going back to VeriFone. Said differently, it seems to me that Square and Intuit asked merchants what they wanted and acted accordingly, while VeriFone may be operating on the assumption that the market will follow where they lead.
>
> If these operational missteps are in fact real, that doesn't bode well for the future. NCR and Micros are both looking to capture more and more of markets like fraud prevention by building them into the cash registers/payment terminals. Likewise, NCR and Micros have shown themselves to be pretty good operators, and that raises the question of how VeriFone will fare when mobile payments become commonplace - particularly if the near field communications approach of companies like Broadcom take off and become commonplace in mobile devices. Likewise, the company has to be careful in mobile not to alienate the independent sales organizations (ISOs) that it works with.

48. On March 11, 2013, the Company filed its Form 10-Q for the first quarter of fiscal 2013 with the SEC. In the 10-Q, the Company further elaborated on the nature of its business in

the Middle East and additional wrongdoing it had committed in that region when it acknowledged that it had conducted illegal business dealings with customers in Iran, in violation of U.S. law:

> Disclosures of Iranian Activities under Section 13(r) of the Securities Exchange Act of 1934
>
> Section 219 of the Iran Threat Reduction and Syria Human Rights Act of 2012 added Section 13(r) to the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Section 13(r) requires us to disclose in our annual or quarterly reports, commencing with the current reporting period (November 1, 2012 to January 31, 2013), whether we or any of our affiliates knowingly engaged in specified activities relating to Iran during the reporting period covered by the annual or quarterly report. Disclosure is required even where the activities, transactions or dealings are conducted outside the U.S. by non-U.S. affiliates.
>
> During the disclosure period, certain employees of non-U.S. VeriFone subsidiaries provided technical support services to a third-party distributor based in Dubai, U.A.E., with reason to know that the services would assist the distributor in reselling certain VeriFone point of sale ("POS") terminals out of its inventory to two Iranian entities, Bank Melli and Bank Mellat. Both of these banks are identified in Section 13(r)(1)(D) as entities with which transactions and dealings are subject to disclosure. These services related to sales to the Dubai-based third-party distributor from two non-U.S. VeriFone subsidiaries in the prior fiscal year, and net revenues from these sales were recognized in the prior fiscal year. No sales were made to this distributor during the current reporting period. This third-party distributor is not listed on any U.S. sanctions lists and is not, to our knowledge, an Iranian government-owned entity or otherwise acting on behalf of the Government of Iran. These activities by employees of our non-U.S. subsidiaries were conducted in contravention of VeriFone's export control and sanctions policies, which prohibit VeriFone and its affiliates from conducting any activities, transactions or dealings with Iran or Iranian counterparties.
>
> The non-U.S. VeriFone subsidiaries did not charge the third-party distributor any fees for the technical support services provided by its employees. Accordingly, we recognized no net revenues or profit from this activity. VeriFone does not intend to continue this activity or to knowingly permit any activities with Iran or Iranian counterparties. In connection with our discovery of the above-described activities, we have terminated all business activities with this distributor because such activities constitute breaches of our contractual terms with such distributor (although one of the non-U.S. VeriFone subsidiaries has engaged and may continue to engage in efforts to collect and receive amounts due from the distributor with respect to the fiscal year 2012 sales). We have also adopted a number of additional compliance measures and controls designed to prevent such activity from recurring.
>
> Separately, we identified six POS terminals that were being leased to the Iranian embassy in Sweden by a Swedish subsidiary of Point, and two POS terminals that were being leased to the Iranian Embassy in Norway by Point's Norwegian

> subsidiary. We acquired Point, a former distributor of our system solutions, in December 2011. All of these leases had been in place prior to VeriFone's acquisition of Point. Of these leased terminals, one terminal is a VeriFone-branded terminal and is of U.S. origin. This VeriFone terminal was leased by the Point Swedish subsidiary in 2010 in apparent contravention of the distribution agreement we had in place with Point at the time which, among other provisions, prohibited distribution of our terminals in contravention of applicable U.S. export control laws. As part of these leases these Point subsidiaries also provided ancillary software, customer support services and supplies, such as paper rolls, for the leased terminals. Between November 1, 2012 and January 31, 2013, we recognized approximately $1,730 in total net revenues from these activities. We are unable to calculate net profits allocable to individual leases, but the net profits related to these leases would be at an amount less than the net revenues. These two Point subsidiaries have terminated their respective lease agreements with the Iranian embassies and, as a result, no longer provide any products or services to the Iranian embassies in Sweden and Norway, nor do we intend to do so in the future.
>
> We have made voluntary disclosure of these matters to OFAC and intend to cooperate fully with OFAC.

49. On March 11, 2013, *Reuters* published an article titled "VeriFone says CEO to step down," reporting in part:

> (Reuters) - VeriFone Systems Inc (PAY.N), a maker of credit card swipe machines, said Chief Executive Douglas Bergeron will step down after more than a decade at the company's helm.
>
> The company's shares rose 7 percent to $21.90 in extended trading after closing at $20.46 on the New York Stock Exchange on Monday.
>
> The departure comes just weeks after the company slashed its profit outlook that prompted several analysts to question the company's management.
>
> "We do not believe his departure was amicable or voluntary," UBS Investment Research analyst John Williams wrote in a note to clients.
>
> A U.S. appeals court revived a proposed securities class action against VeriFone in December that alleged CEO Bergeron was "reckless" in the accounting of its financial reports.
>
> VeriFone last month appointed Marc Rothman chief financial officer after Robert Dykes retired.
>
> Analysts see Rothman's appointment as a big positive for the company. "The addition of CFO Rothman will prove to be a major step forward for VeriFone, and we believe this change at the top will be similarly regarded," Williams added.

## DAMAGES TO THE COMPANY

50. VeriFone has been, and will continue to be, severely damaged and injured by defendants' misconduct. As a direct and proximate result of the defendants' conduct, VeriFone has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

b. substantial loss of market capital;

c. costs already occurred defending against the pending securities class actions, and potential liability therefrom; and

d. any fines that are a result of the Company's violations of the federal securities laws.

51. In addition, VeriFone's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company has still not completed litigation claims related to the massive accounting fraud that occurred during 2007. Now it appears to the investing public that the Company has yet again engaged in systematic use of misleading accounting. The credibility and motives of management are now in serious doubt.

52. The actions complained of herein have irreparably damaged VeriFone's corporate image and goodwill. For at least the foreseeable future, VeriFone will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that VeriFone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

53. A pre-suit demand on the VeriFone Board is futile, and therefore, excused. This is because despite knowing that the Company had been embroiled in a major accounting scandal in 2007 and 2008, having signed Forms 10-K for the intervening years acknowledging that the Company had a history of deficient internal controls, seeing the Company's accounting controls publicly questioned again during 2012, and knowing that a lack of controls over accounting would cause the Company substantial harm, the Director Defendants breached their fiduciary duties by

permitting VeriFone function without such controls. In so doing, the Director Defendants exposed the Company to severe damage and injury. Consequently, the Director Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

54. The current Board of VeriFone consists of the following eight individuals: McGinn, Alspaugh, Denend, Hart, Henske, Millard, Raff, and Stiefler. These defendants have failed to exercise reasonably appropriate oversight over the internal controls for accounting and disclosure.

55. Defendant McGinn is primarily employed as the interim CEO of VeriFone. As such, he derives his primary source of income from his employment at the Company and his professional reputation is inextricably bound to his role at VeriFone. McGinn served as a member of the Company's Corporate Governance and Nominating Committee for years until approximately the end of June 2012. As a result, McGinn was a member of the Board committee specifically charged with the identification of suitable nominees to stand for election as directors of the Company, identifying directors for committee assignments, establishing procedures for the oversight of the evaluation of the Board and management, developing and recommending the Company's corporate governance principles. In permitting defendants to remain at the Company, and on the Audit Committee in particular, while they were failing to fulfill their duties, McGinn breached his duties as a member of the Corporate Governance and Nominating Committee. McGinn was a member of this committee at times when the Company's then-CEO and CFO were presiding over a false accounting and disclosure regime. McGinn was also a member of the Corporate Governance and Accounting Committee when Deutsche Bank published the April 30, 2012 analyst report and the Company issued its response. Thus, McGinn was undeniably aware that the officers and directors his committee continued to recommend for roles in oversight were presiding over an unreliable accounting and disclosure regime with a lack of adequate internal controls. As evidenced by the fact that certain directors who breached their duties continue to serve on the Board, and that the Company has still not come clean about the extent of accounting wrongdoing during 2012 and prior, McGinn has failed to take effective action to institute

functioning controls over the Company that he is charged with running. Due to defendant McGinn's inaction in the face of obvious risks and the substantial likelihood of his liability in connection with breaches of fiduciary duties, demand on defendant McGinn is futile.

56. Defendant Denend is the interim Chairman of the Board and a member of the Audit Committee. Denend has served on the Board since 2005 and was a member of the Audit Committee during 2012. Nonethless, since his election on the Board, up to and including 2012, Denend permitted the Company to function without effective accounting and disclosure controls even though he was undeniably aware of the widespread failures of internal controls during his tenure on the committee. As a result, defendant Denend faces a substantial likelihood of liability in connection with his breaches of fiduciary duties and is not disinterested and independent. Thus, demand on defendant Denened is excused.

57. Defendants Alspaugh, Denend, Henske, and Stiefler are members of the Audit Committee. Among other things, the Audit Committee of the Board is responsible for oversight responsibility relating to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; and (iii) the performance of the Company's internal audit function. All four were members of the Audit Committee during 2012, and in particular on April 30, 2012. Denend and Henske have been members of the Audit Committee since the Company went public in 2005, and have presided over not only the 2012 issues, but the serious and widespread accounting fraud in 2007 and 2008. Nonetheless, the Audit Committee failed to institute sufficient processes for managing the business and financial risks created by the failure to institute functioning controls over accounting and disclosure. By such actions, defendants Alspaugh, Denend, Henske, and Stiefler breached their duties by failing to sufficiently monitor the Company's business and financial risks. As a result of these defendants' breach of their duties, any demand upon them is futile.

58. The Corporate Governance and Nominating Committee is currently comprised of defendants Alspaugh, Hart, and Raff. According to its charter, the Corporate Governance and Nominating Committee of the Board is responsible for identifying and recommending new directors and new committee members, establishing procedures to exercise oversight of the

evaluation of the Board and management, preparing and issuing performance evaluations of Board members, and developing and recommending corporate governance principles applicable to the entire Company. Nonetheless, the Corporate Governance and Nominating Committee failed to recommend suitable candidates for membership to the Audit Committee and as officers to oversee the Company's accounting and disclosure controls, failed to establish sufficient procedures to oversee the actions of the Board and management, and failed to sufficiently evaluate the performance of the Board. By such actions, defendants Alspaugh, Hart, and Raff breached their fiduciary duties by allowing such inadequate corporate governance controls and procedures that the VeriFone Board has now presided over multiple accounting scandals in the eight short years since it went public. Thus, demand on defendants Alspaugh, Hart, and Raff is futile.

59. The Director Defendants have failed to take action against those who are responsible for permitting VeriFone to function without effective accounting controls since its very inception as a public company, including themselves. No legal action has been taken against defendant Bergeron or defendant Dykes. While the Director Defendants have permitted defendant Bergeron to leave the Company without full and truthful disclosure of his role in wrongdoing at VeriFone, they have provided him with millions of dollars' in severance compensation. The Director Defendants have thus demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Moreover, the Director Defendants have thus far attempted to deny the serious accounting problems that occurred in the 2012, and have not sought to make corporate governance changes or hold necessary parties responsible. Because seven of the eight Director Defendants have served on the VeriFone board together since at least 2008, they have developed professional relationships, are friends and have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action. Thus, demand on the Board is futile and therefore excused.

60. As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and

their comrades to tens of millions of dollars in civil liability and/or sanctions. This they have refused to do thus far, and will not do in the future. A majority of the Director Defendants are exposed to potential liability for operating VeriFone without the internal controls over financial reporting that would have detected and prevented material weaknesses and inaccurate representations detailed herein. Thus, demand on the Director Defendants is futile, and therefore, excused.

61. Demand on the Director Defendants is futile because in the years following the the 2007 and 2008 accounting scandal, when faced with repeated opportunities to institute functioning financial controls at time when doing so would have been appropriate, the Board failed to do so. Moreover, at present the Board apparently has instituted no internal investigation and convened no committee of independent directors to assess the scale of deficiencies in accounting and disclosure controls or the harm to the company resulting from the 2012 accounting and disclosure problems. The Director Defendants were either aware of serious systematic problems in the Company's accounting and disclosure controls or were in complete dereliction of their duties as directors in not being aware. Nonetheless, the Director Defendants have not publicly disclosed any meaningful steps to reveal the full extent and implications of the lack of financial controls and the potential restatement of financial results. Even at present, with the Company facing hundreds of millions of dollars of potential liability in already filed securities class actions, the Director Defendants have not made an effort to conduct an exacting investigation to expose the true extent of the problems. As a result, demand is excused.

62. In light of the importance of accounting controls to VeriFone in light of the Company's historic unreliable accounting, demand on the Board is futile. The Director Defendants have shown a consistent and sustained unwillingness to take seriously the discharge of their fiduciary duties by instituting functioning accounting and disclosure controls as demonstrated by their inaction in the face of the following red flags:

a. On December 3, 2007, the Company announced that it would be required to make sweeping financial restatements during the 2007 fiscal year. Shortly thereafter, a number of securities class actions were filed, which were subsequently consolidated into

the 2007 Action. The 2007 Action alleges that beginning in 2006, while defendant Bergeron was CEO, insiders at the Company executed a deliberate and pervasive accounting fraud designed to inflate Company stock while the Bergeron and other insiders sold over $460 million. The Company was eventually forced to restate over $70 million fictitious income and $77 million fake inventory, millions in overstated gross margins, a 129% overstatement of operating income, and EPS overstatements of between 200% and 600% during multiple quarters in 2007. This accounting fraud was accompanied by countless fraudulent public statements and a subsequent attempt at a cover up. Dismissal of the securities plaintiffs' Third Amended Consolidated Class Action Complaint was recently reversed by the U.S. Court of Appeals for the Ninth Circuit and the case is currently pending.

b. During 2007 and 2008, as a result of the foregoing, the Company responded to inquiries and provided information and documents related to investigations by the SEC, the DOJ, the New York Stock Exchange, and the Chicago Board Options Exchange.

c. The Company has incurred more than $50 million in costs related to legal, accounting, and other professional services connected to the Company's internal review of the 2007 accounting fraud, including the modification of credit agreements due to the wrongdoing.

d. On September 1, 2009, while Director Defendants McGinn, Alspaugh, Denend, Hart, Henske, Raff, and Stiefler, were all members of the Board, the SEC charged VeriFone with "falsifying the company's accounting records which boosted gross margins and income reported to shareholders," and specifically named Bergeron as being complicit in the fraud.

e. In connection with 2007 accounting fraud, the Company has admitted to deficient internal controls over, among other things, accounting and disclosure that constituted a material weakness. The Company has also admitted to numerous violations of GAAP.

f. Each Form 10-K filed by the Company with the SEC since 2008 has

included an acknowledgement that the Company has, in the past, had deficient internal controls.

63. The VeriFone Board is dominated by directors that are specifically implicated in the wrongdoing: each member is either: (a) an officer; (b) a member of the audit committee; (c) signed misleading financial statements documents; and/or (d) has served on the Board since the very inception of the 2007 Action. As a result, the Board members cannot be expected to sue themselves.

64. VeriFone's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of VeriFone. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by VeriFone against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of VeriFone, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, if the suit is brought derivatively, as the action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I

## Breach of Fiduciary Duty

65. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

66. Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VeriFone's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

67. Defendants' conduct set forth herein was due to their intentional, reckless, or

negligent breach of the fiduciary duties they owed to the Company. Defendants intentionally or recklessly, breached or disregarded their fiduciary duties to protect the rights and interests of VeriFone.

68. In breach of their fiduciary duties owed to VeriFone, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee VeriFone's business, rendering them personally liable to the Company for breaching their fiduciary duties.

69. As a direct and proximate result of defendants' breaches of their fiduciary obligations, VeriFone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**

**Abuse of Control**

70. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence VeriFone, for which they are legally responsible.

72. As a direct and proximate result of defendants' abuse of control, VeriFone has sustained significant damages.

73. As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, VeriFone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

74. By reason of the foregoing, VeriFone has been damaged.

**COUNT III**

**AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

75. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on May 17, 2012, and possibly previous proxy statements, violated §14(a) and Rule 14a-9 because they included the materially false and misleading financial statements.

77. The proxy statement was false and misleading when issued because it failed to disclose (among other things) that the Company's controls over accounting and financial disclosure were deficient and contained financial statements that were false and misleading.

78. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

79. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting.

80. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statements.

81. By reason of the foregoing, VeriFone has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A. Declaring that plaintiff may maintain this action on behalf of VeriFone and that plaintiff is an adequate representative of the Company;

B. Declaring that the Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to VeriFone;

C. Determining and awarding to VeriFone the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D. Directing VeriFone and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VeriFone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of VeriFone to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E. Determining and awarding to VeriFone exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F. Awarding VeriFone restitution from defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: May 24, 2013

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (Cal. Bar No. 077785)
aplutzik@bramsonplutzik.com
Michael S. Strimling (Cal. Bar No. 96135)
mstrimling@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200

By: [signature]
Alan R. Plutzik

HARWOOD FEFFER LLP
Robert I. Harwood
Samuel K. Rosen
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
(212) 935-7400

LIFSHITZ LAW FIRM
Joshua M. Lifshitz
18 East 41st Street
New York, NY 10017
(212) 213-6222

Attorneys for Plaintiff

# VERIFICATION

I, Sofia Zoumboulakis, hereby declare as follows:

I am a shareholder of Verifone Systems, Inc. and have continuously so owned Verifone Systems, Inc. common stock during the relevant period. I have reviewed the foregoing Shareholder Derivative Complaint For Breach Of Fiduciary Duty And Abuse Of Control ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

I declare under penalty of perjury pursuant to the laws of this jurisdiction that the foregoing is true and correct and that this verification was executed at Markham, Ontario.

May 21 2013

Sofia Zoumboulakis