BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (Cal. Bar No. 077785)
aplutzik@bramsonplutzik.com
Michael S. Strimling (Cal. Bar No. 96135)
mstrimling@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200
Facsimile: (925) 945-8792

HARWOOD FEFFER LLP
Robert I. Harwood
Samuel K. Rosen
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
(212) 935-7400

LIFSHITZ LAW FIRM
Joshua M. Lifshitz
821 Franklin Avenue
Suite 209
Garden City, NY 11530
(516) 493-9780

Attorneys for Plaintiff
SOFIA ZOUMBOULAKIS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOFIA ZOUMBOULAKIS, Derivatively on Behalf of Nominal Defendant VERIFONE SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD A. MCGINN, ROBERT W. ALSPAUGH, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, WENDA HARRIS MILLARD, EITAN RAFF, JEFFREY E. STIEFLER, DOUGLAS G. BERGERON, ROBERT DYKES, and CHARLES R. RINEHART,<br><br>Defendant.<br><br>and<br><br>VERIFONE SYSTEMS, INC.,<br><br>Nominal Defendant, | Case No. 13-cv-2379-EJD<br><br>AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL. UNJUST ENRICHMENT AND VIOLATIONS OF CAL. CORP. CODE §§25402/25502.5<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Sofia Zoumboulakis ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant, VeriFone Systems, Inc. ("VeriFone" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, abuse of control, §14(a) of the Securities Exchange Act of 1934, unjust enrichment and violations of Cal. Corp. Code §§25402/25502.5.

## NATURE AND SUMMARY OF THE ACTION

1. Defendants are responsible for a series of misleading statements to shareholders regarding the Company's financial performance and future prospects. Defendants breached their fiduciary duties by repeatedly touting the Company's strong growth and purported positive financial outlook while withholding material negative information regarding adverse trends and deficient internal controls that were undermining the Company's financial performance and growth prospects.

2. VeriFone develops, sells, and services electronic payment processing technology. The Company primarily functions in two segments: Systems Solutions and Services. Since going public in 2005, VeriFone has been consistently plagued by serious internal control deficiencies. In 2009, the Company was formally charged by the Securities and Exchange Commission ("SEC") with a massive accounting fraud during 2007 and 2008 that resulted in large restatements of numerous of its financial metrics. The Company was also investigated by the U.S. Department of Justice ("DOJ"), the New York Stock Exchange, and others in connection with the same issues. Numerous securities class actions were filed against the Company and consolidated into one suit in the U.S. District Court for the Northern District of California, No. 3:07-cv-06140 (the "2007 Action"). In 2009, the Company resolved the SEC action by submitting to a permanent injunction against further violations of the federal securities laws, specifically in connection with internal controls and financial disclosure. The Company recently agreed to resolve the 2007 Action by paying over $90 million to the class.

3. During 2011 and 2012, VeriFone pursued a strategy of increasing the proportion of

its business devoted to the provision of services from 20% in 2011 to a projected 50% in 2015. The Company's strategy during this time also consisted of acquiring numerous smaller point-of-sale companies in order to increase its service offerings and expand its international presence. The constant stream of acquisitions made it very difficult for investors and analysts to determine from VeriFone's financial statements what portion of its growth was organic and what was due to the acquisitions.

4. Throughout 2011 and 2012, the Company's public statements and future guidance projected strong, consistent organic growth and stated that the recent acquisitions were performing ahead of plan and integrating seamlessly. Defendants repeatedly made statements such as: (a) in May 2012, "We will be 10% to 15% [growth] this year. We will be 10% to 15% [growth] next year"; (b) in September 2012, "this Company is still a mid-teens growth Company"; and (c) in December 2012, "We expect to see the fruits of our labor beginning in the second half of 2013 and a material positive impact on growth rates and margins in 2014" and "The foundations built in 2012 will drive continued outsized returns for our shareholders in 2013 and beyond." As a result, entering 2013, VeriFone's investors had been consistently told to expect strong expansion and organic growth, and had not been warned of serious enterprise risks facing the Company that made the projected growth uncertain.

5. Investors were shocked when, on February 20, 2013, the Company disclosed a major guidance miss for the first quarter of 2013, which it blamed on "external headwinds and internal challenges." Analysts and the financial press immediately questioned the legitimacy of VeriFone's accounting and the truthfulness of its public disclosures over the previous 15 months. However, Company representatives assured the public that although certain, previously undisclosed, negative trends were the cause of the guidance miss, "there's no long-term problem nor is there any long-term franchise impact here."

6. On February 4, 2013, the Company's Chief Financial Officer ("CFO"), defendant Robert Dykes ("Dykes") resigned. On March 11, 2013, little more than two weeks after disclosure of the first quarter 2013 guidance miss, the Company's long-time Chief Executive Officer ("CEO") defendant Douglas G. Bergeron ("Bergeron"), resigned.

7. After the departures of defendants Dykes and Bergeron, the true scale of the misleading disclosures was finally revealed over the next months: far from being a "double digit" growth Company, during the relevant time, VeriFone's reported annual net income per diluted share fell from $1.90 in 2011, to $0.25 in 2012, and ultimately to a *$2.73 net loss* per share in 2013. The Company's interim CEO, defendant Richard A. McGinn ("McGinn") eventually stated that the Company had been having a "poor track record of completing certification of products"[1] and that "things have to change." The extent of the certification problems had not been previously disclosed. McGinn also effectively acknowledged what investors and analysts suspected, that the Company's disclosures since the end of 2011 had omitted material information: "*Issues that we're dealing with have been in the making for quite a while and needed to be corrected*." During 2012, while the Company was projecting "double digit" growth, the existence of these problems was concealed.

8. Seven of the eight Director Defendants (defined herein) were members of the Board when the Company agreed to the permanent injunction in the SEC action in 2009, and all eight Director Defendants were on the Board when the Company settled the 2007 Action for over $90 million. As a result of these experiences, the Director Defendants were intimately acquainted with the harm that could befall the Company if its internal controls over disclosure and accounting again proved to be deficient. At all relevant times, the Director Defendants attended regular Board meetings during which they discussed core elements of the Company's business and enterprise risk, including, the performance of recent acquisitions, problems with product certifications or

---

[1] According to its most recent Form 10-K, VeriFone's:

> "products and solutions generally must be certified against applicable payment industry requirements and mandates. The continual evolution of industry security standards drives recertification and replacement of electronic payment systems. In addition to meeting the PCI standards, additional governmental regulations over payment card data security may apply and require separate local certifications in certain non-U.S. countries, such as Australia, China and Brazil. Certain other countries also have their own set of compliance and certification requirements for payment card data security, including Germany, the United Kingdom, and the Netherlands. Furthermore, in order for our products to be allowed to connect to payment networks, we must obtain certification of the relevant products and solutions with card associations, financial institutions, and payment processors and comply with local government and telecommunications regulations."

pipeline development, and organic growth and revenue. By their consent to the permanent injunction in the SEC action, the Director Defendants affirmatively represented that they would ensure that VeriFone's internal controls were adequate and that public disclosures and accounting were truthful and accurate. The Director Defendants thus knew; consciously disregarded; or were reckless or negligent in not knowing that the Company's: (a) public disclosures and financial statements were inaccurate and misleading; and (b) internal controls over accounting and financial disclosure were inadequate.

9. Defendants have permitted the Company to function without effective internal controls over financial reporting while simultaneously assuring the public that the Company's internal controls functioned properly. By their actions, defendants have breached their fiduciary duties and violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a09 promulgated thereunder, seriously harming VeriFone.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11. This Court additionally has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Canada, and each defendant is a citizen of the United States.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because VeriFone has a substantial presence in California and is headquartered in San Jose, California. Moreover, each defendant has had extensive contacts with California as a director and/or officer of VeriFone or otherwise, which makes the exercise of personal jurisdiction over them proper.

**THE PARTIES**

**A. Plaintiff**

13. Plaintiff is an owner and holder of VeriFone common stock and has been continuously at times relevant hereto.

**B. Defendants**

14. Nominal defendant VeriFone is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 2099 Gateway Place, San Jose, California. According to its public filings, VeriFone is a leading global provider of payment solutions that enable secure electronic payment transactions and other services at the point of sale. The Company's principal operating subsidiary, VeriFone, Inc., was incorporated in 1981, and shortly thereafter introduced the first ever check verification and credit authorization device used by merchants in a commercial setting.

15. Defendant McGinn has served as a director of VeriFone since 2008 and served as its interim CEO from March 2013 to October 1, 2013.

16. Defendant Robert W. Alspaugh ("Alspaugh") has served as a director of VeriFone since 2008. Alspaugh is a member of its Audit Committee and its Corporate Governance and Nominating Committee.

17. Defendant Leslie G. Denend ("Denend") has served as a director of VeriFone since 2005 and was named the interim Chairman of its Board in March 2013. Denend is the Chair of VeriFone's Compensation Committee and was a member of its Audit Committee at relevant times.

18. Defendant Alex W. Hart ("Hart") has served as a director of VeriFone since 2006. He is the Chair of its Corporate Governance and Nominating Committee.

19. Defendant Robert B. Henske ("Henske") has served as a director of VeriFone since 2005. Henske is Chair of its Audit Committee, is an Audit Committee financial expert, and is a member of VeriFone's Compensation Committee.

20. Defendant Wenda Harris Millard ("Millard") has served as a director of VeriFone since 2012. Millard is a member of its Compensation Committee.

21. Defendant Eitan Raff ("Raff") has served as a director of VeriFone since 2007.

Raff is a member of its Corporate Governance and Nominating Committee.

22. Defendant Jeffrey E. Stiefler ("Stiefler") has served as a director of VeriFone since 2008. Stiefler is a member of its Audit and Compensation Committees.

23. Defendant Bergeron is a former director and officer of the Company. Bergeron served as the Company's CEO and a director since the Company was formed in July 2002 until he abruptly resigned on March 12, 2013. Upon Bergeron's resignation, the Company agreed to pay him $1 million per year for a two-year period in his severance agreement and stated that his dismissal was without cause.

24. Defendant Dykes is a former officer of the Company. Dykes served as an Executive Vice President and the CFO since September 2008 until the Company announced he had resigned on February 4, 2013.

25. Defendant Charles R. Rinehart ("Rinehart") served as a director of VeriFone from May 2006 until June 27, 2012, and as non-executive Chairman from March 2008 until June 27, 2012. Defendant Rinehart also served as a member of the Audit Committee during the Relevant Period.

26. The defendants referenced in ¶¶ 15-22 shall be collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

27. By reason of their positions as officers, directors, and/or fiduciaries of VeriFone and because of their ability to control the business and corporate affairs of VeriFone, defendants owed VeriFone and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage VeriFone in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to VeriFone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of its affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28. Defendants, because of their positions of control and authority as directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with VeriFone, each defendant had knowledge of material non-public information regarding the Company.

29. To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP");

d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

30. According to the Charter of the Audit Committee, the Audit Committee members, Alpaugh, Henske, and Stiefler, and at certain times, Denend, were and are responsible for, among other things:

> Providing assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment community, and others relating to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) and the performance of the Company's internal audit function and independent auditors.

31. According to the Charter of the Corporate Governance and Nominating Committee,

the Corporate Governance and Nominating Committee members, defendants Alspaugh, Hart, McGinn, and Raff, were and are responsible for, among other things:

a. Identifying individuals believed to be qualified to become Board members, consistent with criteria approved by the Board, and to select, or recommend to the Board, the nominees to stand for election as directors at the annual meeting of stockholders;

b. Identifying Board members qualified to fill vacancies on any committee of the Board (including the Committee) and to recommend that the Board appoint the identified member or members to the respective committee;

c. Establishing procedures for the Committee to exercise oversight of the evaluation of the Board and management; and

d. Developing and recommending to the Board a set of corporate governance principles applicable to the Company, and to review those principles at least once a year.

## BACKGROUND

32. VeriFone is a global provider of technologies that process electronic payments for goods and services. The Company serves customers including financial institutions, payment processors, industrial concerns, retailers, government organizations, and healthcare providers. The Company's technologies process payments from signature and PIN-based debit cards, credit cards, contactless or radio frequency identification, among other sources, at the point of sale via merchant-operated, consumer facing, and self-service systems.

33. The Company generates revenues from two primary operating segments which are core elements of its business: System Solutions and Services. Systems Solutions are available in various modular configurations typically facing the consumer and allowing the shopper to keep possession of their card, enter a PIN, sign her name electronically, or tap a near field communication enabled phone or device to complete payment. The Services segment includes offerings such as repair/maintenance, advertising publishing, gateway processing, remote terminal management, software maintenance, customized application development, software as a service, helpdesk, customer service, and encryption/tokenization. In its 2011 Form 10-K, the Company stated that services were an increasingly important part of its overall revenue mix, accounting for

over 20% of sales during the fiscal year ended October 31, 2011, and that it projected services revenue to reach 50% of total VeriFone revenue in the future.

34. Since at least 2005, VeriFone's growth has occurred both organically and via numerous acquisitions, in particular: (a) in August 2011, the Company acquired Hypercom Corporation ("Hypercom"), a global provider of payment solutions and other services; (b) in November 2011, the Company acquired Global Bay Mobile Technologies, a provider of mobile retail solutions and applications; (c) in December 2011, the Company acquired Electronic Transaction Group Nordic Holding AB ("Point"), previously a VeriFone distributor and Northern Europe's largest provider of payment and gateway services; (d) in January 2012, the Company acquired ChangeSmart Inc., a provider of online payment solutions; and (e) in March 2012, the Company acquired LIFT Retail Marketing Technology, Inc., a provider of digital marketing systems.

**SUBSTANTIVE ALLEGATIONS**

35. On December 14, 2011, the Company released its results for the fourth quarter and full year of 2011. Among other things, the press release stated:

> SAN JOSE, CA - December 14, 2011 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ("Q4 FY11") and fiscal year ended October 31, 2011.
>
> Non-GAAP net revenues for Q4 FY11 were $416 million, compared to $317 million in the previous quarter and $276 million for the comparable period of 2010 ("Q4 FY10"), a 51% year-over-year increase. Q4 FY11 marked the sixth straight quarter that the growth rate exceeded 20% year-over-year, excluding the contribution from the Hypercom business acquired in August.
>
> Non-GAAP net revenues for the full year ended October 31, 2011, were $1,310 million, a 31% increase over the $1,002 million result for the full year ended October 31, 2010. GAAP net revenues were $411 million for Q4 FY11, $317 million for the prior quarter and $276 million for Q4 FY10. For FY11, GAAP net revenues totaled $1,304 million, a 30% increase over the $1,002 million total for FY10.
>
> * * *
>
> Non-GAAP net income per diluted share for Q4 FY11 was $0.53, compared to $0.49 in the prior quarter and $0.40 for Q4 FY10, a 33% year-over-year increase.

> Non-GAAP net income per diluted share for the full year ended October 31, 2011, was $1.92, a 45% increase over the $1.32 figure for the full year ended October 31, 2010. GAAP net income per diluted share for the latest quarter was $1.84, compared to $0.28 in the prior quarter and $0.55 in Q4 FY10. GAAP net income per diluted share was $2.92 for FY11 and $1.13 for FY10.
>
> "*We finished 2011 with another year of record revenues and record profit, and are now midway through our multi-year transformation to the world's leading services-driven payment technology provider*," said Douglas G. Bergeron, Chief Executive Officer. "Looking to 2012, we are very encouraged by the opportunities at hand throughout our growing, global marketplace."
>
> * * *
>
> ***Guidance for First Quarter 2012 and Full Year***
>
> VeriFone has updated its guidance assuming the pending Point acquisition closes at the end of this month. For the first fiscal quarter ending January 31, 2012, VeriFone expects to report net revenues in the range of $415 million to $420 million. Non-GAAP net income per diluted share is projected to range from $0.50 to $0.52. For the full year of fiscal 2012, VeriFone expects to report net revenues in the range of $1.90 billion to $1.92 billion. Non-GAAP net income per diluted share is expected to range from $2.53 to $2.60 in FY12.

(Emphasis added.)

36. Also on December 14, 2011, the Company conducted a conference call to discuss the results with investors and analysts. During the call, the following statements were made:

> [Bergeron:]
>
> *I am very pleased with the dramatic progress we have made in our Hypercom integration activities*. Our sales and marketing integration is complete. We have made significant progress in *improving the Hypercom supply chain* and logistics model, and have rationalized the R&D investment for a combined company. We have also driven synergies across the support functions, eliminating redundant positions and rolling IT applications into our existing VeriFone Oracle infrastructure.
>
> * * *
>
> [Bergeron:]
>
> We expect the Point acquisition to be immediately accretive to our gross margins, operating margins and to EPS beginning in the second half of FY '12. With the addition of Point *services revenue will now exceed 30%* of all revenue in Q2, assuming a December 30 close date. *We are on our way towards our goal of*

> *creating a services-based solutions business with 50% services revenue by the end of fiscal year 2015.*
>
> * * *
>
> [Bergeron:]
>
> We completed a very complicated takeover of Hypercom and then proceeded to *rapidly integrate* the business, and *we are already enjoying significant operating synergies*. We expect solid gross margin expansion from this additional business throughout 2012.
>
> *Our focus on services is reaping great rewards for our shareholders. Growth rates have accelerated, margins are expanding, and we have developed unique advantages for our product portfolio*….
>
> Looking ahead to 2012, *we see a world of opportunity for VeriFone unparalleled in the 10 plus years that I have been CEO*. The amount of innovation at the edge of the network, the VeriFone neighborhood, has never been greater.

(Emphasis added.)

37. The foregoing statements made during the December 14, 2011 investor conference call were misleading and inaccurate because: (a) they concealed that expenditures previously devoted to hardware were now being diverted to services, starving the hardware business for research and development funds, and ultimately causing the supply chain and inventory problems that manifested in product gaps and competitive losses in 2012 and 2013; (b) the transition to a 50% services revenue company was not "rapidly integrating" and the Company was not "already enjoying significant operating synergies"; and (c) VeriFone's transition in business model was much more risky and had a much greater potential downside than disclosed.

38. On December 23, 2012, the Company filed its Form 10-K with the SEC for the year ended October 31, 2011. The Form 10-K was signed by Director Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler, as well as defendants Bergeron and Dykes. The Form 10-K stated:

> Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the

> results of management's assessment with the Audit Committee of our Board of Directors.

39. The Form 10-K misleadingly described VeriFone's internal controls over financial reporting and public disclosures by representing that they were adequate, when in fact they were subject to manipulation and consistently failed to ensure that the Company's public statements accurately depicted the Company's current business and future prospects.

40. On March 5, 2012, the Company released its results for the first quarter of 2012. The press release stated in part:

> SAN JOSE, CA - March 5, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2012 ("Q1 FY12").
>
> Non-GAAP net revenues for Q1 FY12 were $425 million, compared to $416 million in the previous quarter and $284 million for the comparable period of fiscal 2011 ("Q1 FY11"), a 50% year-over-year increase. GAAP net revenues were $420 million for the latest quarter, $411 million for the prior quarter and $284 million for Q1 FY11.
>
> Non-GAAP gross margins were 43% for Q1 FY12, compared to 40% in the prior quarter and 41% in Q1 FY11. GAAP gross margins were 37% for the latest quarter, 31% for the prior quarter and 39% for Q1 FY11.
>
> Non-GAAP net income per diluted share for Q1 FY12 was $0.58, compared to $0.53 in the prior quarter and $0.43 for Q1 FY11, a 35% year-over-year increase. GAAP net income per diluted share for the latest quarter was a $0.03 loss, compared to $1.84 income in the prior quarter and $0.35 income in Q1 FY11.
>
> "We are delighted with our strong start to fiscal year 2012. We reported record revenues and non-GAAP EPS, the highest non-GAAP operating margin in over five years and continued double-digit organic growth," said Douglas G. Bergeron, Chief Executive Officer. "*The Point business is performing ahead of plan. Their 'payment-as-a-service' model is positioned to serve as the new North American paradigm* for quickly deploying and maintaining advanced EMV software and mobile wallet software updates for Visa, Isis, Google, PayPal and others."

* * *

> ***Guidance for Second Quarter 2012 and Full Fiscal Year***
>
> VeriFone has updated its guidance. For the second fiscal quarter ending April 30, 2012, VeriFone expects to report non-GAAP net revenues in the range of $465 million to $470 million. Non-GAAP net income per diluted share is projected to range from $0.59 to $0.60. For the full year of fiscal 2012, VeriFone expects to report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

41. Also on March 5, 2012, the Company conducted a conference call to discuss the results with analysts and investors. During the call, the following statements were made:

> [Bergeron:]
>
> Due to the nature of the Point revenue model with a heavy emphasis on recurring revenues through their all-in-one offering, *we expect this monthly revenue to increase sequentially throughout the year*.
>
> * * *
>
> [Bergeron:]
>
> I think our guidance implies about this type of *organic revenue growth* throughout the year. I wouldn't be surprised if some of the things that we acquired in mid-2011 by the end of this year start really flourishing and we get to record those as organic.
>
> I think the mix will shift a little, consistent with the premise of your question. I don't think 65% organic growth in Latin America is sustainable, *but we will have good, strong plus 20% organic growth there for many years*.
>
> * * *
>
> [Bergeron:]
>
> …*I think services as a percentage of revenue and services margins both are going to be continued highlights of the story over the next couple of years*.
>
> * * *
>
> [Analyst:]
>
> Could you just speak overall to the risk or potential risk that Square poses to VeriFone competitively?

> [Bergeron:]
>
> We have had competitors for 30 years. We have had lots of competitors that we have taken care of euphemistically over the last 11 years. And we will have competitors for the next 20 years. *If VeriFone was to stand flat-footed, not embrace new technologies that are out there, not engage in great discussions with its customers about where it wants to go, we would be yesterday's lunch*. The fact is that is not the VeriFone that our investors expect. *We are as innovative as anyone in Silicon Valley*. And we leverage that innovation with our incumbency.
>
> * * *
>
> [Bergeron:]
>
> With respect to the replacement products to the Hypercom legacy products in Germany, we expect the replacement products to be -- they're in beta now and they should be going into full production by the third quarter. I mean to be candid, Hypercom had starved its R&D team for that eight or nine months that we were pursuing them. So when we got the keys to the store, we found that they were further behind.
>
> *Now we have been putting a lot of money in that*, and getting those customers all excited about what we have to show them, but it cost us a few months, and frankly, was probably the single biggest reason why our out of the gate Hypercom revenue expectations didn't meet our original plan.
>
> But those customers have been kept warm and happy, and now these products are close to being shipped, *we expect to sell a lot of them*.

42. The foregoing statements made in the March 5, 2012 press release and during the conference call were misleading and inaccurate because: (a) the Company was facing competitive risks and integration problems that were concealed and which rendered the positive statements about VeriFone's prospects misleading and without basis; (b) the Director Defendants were not ensuring that the Company was devoting adequate funds to technological innovation and Square, Inc. ("Square") posed a serious competitive threat; and (c) the integration of Hypercom was not going as smoothly as stated and carried undisclosed risks related to integration problems.

43. On March 12, 2012, the Company filed its Form 10-Q with the SEC for the quarter. Among other things, the Form 10-Q assured investors that the Company's controls were sufficient and that the Company was continuing to devote research and development resources "to address the market needs of both emerging and developing economies." These disclosures were

misleading and inaccurate because the Company's internal controls were inadequate and the Company's research and development investment was not being allocated as investors had been led to believe.

44. On April 30, 2012, Deutsche Bank released an analyst report on VeriFone advising investors to sell their VeriFone stock and questioning the Company's accounting practices. The report stated in part:

> Cutting Rating to Sell
>
> We are downgrading PAY to Sell from Hold and lowering our TP to $40 from $44. *After further analyzing PAY's organic growth, we believe the 11.8% organic growth stated on the 1Q12 earnings call significantly exaggerates the "true" flat 1Q12 organic growth. In our view, organic growth is being inflated through acquisitions*. Additionally, we believe the *likelihood of a strong EMV upgrade cycle has been overstated* and mobile payments bring significant risk to the model. *Given poor financial disclosures*, lower true organic growth, future business risks and rich valuation, *we are no longer comfortable recommending investors hold PAY shares*.
>
> True organic growth guidance of 4–6%
>
> *We believe PAY's stated organic growth is inflated by recognizing Verifone sales to legacy Hypercom customers as organic growth (possibly doing so for other acquisitions too), but often is essentially cannibalizing Hypercom product sales*. …We also believe PAY's organic growth spreadsheet had an error in its FY12 calculation.
>
> * * *
>
> Future Growth Uncertain
>
> We have always found the Verifone story interesting, but *we were never comfortable with the company's disclosures* and the business model's future long-term opportunity in a mobile payments world. Although we see likely pro forma EPS upside to estimates for FY12 due to early accretion from the Hypercom and Point acquisitions (expectations are already high), *we believe "true" organic growth is being overstated by the company*…. *We will continue to diligently monitor Verifone's financial disclosures in hopes of more transparency*…..
>
> Building "organic" growth through acquisitions
>
> *In our view, Verifone has bought organic growth through acquisitions by cannibalizing the acquisitions' products, thereby lowering original revenue estimates of the acquired companies*. For example, Hypercom generated $375m in revenues in 2011, and Verifone expects Hypercom to generate only $300m in

revenues in FY12 after initially estimating a $350m revenue contribution from the acquisition. Verifone blamed this $50m drop in revenues on underinvested product lines and channel stuffing, which surprises us since *these issues should have been uncovered after owning the company for four months*. Verifone has confirmed that it sells its own products to Hypercom customers and recognizes such sales as "organic". Regarding Point, management guided to $260m in revenues for CY12 compared to $230-240m in revenues management estimates Point generated in 2011. Verifone has explained that lower Point revenue in the earlier months of CY12 stem from changes in Point's business model from product sales to product and services sales.

*We find it odd that Verifone has changed the revenue contribution from a large acquisition materially from what was outlined at the time of the announcement, significantly lowering the 12-month revenue contributions for Hypercom several months later (this helps the organic growth guidance calculation)*. We assume the prices paid for the acquisition was [sic] based on assumptions communicated during the acquisition's announcement, not on the reduced forward projection, *bringing into question the quality of Verifone's due diligence*, its acquisition targets, and the price paid for those targets.

1Q12 organic revenues turned flat

On its 1Q12 earnings call, Verifone highlighted that its organic revenue growth equaled 11.8% year-over-year and also issued a separate spreadsheet detailing its organic growth calculation. However, *a table included in Verifone's 1Q12 10-Q shows pro forma revenues as if all FY12 and FY11 acquisitions happened on November 1, 2010, giving an organic growth calculation of 0.5% year-over-year in 1Q12. The pro forma table, though, does not fully account for revenue from Point acquisitions made after November 1, 2010, necessitating an addition of acquisition revenue between November 1, 2010 and the date of acquisition by Point (Verifone issued an 8-K on March 19 showing Point's financial statements from 2009, 2010, and Jan-Sep 2011 with revenue contributions from Point's acquisitions during those 2.75 years). We have calculated an adjustment of $2.722m to the January 2011 period, resulting in an apples-to-apples organic growth rate of -0.1% year-over-year, a significant departure from Verifone's stated 11.8% organic growth rate in 1Q12*.

(Emphasis added.)

45. That same day, VeriFone issued a press release reaffirming its previously released guidance and refuting the Deutsche Bank report. The press release stated in part:

VeriFone Reaffirms Organic Growth Estimates

SAN JOSE, Calif.--(BUSINESS WIRE) -- Apr. 30, 2012 -- VeriFone Systems, Inc. (NYSE: PAY), issued the following statement regarding a report on organic growth calculations that was disseminated this morning from Deutsche Bank.

> VeriFone uses a methodology of calculating organic growth prescribed by the vast majority of investors and Wall Street analysts: excluding revenue of all acquired companies, large and small, until 12 months after acquisition.
>
> Deutsche Bank is choosing to include in its calculation the revenue of acquired companies as if VeriFone had owned them for the entire current and year-ago period. We believe this does not reflect the true organic results of VeriFone's business and we reaffirm our expectations for 10-15% organic growth rates for fiscal year 2012 and long-term.

46. The April 30, 2012 press release was misleading and inaccurate because in reality, the Company's internal accounting controls inadequate and its organic growth was overstated.

47. On May 16, 2012, defendant Bergeron participated on behalf of the Company in a conference call for the J.P. Morgan Technology, Media and Telecom Conference. During the call, defendant Bergeron defended the Company's accounting methodology and disclosed organic growth rates, making the following statements were made:

> [Bergeron:]
>
> We have been consistently within our long-term guidance of 10% to 15%. We are going to be 10 to 15 -- we were 10% to 15% last quarter. Ironically, Ingenico was 12%. I think it affirms our organic growth rate.
>
> *We will be 10% to 15% this year*. *We will be 10% to 15% next year*. How do we get to 10% to 15%? Real simple. We have about 40% of our business in the emerging markets. If you have looked at any of our last six or seven Quarterly Reports you can see that our emerging markets are on fire.
>
> Asia is accelerating. Latin America has been nothing short of amazing, and even EMEA. EMEA isn't all [Angela Merkel] and Greece, it's Middle East, Africa, Russia, many places that are far behind the rest of the developed world in terms of payment systems. *So we will continue to grow in the emerging markets, for many years, 20% to 30%*. *We will continue to grow in the developed world for many years in high single digits*.
>
> *We don't grow at GDP growth rates*. We are part of a secular shift from cash to cashless. So if you take 60% of our business growing at 8% to 10% and 40% of our business growing north of 20% you get 10% to 15%. *This whole concept, this controversy around, well, maybe some of the VeriFone organic growth rate was really the selling product into the Hypercom customers. If it was that easy, guys, there wouldn't be the barriers of entry in this business that have created a practical duopoly*.

* * *

[Bergeron:]

> I would say, given probably lousy economic environment in continental Europe but continued good environment in the emerging markets Northern Europe, Middle East, and an improving environment in North America, *we have seen nothing that should stand in the way of 10% or 15% organic growth next year*.

(Emphasis added.)

48. The foregoing statements made during the May 16, 2012 conference call were misleading and inaccurate because: (a) the Company had not been growing at the represented organic rate; (b) numerous operational and competitive risks made it unlikely that the Company would continue to sustain its reported growth; and (c) serious operational and execution problems were concealed.

49. On May 17, 2012, the Company filed its definitive proxy statement on Schedule 14A with the SEC in contemplation of the VeriFone Annual Meeting of Stockholders, to be held on June 27, 2012. The proxy statement incorporated by reference, all of the Company's public filings over the previous year. In soliciting votes for the Board's director nominees, the proxy statement disclosed that bonus compensation for VeriFone's named executives was derived in part from the Company's financial achievement during the previous year as stated in its publicly filed financial statements. In reliance in part on the Company's reported results, defendant Bergeron received over $14 million in total compensation during the year ended October 31, 2011. The proxy also statement stated the following in part:

> REPORT OF THE CORPORATE GOVERNANCE AND NOMINATING COMMITTEE
>
> * * *
>
> As part of its duties, in September 2011, the Corporate Governance and Nominating Committee reviewed the Committee's charter and VeriFone's Corporate Governance Guidelines to determine whether any changes to the charter or the guidelines were deemed necessary or desirable by the Committee. After completing this review, the Committee recommended to the Board that no amendments to these documents needed to be made at that time. In March 2011, the Corporate Governance and Nominating Committee also completed its review of existing

> director compensation guidelines and recommended certain changes to the Board based on such review.
>
> The Committee also conducted an evaluation of its own performance that included an evaluation of its performance compared with the requirements of the charter of the Committee. *During fiscal 2011, the Corporate Governance and Nominating Committee performed all of its duties and responsibilities under the Corporate Governance and Nominating Committee Charter*.
>
> * * *
>
> REPORT OF THE AUDIT COMMITTEE
>
> * * *
>
> In the performance of its oversight function, the Audit Committee has considered and discussed the audited financial statements with management and the independent registered public accounting firm. *The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect*. In addition, the Audit Committee has discussed with the independent registered public accounting firm the auditors' independence from VeriFone and its management, including the matters in the written disclosures and letter required by applicable requirements of the Public Company Accounting Oversight Board, a copy of which the Audit Committee has received. All non-audit services performed by the registered public accounting firm must be specifically pre-approved by the Audit Committee or a member thereof.
>
> In reliance on the reviews and discussions referred to above, and subject to the limitations on the role and responsibilities of the Audit Committee referred to above and in the Audit Committee charter, the Audit Committee recommended to the Board the inclusion of the audited financial statements in VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2011, as filed with the Securities and Exchange Commission.

50. The 2012 proxy statement was misleading and inaccurate because it failed to disclose that the Audit Committee and the Corporate Governance and Nominating Committee had each both failed to discharge their responsibilities, the Company's internal controls over accounting and public disclosure were inadequate and conveyed a misleading picture of the Company's business as described in the financial statements incorporated by reference in the proxy statement, and defendant Bergeron was being paid millions of dollars in incentive compensation based on overstated false financials that he was personally engaged in creating.

51. On May 24, 2012, the Company released its results for the second quarter of 2012. Among other things, the press release stated:

> SAN JOSE, CA - May 24, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2012 ("Q2 FY12").
>
> Non-GAAP net revenues for Q2 FY12 were $479 million, compared to $425 million in the previous quarter and $293 million for the comparable period of fiscal 2011 ("Q2 FY11"), a 64% year-over-year increase. GAAP net revenues were $472 million for the latest quarter, $420 million for the prior quarter, and $292 million for Q2 FY11.
>
> In Q2 FY12, non-GAAP net revenues excluding revenues from businesses acquired in the past 12 months increased 15% from the year-ago quarter. Hypercom-brand non-GAAP net revenues increased $8 million sequentially to $81 million in Q2 FY12.
>
> Non-GAAP gross margins were 45% for Q2 FY12, compared to 43% in the prior quarter and 43% in Q2 FY11. GAAP gross margins were 41% for the latest quarter, 37% for the prior quarter and 42% for Q2 FY11.
>
> Non-GAAP net income per diluted share for Q2 FY12 was $0.64, compared to $0.58 in the prior quarter and $0.46 for Q2 FY11, a 39% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.13 income, compared to a $0.03 loss in the prior quarter and $0.27 income in Q2 FY11.
>
> "*We are very pleased with our performance, particularly the acceleration in organic growth and the increase in Hypercom-brand sales*," said Douglas G. Bergeron, Chief Executive Officer. "We remain confident in our outlook for the year. VeriFone is continuing to prove that widespread incumbency combined with market-leading innovation is a winning formula for the payments marketplace."
>
> * * *
>
> ***Guidance for Third Quarter 2012 and Full Fiscal Year***
>
> For the third fiscal quarter ending July 31, 2012, VeriFone expects to report non-GAAP net revenues in the range of $495 million to $500 million. Non-GAAP net income per diluted share is projected to range from $0.68 to $0.70. For the full year of fiscal 2012, VeriFone expects to report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

(Emphasis added.)

52. Also on May 24, 2012, the Company conducted a conference call to discuss the results with analysts and investors. During the call, the following statements were made:

> [Bergeron:]
>
> *Hopefully, our accelerating organic growth will put to bed any confusion regarding our organic growth*. Our strategy blends strong organic growth of 10% to 15% with an opportunistic acquisition strategy that leverages our brand and worldwide distribution channel. *We continue to see an opportunity to enjoy greater than 20% in emerging markets organic growth and high single-digit organic growth in our developed markets*. And as we have demonstrated in the past, we will continue to convert this revenue growth into an even faster growth in earnings per share.
>
> * * *
>
> [Bergeron:]
>
> [*W*]*e're solidly behind our annual 10% to 15% organic growth rate*.
>
> * * *
>
> [Analyst:]
>
> Can you speak a little bit about demand conditions in Europe?
>
> * * *
>
> [Bergeron:]
>
> *There's nothing fundamentally changing in our demand*. As we mentioned before, through good fortune, our exposure in Europe is largely Northern Europe, the Middle East, Germany, with the Hypercom acquisition, now that we have products to sell, and in Africa, which is doing phenomenally well. And we have much less exposure to the problem neighborhoods in Southern Europe.
>
> *So, we continue to see good demand*. We saw great organic demand in Q2. And the headlines have been as they are now for several months.
>
> * * *
>
> [Analyst:]
>
> Is there anything in the back-half of the year demand-wise that you guys are looking out for in Europe, or any other parts of the world, that could pose any challenges to your organic growth targets?

> [Bergeron:]
>
> *No. We did all of our country-by-country reviews this week and everything is as planned….*
>
> You know, the euro went from [$1.38 to $1.30], and we basically swallowed all of that just through accelerating sales and organic growth. It's now at [$1.256]. And we're just being cautious here. I don't -- if the trend continues, we're going to continue to make pricing revisions, but it's hard to react on a one-quarter basis to address the issue. (multiple speakers) *It's really a – it's a currency translation issue in the short-term.*
>
> * * *
>
> [Analyst:]
>
> You guys have had two extremely good quarters in a row. Are you guys seeing any signs of slowdown there? You know, there's some new stories about Brazil potentially slowing down, but I was wondering if you can provide an update on the demand pipeline there?
>
> [Bergeron:]
>
> Yes, *I don't think we track quarterly with GDP growth*. I mean, Brazil is a perfect example of writing a multi-year wave of a shift from cash [to] cashless, in a country that has a very active central bank that is -- that believes that an electronic payment society is good for banking, it's good for consumers, it's good for fraud, and good for sales tax collection.
>
> And that -- those dynamics, but for an economic catastrophe like we saw in late 2008/early 2009, don't really change and *they're not very sensitive to GDP growth*.

(Emphasis added.)

53. The foregoing statements made in the May 24, 2012 press release and during the conference call were inaccurate and misleading because: (a) the Company's organic growth prospects were not as stated; (b) material risks to VeriFone's operations were not disclosed; and (c) in mere months, defendant Bergeron would attempt to blame poor results on macroeconomic conditions in Europe.

54. On June 11, 2012, the Company filed its Form 10-Q with the SEC for the quarter. Among other things, the Form 10-Q assured investors that the Company's controls were sufficient and that the Company was continuing to devote research and development resources "to address

the market needs of both emerging and developed economies." These disclosures were misleading and inaccurate because the Company's internal controls were inadequate and the Company's research and development investment was not being allocated as investors had been led to believe.

55. On June 27, 2012, the Company filed a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the May 2012 Proxy Statement. Defendants Alspaugh, Bergeron, Denend, Hart, Henske, McGinn, Raff, and Stiefler were reelected to the Board, the Company's shareholders approved executive compensation in an advisory vote, and the stockholders ratified the selection of Ernst & Young as the Company's independent auditor. The reelection of the eight Director Defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein. Any reasonable investor would have found the true state of the Company's finances and its internal controls, particularly in light of the permanent injunction against improper financial reporting, to be material information in deciding whether or not to vote for the reelection of the eight Individual Defendants and the ratification of the Company's independent auditor.

56. On September 5, 2012, the Company released its results for the third quarter of 2012. The press release stated the following in part:

> SAN JOSE, CA - September 5, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2012 ("Q3 FY12").
>
> Non-GAAP net income per diluted share for Q3 FY12 was $0.75, compared to $0.64 in the prior quarter and $0.49 for the three months ended July 31, 2011 ("Q3 FY11"), a 53% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.34, compared to $0.03 in the prior quarter and $0.28 in Q3 FY11.
>
> Non-GAAP net revenues for Q3 FY12 were $493 million, compared to $479 million in the previous quarter and $317 million for Q3 FY11, a 56% year-over-year increase. GAAP net revenues were $489 million for the latest quarter, $472 million for the prior quarter and $317 million for Q3 FY11.
>
> In Q3 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 16% from the year-ago quarter and 21% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 9% both unadjusted and at constant currency, while international Organic non-GAAP

> net revenues grew 21% from the year-ago quarter and 28% at constant currency.
>
> Non-GAAP gross margins were 45% for Q3 FY12, compared to 45% in the prior quarter and 43% in Q3 FY11. GAAP gross margins were 42% for the latest quarter, 41% for the prior quarter and 42% for Q3 FY11.
>
> Net cash provided by operating activities was $82 million in Q3 FY12 as the total cash balance grew by $49 million in the quarter.
>
> "We are very proud of our performance in Q3. Despite continued volatility around exchange rates, our business remains vibrant in all geographies," said Douglas G. Bergeron, Chief Executive Officer. "*In the U.S., growth accelerated as we saw the beginnings of the adoption of EMV-based systems and the first significant payments services deals in the quarter. We are excited about our prospects for 2013 and beyond*."
>
> * * *
>
> ***Guidance for Fourth Quarter 2012, Fiscal Year 2012 and Fiscal Year 2013***
>
> For the fourth fiscal quarter ending October 31, 2012 ("Q4 FY12"), Latin America non-GAAP net revenues, which are reported separately, are expected in the range of $65 million to $75 million, approximately $25 million less than the run rate of recent quarters due to isolated events, and are expected to rebound to $90 million to $95 million in the first quarter of fiscal 2013.
>
> VeriFone expects to report total non-GAAP net revenues for Q4 FY12 in the range of $495 million to $500 million and non-GAAP net income per diluted share in the range of $0.75 to $0.77. Such numbers imply full fiscal year 2012 non-GAAP net revenues of $1.893 billion to $1.898 billion and non-GAAP net income per diluted share of $2.73 to $2.75.
>
> The company expects FY13 non-GAAP revenue of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share of $3.25 to $3.30.

57. Also on September 5, 2012, the Company conducted a conference call to discuss the results with investors and analysts. During the call, the following statements were made:

> [Dykes:]
>
> Despite continued volatility around exchange rates, *core demand remains strong across all geographies*. And not shown on the table, but Pro forma revenue grew 5.6% in Q3, which was 11.3% on a constant currency basis. Non-GAAP gross margins came in at 45.4%, an all-time high, and an increase of 0.8 points from our second quarter. System solutions gross margins declined very slightly by 0.1 point. Service gross margins improved by 2.8 points. *The sequential improvement in service gross margins primarily reflects increased services revenue with a*

*favorable mix towards service offerings that provide us with higher incremental margins such as Point*.

* * *

[Bergeron:]

So we're very pleased with the results and outlook that we're able to communicate to you today. We continue to focus efforts on developing our competitive advantage which is our ability to bundle encryption services, content and advertising, gateway services, support for multiple new payment methods, and e-commerce capabilities to enable our customers to reinvent the retail experience for their consumers. *We're making great strides in the conversion of VeriFone into the world's premier software and services platform for mobile payments, card payments, and security*.

* * *

[Bergeron:]

Looking forward to 2013, we see another fantastic year of revenue growth and accelerated earnings and cash flow growth resulting from expanding margins, a deleveraging balance sheet, and continued success with our software and services initiatives. Thank you for listening. We will now open up the call to your questions.

* * *

[Dykes:]

*I would say that inherently this Company is still a mid-teens growth Company*.

* * *

[Bergeron:]

*So we not only have financially strong results in our North American segment, our backlog of business, services business and deferred revenue is growing quite strongly as well*.

* * *

[Analyst:]

Doug, do you still see this being a 50% services business in a couple of years?

[Bergeron:]

I hope so. You know, we're focused on everything everywhere around services. Our general managers, our salespeople are compensated to turn what would be a

> complicated product sale into a more complicated services sale. It does provide a little bit of a headwind on revenue growth. *I think we can manage through that*. But we're out trying to solve problems for retailers who are trying to reinvent themselves, become PCI and EMV compliant, run these mobile wallets. And my sense is the more complexity is out there, the more of an opportunity will be for us to not sell devices but sell services. *In the developing world where product sophistication is much lower throughout Asia, Latin America, certainly in Sub-Saharan Africa, we'll still continue to sell boat loads of products versus services. Hence, that's why we still think there will be a lot of products in our business*.

(Emphasis added.)

58. The foregoing statements in the September 5, 2012 press release and during the conference call were misleading and inaccurate because: (a) the Company was failing to obtain certification of an important product in Canada; (b) the conversion to a services based company was not progressing as represented; (c) VeriFone was not "inherently" a "mid-teens growth" Company and its organic growth was being misrepresented; and (d) serious undisclosed operational problems existed.

59. On September 10, 2012, the Company filed its Form 10-Q with the SEC for the quarter. Among other things, the Form 10-Q assured investors that the Company's controls were sufficient and that the Company was continuing to devote research and development resources "to address the market needs of both emerging and developed economies." These disclosures were misleading and inaccurate because the Company's internal controls were inadequate and the Company's research and development investment was not being allocated as investors had been led to believe.

60. On November 29, 2012, Wedbush analysts issued a research report on VeriFone that noted the Company's "*poor quality of earnings and opaque view into past and future growth rates*" and faulted VeriFone's "opaque reporting."

61. On December 13, 2012, the Company released its results for the fourth quarter and full year of 2012. The press release stated in relevant part:

> SAN JOSE, CA - December 13, 2012 - VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ("Q4 FY12") and fiscal year ended October 31, 2012.

Non-GAAP net income per diluted share for Q4 FY12 was $0.76, compared to $0.75 in the prior quarter and $0.53 for the three months ended October 31, 2011 ("Q4 FY11"), a 43% year-over-year increase. Non-GAAP net income per diluted share for the full year ended October 31, 2012 ("FY12") was $2.74, a 43% year-over-year increase over the $1.92 figure for the full year ended October 31, 2011 ("FY11"). GAAP net income per diluted share for the latest quarter was $0.24, compared to $0.34 in the prior quarter and $1.84 in Q4 FY11. GAAP net income per diluted share was $0.59 for FY12 and $2.92 for FY11.

Non-GAAP net revenues for Q4 FY12 were $489 million, compared to $493 million in the previous quarter and $416 million for Q4 FY11, an 18% year-over-year increase. Non-GAAP net revenues for FY12 were $1.886 billion, a 44% increase over the $1.310 billion result for FY11. GAAP net revenues were $485 million for the latest quarter, $489 million for the prior quarter and $411 million for Q4 FY11. For FY12, GAAP net revenues totaled $1.866 billion, a 43% increase over the $1.304 billion total for FY11.

In Q4 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 4% from the year-ago quarter and 8% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 22% both unadjusted and at constant currency, while international Organic non-GAAP net revenues declined 3% from the year-ago quarter but increased 2% at constant currency. Organic non-GAAP net revenues increased 11% in FY12 compared to FY11 and 14% at constant currency. For FY12, North America Organic non-GAAP net revenues grew 4% from FY11 both unadjusted and at constant currency, while international Organic non-GAAP net revenues grew 15% from FY11 and 20% at constant currency.

Non-GAAP gross margins were 44% for Q4 FY12, compared to 45% in the prior quarter and 40% in Q4 FY11. Non-GAAP gross margins were 44% for FY12 and 42% for FY11. GAAP gross margins were 41% for the latest quarter, 42% for the prior quarter and 31% for Q4 FY11. GAAP gross margins were 41% for FY12, compared to 38% for FY11.

* * *

***Guidance for First Quarter 2013 and Fiscal Year 2013***

For the first fiscal quarter ending January 31, 2013, VeriFone expects to report total non-GAAP net revenues in the range of $490 million to $500 million and non-GAAP net income per diluted share in the range of $0.70 to $0.73.

For the full year of fiscal 2013, the company continues to expect to report total non-GAAP net revenues in the range of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share in the range of $3.25 to $3.30. Free cash flow, defined as cash flow from operations as presented under GAAP less capital expenditures, is

expected in the range of $285 million to $315 million.

62. Also on December 13, 2012, the Company conducted a conference call to discuss the full year and fourth quarter results with analysts and investors. During the call, the following statements were made:

> [Bergeron:]
>
> The aggregate cost of these investments is approximately $4 million in operating expense per quarter. *We expect to see the fruits of our labor beginning in the second half of 2013 and a material positive impact on growth rates and margins in 2014*. All of these initiatives are being rolled out as managed services and towards our goal of transforming our business model. We believe we can repeat the success we have seen in North America throughout all of VeriFone.
>
> * * *
>
> [Dykes:]
>
> Again, cash flow is very important to us, and we always seek to optimize it. But we use non-GAAP earnings to understand how our business is truly performing, not free cash flow. There are important reasons as to why everyone uses accrual-based accounting and not cash-based accounting to measure their operations. *Nevertheless, we are continuing to forecast strong free cash flow in fiscal 2013, as I will now explain*.
>
> * * *
>
> [Bergeron:]
>
> We will see higher R&D and channel investments than in previous years in order to set up our international markets for rapid Point, GlobalBay and taxi revenue growth in the second half of 2013 and 2014.
>
> As we complete fiscal year 2012, we have accomplished a great amount. Our full year organic revenue growth was 14% on a constant currency basis. Operating margins were at an all-time high percentage. We generated outstanding bottom line growth of 43% for our shareholders. *But we have not sacrificed strategic investments for the sake of the bottom line*. The past year featured the acquisition of Point and its highly successful payment-as-a-service model that we are using a blueprint for providing compressive payment solutions to retailers around the world
>
> Also in 2012, we cemented our position as the leading provider of mobile payment technology with GlobalBay retailing applications, robust and highly secure payment sleeves for mobile devices and strategic partnerships with the new mobile wallet sponsors PayPal, Google and Isis and retail systems providers Oracle and Fujitsu.

> *The foundations built in 2012 will drive continued outsized returns for our shareholders in 2013 and beyond.*
>
> * * *
>
> [Analyst:]
>
> Just a couple of quick questions here. Most of mine have been addressed. But if I just look on the reported revenue line, system solutions, by far, the dominant contributor to the Q, that was above our plan. And I was wondering if you could just talk a little bit about the organic revenue growth outlook for POS, in particular, and how we should think about that going forward. And then I have a follow-up.
>
> [Bergeron:]
>
> I mean, we went to great lengths to not only provide, Wayne, organic revenue projections. We even gave you organic guidance per region. I think you see...
>
> [Analyst:]
>
> Right, but I'm parsing out -- I apologize for interrupting your answer. I'm trying to parse out the service from the hardware on a geographic basis.
>
> [Dykes:]
>
> The bulk of what we were talking about when we gave those growth rates is really a reflection of POS-type business. Clearly, we've included in that the fact that *there will be some -- a weakening of the straight POS business as we move to the services business with the Point model, et cetera. But we don't want to literally break it out because we're still evolving in those other markets*. And so I think it's better just to stick with the total growth by business -- by the geographic area and know that if all things were equal, if we weren't trying to grow our Point business, the POS business will grow a bit stronger than that. But we have included in there a bit of a weakness in the POS business as we grow the service...
>
> [Bergeron:]
>
> Well, it's a weakness in reported revenues from systems, it's not a weakness in customer attachment, which comes vis-à-vis the services contracts.
>
> [Dykes:]
>
> That's what I'm trying to say. It's a lower growth than in other ways it would have been. And we reflected that in those numbers.

(Emphasis added.)

63. The foregoing statements made during the December 13, 2012 conference call were misleading and inaccurate because: (a) there was no basis for the optimistic statements regarding VeriFone's business prospects and material risks were concealed; and (b) the "weakening" of the hardware business was significant, pronounced, and undisclosed.

64. On December 19, 2012, the Company filed its Form 10-K with the SEC for the fiscal year ended October 31, 2012. The Form 10-K was signed by Director Defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler, as well as defendants Bergeron and Dykes. Among other things, the Form 10-K stated that the Company continued to devote research and development resources to "to address the market needs of both emerging and developed economies" and assured investors that VeriFone's internal controls functioned properly:

> Management assessed our internal control over financial reporting as of October 31, 2012, the end of our fiscal year. Management based its assessment on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.
>
> Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

65. The Form 10-K was misleading because it inaccurately stated that the Company's internal controls were sufficient when they were not and inaccurately conveyed a more optimistic picture of VeriFone's 2012 business and 2013 prospects than was reality.

66. On February 4, 2013, the Company announced that defendant Dykes had resigned. The Company failed to disclose that defendant Dykes had presided over improper accounting and disclosure that inaccurately and misleadingly represented the state of VeriFone's business since at least December 2011.

67. As of the beginning of February 2013, the public had been led to believe that

VeriFone's future prospects were very good, strong organic growth could be expected over the next year, the Company's operations in Europe and in Latin America were not contingent on macroeconomic trends, the Company was not facing major competitive threats from eCommerce rivals such as Square, and that VeriFone's operations were functioning as planned. The Company's investors had not be cautioned regarding risks caused by the decreased research and investment spending for hardware products, increased competitive pressures, and major revenue disruptions caused by the shift to a more services-reliant business model.

**THE TRUTH SLOWLY BEGINS TO EMERGE**

68. On February 20, 2013, the Company issued a press release announcing its preliminary results for the first quarter of 2013. The press release stated in part:

> VeriFone expects to report Q1 non-GAAP net revenues in the range of $425 million to $430 million and Q1 GAAP net revenues in the range of $424 million to $428 million. VeriFone expects to report non-GAAP net income per share between $0.47 and $0.50 and GAAP net income per share between $0.07 and $0.10.
>
> The *lower than expected results* for the first quarter were driven primarily by:
>
> - *Continued weak macro-economic conditions in Europe*;
> - Increased focus and investments throughout 2012 on longer-term service initiatives in multiple jurisdictions at the expense of near-term hardware and software features and customization projects that were reduced or delayed, which resulted in *missed revenue opportunities*;
> - An increase in deferred revenue related to volume shipments made during the quarter to a new mix of customers in the Middle East and Africa. These shipments did not meet first quarter revenue recognition requirements;
> - Lower than anticipated revenue from large Brazilian customers, as well as political and economic uncertainty in Venezuela, typically a strong market for VeriFone; and
> - Several customers electing to delay major projects beyond the first quarter, as well as the cancelled Washington, D.C. taxi project.
>
> "During the first quarter we faced a number of *external headwinds* and *internal challenges*, which impacted our results," said Douglas G. Bergeron, Chief Executive Officer. "While we are disappointed with our performance and execution, we have a firm grasp on the challenges we faced and are taking aggressive steps to strengthen our competitiveness over the long-term. *Although the focus on our services efforts impacted some local software and hardware modifications that were required to be competitive, our product platform and architecture are consistently recognized by the industry as being best-in-class*. We are confident in our ability and committed to executing against our strategic priorities to drive shareholder value."

The company is executing steps to address the current challenges, including:

- Conducting a comprehensive review of VeriFone's strategic operating plan to ensure near-term product priorities are provided for, even as the company continues to increase its services offerings.
- Increasing management focus and R&D investment on product development and certifications to accelerate the release of in-demand products throughout fiscal 2013; and
- Driving cost efficiencies, including streamlining and better integrating recently completed acquisitions.

"Our industry remains vibrant and offers tremendous opportunity for growth especially around complexity at the point of sale and EMV mandates," continued Bergeron. "We expect EMV to expand the total addressable market in the U.S., and major industry trends such as growth in retail mobility and the increased need for more sophisticated security systems to create additional opportunities for our industry. As the trusted and innovative partner of merchants worldwide, *VeriFone is uniquely positioned to capitalize on these trends*."

Bergeron said, "Over the last few years, we have built a portfolio of services, which have gained considerable traction in the market. *We are confident this progress will allow us to derive higher overall revenue and margins*, develop deeper relationships with our customers and drive more predictable financial results. For example, our Point payments-as-a-service business has enjoyed early success, and we are exporting the model to new regions including Australia, New Zealand, continental Europe and the U.S."

Bergeron concluded, "*We are encouraged by the performance of our North America region and payments-as-a-service offerings in the existing Point markets, which both saw quarterly net revenue grow by double-digit percentage points year-over-year*. We remain optimistic about our business prospects with upcoming growth drivers such as the U.S. EMV mandate, and we continue to build on our taxi, gas pump and national retailer customer base. We are moving forward and remain committed to expanding our payments-as-a-service business, while continuing to accelerate our product development and certifications. *Based upon this, we expect to resume year-over-year net revenue growth in the mid- to high-single digits beginning in fiscal 2014*."

(Emphasis added.)

69. Although the foregoing disclosure hinted, for the first time, that VeriFone faced "internal challenges," it inaccurately attributed most of the poor results to "external headwinds" and misleadingly assured investors that the Company was positioned to resume strong growth in the near future. The depth of VeriFone's serious, fundamental problems, including in its North

America operations, and the fact that it had not been growing as stated continued to be concealed.

70. The financial press and analysts immediately reacted to the results, and the purported explanation of them, with incredulity. On February 21, 2013, Wedbush analysts issued a report questioning the defendants' explanation for the results and stating that in their view, "[a] key reason for the sharp deterioration may be the integration and rationalization of Point, Hypercom, and several other acquisitions VeriFone made over the last couple of years. While macro condition[s] may have had an impact on business, we would point out that the global economy has had far less of an impact on peers…"

71. On February 21, 2013, *Reuters* published an article titled "Verifone shares nearly halve, analysts query management," stating in part:

> VeriFone shares slid to $17.93, their lowest in nearly three years, and *at least seven analysts cut their price targets on the stock*. Deutsche Bank, in a client note, said the company had finally admitted it had failed to execute on its plans to move to a more subscription-based service model.
>
> Several analysts suggested that VeriFone's new chief financial officer had taken a more conservative accounting approach at the company, which already faces a court case for a past accusation of reckless accounting.
>
> The company will likely be sold, SunTrust Robinson Humphrey analyst Andrew Jeffrey wrote in a note, cutting his rating on the stock to "neutral" from "buy".
>
> "*Management credibility has been lost*," he said. "*Market share losses are deeper and more persistent than we had previously believed*."
>
> "We believe VeriFone will be acquired before it completes its business model transition."
>
> Deutsche Bank analyst Bryan Keane said he could not suggest who might be interested in buying the company. "...We still think the valuation is expensive, when you look at the free cash flow the company generates," he told Reuters.
>
> * * *
>
> The company might have been aggressively shifting to services from hardware sales and the management took its eye off the ball in terms of product evolution, allowing rival Ingenico SA (INGC.PA) to take market share, analysts said.
>
> * * *

> Deutsche, which rates the stock a "sell", slashed its price target to $15 from $27. The brokerage said past acquisitions had masked what was happening at the company and that it had long been wary of its "*aggressive accounting recognition*."
>
> "The recent CFO retirement/resignation and the first-quarter revenue recognition requirements could also suggest *accounting red flags in prior quarters*," Deutsche said, noting the latest quarter's accounts had been signed off by the new CFO.
>
> * * *
>
> Analysts on Thursday rejected the company's argument that its problems came from the weak economy. While macro conditions may have had an impact on business in the quarter, the global economy has had far less of an impact on peers such as NCR Corp (NCR.N) and Micros Systems (MCRS.O), said Wedbush analyst Gil Luria, who cut his price target to $22 from $33.
>
> Citi Research analyst Philip Stiller cut his rating on the stock to "neutral" from "buy" and price target to $23 from $47.
>
> "(VeriFone) has *a long uphill battle to rebuild trust* and belief in the company on top of ongoing execution issues in a rapidly changing payments landscape," he said in a note.

(Emphasis added.)

72. On February 22, 2013, *Seeking Alpha* published an article titled "VeriFone Now a Falling Knife," stating in part:

> VeriFone management seems to appreciate that results like these require some explanation, but I'm not entirely sure I accept the reasons they've offered.
>
> Management mentioned weak conditions in Europe. Fair enough - we all know that conditions in Europe are pretty tough. *Buy why, then, is Europe-based Ingenico not seeing the same trouble?*
>
> VeriFone management also talked about a new accounting policy regarding revenue recognition that meant revenue from new distributors in the Mideast and Africa was not recognized this quarter. With a new CFO on board that, too, is a credible explanation. *Unfortunately, it also feeds into one of the more persistent bear stories about VeriFone – that the company has been a little too aggressive with its accounting in the past (including its calculation of organic growth). If management was overstating past revenue growth, that could explain why the business has seemingly hit such a hard wall now.*

(Emphasis added.)

73. On March 5, 2013, the Company issued a press release announcing its complete first

quarter 2013 results substantially the same as the preliminary results released on February 20, 2013. The press release also contained the Company's full year and second quarter 2013 guidance: (a) for the full year, net revenues in the range of $1.8 billion to $1.83 billion and net income per diluted share in the range of $1.90 to $2.10; and (b) for the second quarter, net revenues in the range of $435 million to $450 million and net income per diluted share in the range of $0.45 to $0.50.

74. Also on March 5, 2013, the Company conducted a conference call to discuss the results with analysts and investors. During the call, defendant Bergeron, who had previously stated that the Company was protected from economic turmoil in Europe, attempted to blame the guidance miss in part on weakness in the Eurozone economy. In addition, the following statements were made:

> [Bergeron:]
>
> First, Europe. Heading into the quarter, we were starting to become of a mind that the worst was over for Europe. With new products now shipping in Germany, we believe that the region would experience modest sequential growth. It did not. In fact, we saw some of the softest European economies trend towards recession.
>
> * * *
>
> [Bergeron:]
>
> Let me now turn to the internal execution challenges that we faced in the quarter.
>
> Over the past 30 days, the VeriFone Board of Directors, my management team and I, have initiated an exhaustive, deep-dive evaluation of our business and its operations. In retrospect, *we found that a number of our issues in the quarter and in the last few quarters were, indeed, self-inflicted*. First, we did not allocate sufficient resources to product localization and customization, which has temporarily impacted our product leadership in several markets.
>
> * * *
>
> VeriFone spends approximately 40% of our R&D dollars on [localization and customization], which is widely distributed across the world, and involves over 700 employees in over 40 countries. *Over the past two years, the volume of these country-specific requirements has grown enormously*. In retrospect, we weren't hiring fast enough and allocating enough resources to keep our first-to-market position with a few of our products in a handful of markets.

* * *

As it turned out, certain sales to [distributors in the Middle East and Africa] *did not meet the criteria of our customer credit policy* by quarter-end. And therefore, *we deferred the revenue on these sales*, approximately $23 million. In retrospect, this can only be attributed to poor sales planning and execution.

Second, we were impacted by our sometimes-obsessive goals around transformation to a services-based business model. A services-based solutions sale, which means a multi-year contract with a customer combining systems and services, *involves the deferring of revenue from the embedded product component over the life of the contract*, but at a dramatically improved profitability, sometimes 2 to 2.5 times the product sale.

* * *

[Bergeron:]

*The internal execution challenges, which I've detailed for you, are issues that can be solved in a matter of months, not years*.

* * *

[Rothman:]

As discussed earlier, a significant part of our shortfall related to the deferral of sales in the Middle East and Africa region. *The decision to defer this revenue was consistent with the Company's long-standing revenue recognition policy and requirements under GAAP, and was not a change in accounting policy or practice*. In addition, as is customary, our conclusion was reviewed by our external auditors in the normal course of their review of our quarterly results

* * *

[Bergeron:]

Despite our short-term disappointment, *we do not believe that the first-quarter shortfall reflects a fundamental weakening of either the global market for point-of-sale solutions, or our longer-term competitive position in that market*. As we said earlier, our problems will be addressed over a matter of months, not years.

* * *

[Bergeron:]

We will recover this. We have a 32-year-old brand and it is a proud brand. We do a lot of really good stuff for our customers. In fact, many of them are waiting

patiently for us to double down on some of this investment. *So, there's no long-term problem nor is there any long-term franchise impact here*. We just got to get back to our knitting, not be overly distracted by our services initiatives. I'd like to keep plugging away at that, too, and we'll get there.

* * *

[Bergeron:]

But our guidance reflects not a lot of enthusiasm or hope for a macro recovery in Pan-Europe this year. I think we are where we are in Europe, and we can either adjust to that reality or live in some sort of denial. *And I think perhaps we were living in a quasi state of denial in terms of the fact that very few retailers are opening new stores*. A lot of the compliance deadlines are behind us. And the bright spot for us in Europe, obviously, are now going to be Germany, because we have a competitive product; hopefully, France in another quarter; and Point.

* * *

[Bergeron:]

*We lost market share for sure since the Hypercom acquisition*. Some of it was planned, *a few revenue dissynergies*, and some of it was self-inflicted through some poor management as to resources and some *underinvestment*. We will reclaim that market share over the next couple of years. We will reclaim all of the ability to gain that market share back through technology excellence *over the next six to nine months*.

* * *

[Analyst:]

It sounds like, based on your earlier comments, you're not planning any material changes in how the Company applies revenue recognition policies? Is that fair?

[Rothman:]

That's correct. So, if we have any changes in accounting policies, we'll certainly be transparent, upfront, on those changes. There have been no changes and we don't have any expectation in the near-term.

* * *

[Bergeron:]

I think a few quarters ago -- you know, I can honestly say that there's no given – there's no architecture issue or platform issue.

(Emphasis added.)

75. Thus, during the March 5, 2013 call, Bergeron acknowledged: (a) VeriFone had been experiencing certain issues "for the last few quarters"; (b) the Company had known for two years that its localization and customization needs were increasing, but it had not been allocating adequate funds; and (c) revenue recognition issues were a partial cause of the poor results;

76. However, defendant Bergeron continued to overstate the Company's prospects, minimize the serious challenges VeriFone was facing, and continued to offer conflicting explanations regarding the Company's purported problems in Europe and the effect of Eurozone economic weakness.

77. On March 6, 2013, Deutsche Bank analysts issued a report on VeriFone which stated the following in part:

> The company expressed optimism over its ability to fix execution issues and dismissed accounting concerns, however, we remain concerned about market share losses, weak organic growth/ FCF, and future secular headwinds to the hardware POS business.
>
> * * *
>
> Acquisitions masked execution/ business model issues
>
> *Much of PAY's weaker results can be explained by the anniversarying* [sic] *of its large acquisitions where now the true organic growth cannot be masked*. PAY blamed weak results on an uncertain macro (~30% of weakness), execution issues (~30%) and deferred revenues (~40%). PAY defended its product platform and blamed the product issue on under-investment in localization and customization of product for country-specific requirements (company will heavily invest in products). Over the last year, different sets of product-related issues continue to impair the company's ability to execute (Hypercom product issues led to weak sales in Europe in FY12) and do not expect a quick fix.

(Emphasis added.)

78. On March 11, 2013, the Company filed its Form 10-Q for the first quarter of fiscal 2013 with the SEC. In the 10-Q, the Company further elaborated on the nature of its business in the Middle East and additional wrongdoing it had committed in that region when it acknowledged that it had conducted illegal business dealings with customers in Iran, in violation of U.S. law.

79. Also on March 11, 2013, the Company announced that defendant Bergeron was "stepping down" as CEO and a director and defendant McGinn had been named Interim CEO. The press release reiterated the Company's guidance for the second quarter and full year 2013 and quoted defendant McGinn as stating: "Doug Bergeron has led VeriFone since 2001 and overseen its transformation into an industry leader. *On behalf of the entire Board, I want to thank Doug for his dedication and his many contributions*."

80. On March 15, 2013, the Company filed a Form 8-K stating that the termination of defendant Bergeron would be deemed a termination without cause. As a result:

> *Mr. Bergeron's total cash severance will equal $1,000,000 per year*, payable in equal installments on the Company's regular salary payment dates through the second anniversary of Mr. Bergeron's separation from the Company. The Company has agreed that notwithstanding the terms of the Employment Agreement, severance amounts payable following Mr. Bergeron's separation will not be reduced by the amount of any compensation Mr. Bergeron receives with respect to any other employment during such period. Under the terms of the Employment Agreement, *Mr. Bergeron will also be entitled to continuation of medical benefits on substantially the same terms as in effect immediately prior to his separation from the Company*. With respect to Mr. Bergeron's outstanding equity-based awards that have not yet vested as of March 12, 2013, *Mr. Bergeron will continue to vest in those awards (other than equity-based awards that vest based on achievement of pre-established performance goals, which will cease to vest as of March 12, 2013), as if Mr. Bergeron remained employed by the Company until March 12, 2014*.

(Emphasis added.)

81. On April 2, 2013, analysts at Deutsche Bank released a report on VeriFone stating:

> We downgraded Verifone to Sell on April 30, 2012 (please refer to our downgrade note "Downgrading to Sell - Hype Different Than Reality") due to our concern regarding the weak organic growth, poor FCF, muted EMV opportunity, and secular disintermediation risk from mobile payments and mPOS devices. The CEO discussed mis-execution on the 1Q13 earnings call, leading to the departure of top management (CFO, Bob Dykes left on Feb 4, 2013 and CEO, Doug Bergeron resigned on March 11, 2013). PAY blamed a host of issues, including deficient product development, economic uncertainty, political troubles, demand slowdown, deferred rev and shipments to the Middle East, and client delays & losses for its issues. *We believe most of these issues existed for several quarters and were masked by the acquisition revenues*.

(Emphasis added.)

82. On May 8, 2013, the Company filed it's a definitive Proxy Statement in advance of the June 20, 2013 Annual Meeting. The Proxy Statement solicited votes on items including: (a) the

election of eight directors; (b) the approval of an amendment to the VeriFone 2006 Equity Incentive Plan to increase the number of shares to be issued thereunder; (c) an advisory vote on compensation for named executive officers; and (d) ratification of the selection of Ernst & Young LLP as the Company's independent auditor. The Proxy Statement stated the following:

> REPORT OF THE CORPORATE GOVERNANCE AND NOMINATING COMMITTEE
>
> * * *
>
> As part of its duties, in September 2012, the Corporate Governance and Nominating Committee reviewed the Committee's charter and *VeriFone's Corporate Governance Guidelines to determine whether any changes to the charter or the guidelines were deemed necessary or desirable by the Committee*. After completing this review, *the Committee recommended to the Board that no amendments to these documents needed to be made at that time*. In March 2012, the Corporate Governance and Nominating Committee also completed its review of existing director compensation guidelines and *recommended certain changes to the Board based on such review*.
>
> The Committee also conducted an evaluation of its own performance that included an evaluation of its performance compared with the requirements of the charter of the Committee. *During fiscal 2012, the Corporate Governance and Nominating Committee performed all of its duties and responsibilities under the Corporate Governance and Nominating Committee Charter*.
>
> * * *
>
> REPORT OF THE AUDIT COMMITTEE
>
> * * *
>
> In the performance of its oversight function, the Audit Committee has considered and discussed the audited financial statements with management and the independent registered public accounting firm. *The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect*. In addition, the Audit Committee has discussed with the independent registered public accounting firm the auditors' independence from VeriFone and its management, including the matters in the written disclosures and letter required by applicable requirements of the Public Company Accounting Oversight Board, a copy of which the Audit Committee has received. All non-audit services performed by the registered public accounting firm must be specifically pre-approved by the Audit Committee or a member thereof.

> In reliance on the reviews and discussions referred to above, and subject to the limitations on the role and responsibilities of the Audit Committee referred to above and in the Audit Committee charter, the Audit Committee recommended to the Board the inclusion of the audited financial statements in VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2012, as filed with the Securities and Exchange Commission.

83. The 2013 proxy statement was misleading and inaccurate because it failed to disclose that the Audit Committee and the Corporate Governance and Nominating Committee were both failing to discharge their responsibilities adequately, the Company's internal controls over accounting and public disclosure were inadequate and conveyed a misleading picture of the Company's business, and defendant Bergeron was being paid millions of dollars in severance compensation although he was personally engaged in making false statements and breaching his fiduciary duties.

**THE TRUE STATE OF VERIFONE IS FINALLY REVEALED**

84. On June 5, 2013, the Company issued a press release announcing its second quarter 2013 results and releasing the following guidance for the third quarter of 2013: net revenue of $400 million and net income per diluted share of approximately $0.20. The press release also stated in part:

> VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2013 ("Q2 FY13"). Non-GAAP net revenues for Q2 FY13 were $430 million, compared to $479 million a year ago, *a 10% decrease*. GAAP net revenues were $426 million, compared to $472 million a year ago, *a 10% decrease*. Non-GAAP net income per diluted share was $0.42, compared to $0.64 a year ago, *a 34% decrease*. GAAP *net loss per diluted share was $0.54*, compared to net profit of $0.03 a year ago.
>
> * * *
>
> Commenting on the results, Richard McGinn, Interim Chief Executive Officer, said, "We are keenly aware of the *significant short-term challenges impacting our fiscal year 2013 financial results*. To regain our momentum, *we are addressing the critical issues head-on*. We have empowered a new senior leadership team. *We are substantially increasing our R&D investment* to best serve our customers and regain competitiveness in markets where we have *product gaps*. And, we have increased our focus on cash management, as evidenced by our generation of $79 million of operating cash flow in the second quarter."

85. Also on June 5, 2013, the Company conducted a conference call to discuss the results with analysts and investors. During the call, the following statements were made:

> [McGinn:]
>
> [W]e are well aware that *we have significant short-term challenges* impacting our fiscal year 2013 results. Challenges have resulted in a miss to our financial guidance for the year, including significant take-down disclosed today for the second half of 2013. We're addressing the issues that have caused our current situation head-on, for the benefit of sustainable mid- and long-term value creation. This includes significant and *necessary personnel changes*, which we have made during Q2.
>
> …As I just stated, we're facing our issues head-on. *We know we have them*, including some *issues of product competitiveness* in selective markets…. *It will take some time* for us to get back on a growth track, but by the end of this call, I hope you will see why we have every confidence that we'll get there.
>
> * * *
>
> [McGinn:]
>
> Unfortunately, certain *product and investment decisions* taken in the recent past have had unintended consequences, that have negatively impacted that position. *Our beliefs about productivity improvements and R&D have proven not to be correct*. *The result, not surprisingly, has been that some customers in selected markets have made choices to meet an immediate need with non-VeriFone products*. In addition, *we had a poor track record of completing certification of products* in a timely fashion. This has contributed to customer and partner dissatisfaction.
>
> Since taking the helm this quarter, I have made it a priority to meet with customers in selected markets, and to listen to their views on VeriFone. What they think we do well, what they think we can do better, and what they need from us. Quite honestly, it's been an eye-opening process. They have been brutally honest about *our lack of partnership*, and it has been made clear to all of us at VeriFone that *things have to change*.
>
> * * *
>
> [McGinn:]
>
> On the R&D and product front, first and foremost, *the lack of R&D investment forced some of our important customers to seek solutions from competitors*. After years of meeting their needs with great products and service, we took a decision about investing in new product development. *This lack of investment has resulted in delayed product releases, and a poor track record of completing those products*. All

> of this has contributed to customer and partner dissatisfaction, *which is now manifesting in a top line decline*.

* * *

> [McGinn:]
>
> *Issues that we're dealing with have been in the making for quite a while and needed to be corrected*.

86. Also on June 5, 2013, the Company filed its Form 10-Q for the quarter with the SEC. The Form 10-Q stated that "as of the end of the period covered by this report, our interim CEO and our CFO have concluded that our disclosure controls and procedures… are effective" and that there had been no changes to the internal controls during the period.

87. On June 6, 2013, *Bloomberg* published an article titled "VeriFone Falls After Profit, Sales Forecast Miss," reporting: "VeriFone faces 'continued turbulence on most fronts,' Michael Grondahl, an analyst at Piper Jaffray Cos., wrote in a research note today. There are 'product development delays in many geographies that drove customers to purchase competitors' products as a patch,' he said." A June 6, 2013, *Investopedia.com* article titled "Wall Street Clearly Underestimating VeriFone's Struggles," stated in part: "VeriFone management can talk about 'significant short-term challenges' if they like, but I think these challenges are starting to stack up as real long-term threats, particularly from a market share perspective."

88. On June 7, 2013, VeriFone stock hit a new 52-week low when it reached $17.07 in intraday trading on high volume.

89. On June 11, 2013, Zacks Investment Research downgraded VeriFone to "Strong Sell."

90. On June 14, 2013, VeriFone stock again reached a new 52-week low of $15.81 during intraday trading on high volume.

91. On June 20, 2013, *The Street* published an article titled "The Street Has Hung Up on VeriFone," which stated in part:

> It's really interesting to see how the Street has finally caught on to the nightmare that VeriFone has become.

* * *

> While rivals are eating away VeriFone's business, the company is also seeing continued leverage erosion -- gross margin fell 4.5% to 36.2%. Likewise, operating margin declined by almost 6%, leading to 34% decline in net income. Where does VeriFone turn to next? Thing aren't expected to get better.

92. On June 24, 2013, the Company filed a Form 8-K with the SEC announcing the results of the shareholder vote solicited in the May 8, 2013 Proxy Statement at the Annual Meeting on June 20, 2013. Among other things, the vote resulted in the amendment of VeriFone's bylaws, the approval of an amendment to the VeriFone 2006 Equity Incentive Plan, ratification of the Company's independent auditor, Ernst & Young LLP, an advisory vote on executive compensation, and the reelection of defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler. Notably, the Company's stockholders did not approve the compensation of the Company's named executive officers in the advisory vote: approximately 17 million votes were in favor and 66 million were against with 127 abstentions and 11 million broker non-votes. Prior to casting these votes, any reasonable shareholder would have found the true state of the Company's internal controls and finances to have been material information.

93. On July 19, 2013, the Company filed a Form 8-K with the SEC disclosing that it had been forced to obtain an amendment to its credit agreement in order change the calculation of cash on hand for purposes of its loan covenants and to increase the leverage ratio permitted under the agreement.

94. On August 15, 2013, the Company disclosed that it had agreed to settle the 2007 Action for over $90 million plus a potential contingent adjustment.

95. On September 5, 2013, the Company issued a press release announcing its results for the third quarter of 2013. The press release stated in part:

> VeriFone Systems, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2013 ("Q3 FY13"). Non-GAAP net revenues for Q3 FY13 were $418 million, compared to $493 million a year ago, *a 15% decrease*. GAAP net revenues were $416 million, compared to $489 million a year ago, *a 15% decrease*. Non-GAAP net income per diluted share was $0.24, compared to $0.75 a year ago.

> *GAAP net loss per diluted share was $0.02, compared to net income per share of $0.34 a year ago.*

(Emphasis added.)

96. Also on September 5, 2013, the Company conducted a conference call to discuss the results with analysts and investors. During the call, the following statements were made:

> [McGinn:]
>
> As far as Canada is concerned, *we were not battle ready in terms of things that we had done in the past couple of years*. The customer reaction was not positive and then we came forward to get into the certification queue. We were late to that queue, missed a cycle, and *our good competitor -- primary competitor -- took advantage of that*, as one would, which had them get a big move up in terms of business vis-a-vis us.
>
> * * *
>
> [Analyst:]
>
> So just to be clear, Rich, this was more of a legacy sort of lingering issue than something that has come up in the last month. This sounds like an old issue that you are still dealing with.
>
> [McGinn:]
>
> *An old issue with a long tail*. *And we are finally getting it under control now, and that is what has been plaguing us*. And understandably, the *customers voted with their feet*. And they moved to someone else who was seen, in the absence of our inability to deliver the product at the right time, well baked, to go with someone else
>
> * * *
>
> [McGinn:]
>
> The real issue is, as we have told you last quarter and this quarter, is, we didn't do a good job. *We didn't invest enough*; *we didn't invest properly*; we had some issues, and we let another good competitor take ship share away from us in the recent past.
>
> * * *
>
> [McGinn:]
>
> If I may, just make a closing statement, *I think earlier it may have been* [an analyst] *who said that it was good to see the bottom and we concur*. *We feel good about the way things are beginning to change*.

* * *

> [McGinn:]
>
> And that is why we are saying, *as we are seeing this turn, we see it step by step, quarter by quarter, our confidence is increasing, the rate of change is increasing*.

(Emphasis added.)

97. On September 6, 2013, the Company filed its Form 10-Q for the third quarter of 2013 with the SEC. Among other things, the Form 10-Q stated that the Company's internal controls were effective and that no changes to them had occurred during the period.

98. On September 16, 2013, *The Street* published an article titled "VeriFone High-Jumps Over Low Bar," which stated in part:

> I suspect VeriFone bulls will disagree. But let's not pretend that in the June quarter management didn't "throw everything out, including the kitchen sink." What I mean by this is, given the dire state of the company, along with a CEO search, management had essentially thrown its hands up with respect to guidance -- lowering the bar so low that research firm Zack's immediately downgraded the stock to "strong sell."
>
> * * *
>
> However, VeriFone's operational deficit has been going on far too long for the economy to continue to take the blame. This is something that I can't quite understand. To the extent that this "better-than-expected quarter" is a high jump towards long-term execution, I disagree.

99. On September 23, 2013, the Company announced that it had appointed Paul Galant to serve as Chief Executive Officer, effective October 1, 2013.

100. On December 17, 2013, the Company issued its financial results for the fourth quarter and full year 2013. Although defendant McGinn had stated during the September 5, 2013 conference call that VeriFone had reached "bottom" and that the Company's prospects were beginning to change for the better, the Company's fourth quarter and full year 2013 results continued to surprise investors as they revealed the extent of the Company's deception throughout 2012 and the beginning of the 2013. The press release reported a net loss per diluted share of *$2.26 for the fourth quarter* and *a net loss of $2.73 per share for the full year 2013*, compared to

reported net income per share of $0.24 and $0.59 for the fourth quarter of 2012 and the full year 2012, respectively.

101. At close on December 18, 2013, VeriFone stock was over 7% down from the close the previous day earlier.

**IMPROPER INSIDER STOCK SALES**

102. Between December 2011 and January 2013, while the true state of VeriFone's internal controls and financial condition was being concealed, three of defendants sold VeriFone stock at a substantial profit: (a) defendant McGinn made $663,640 on one sale on March 8, 2012; (b) defendant Raff executed five sales between February and May 2012 for total proceeds of $1,631,063; (c) and defendant Rinehart executed two sales, in March and May 2012, for proceeds of $1,887,935. These sales, in addition to sales by other VeriFone executives not named as defendants, made at times when the true condition of the Company was being concealed from investors, totaled over $12 million.

**REASONS WHY DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

103. By their consent to the permanent injunction in the 2009 SEC action, the Director Defendants: (a) agreed to ensure that the Company's internal controls were adequate; and (b) knew that if they allowed or caused such controls to be inadequate, VeriFone would be severely harmed.

104. At times relevant to the allegations herein, the defendants knew; consciously disregarded; or were either reckless or negligent in not knowing that VeriFone's internal controls over accounting, financial reporting, and disclosure were inadequate and not properly functioning, thereby failing to prevent the routine issuance of misleading and inaccurate statements regarding the Company's operations and prospects.

105. In particular, the Director Defendants met regularly and reviewed VeriFone's results of operations. According to statements made by defendants Bergeron and McGinn and detailed above, the true state of VeriFone's business was known by the Director Defendants prior to it being publicly disclosed. The Director Defendants knew; consciously disregarded; or were either reckless or negligent in not knowing that the Company's public disclosures contradicted the information they were being given in Board meetings. Their failure to take action to reveal the

deception, to conceal the actual results, and to reform the Company's internal controls was breach of their fiduciary duties.

106. Defendants breached their fiduciary duties by, among other things, failing to: (a) ensure that the Company's internal controls functioned properly; (b) hold defendants Bergeron and Dykes accountable for their wrongdoing and, in particular, granting defendant Bergeron a severance package worth millions of dollars; (c) ensure that the Company's public communications were made with due candor; and (d) strengthen the Company's internal controls in the face of obvious improper disclosures and accounting.

**DAMAGES TO THE COMPANY**

107. As a result of defendants' wrongdoing, VeriFone suffered from severely deficient internal controls and disseminated misleading public statements concerning the Company's business prospects and financial condition. This lack of internal controls and these misleading statements have seriously harmed VeriFone's credibility, corporate image, and goodwill, as reflected by the Company's market capitalization loss of over 50%, or more than $2.5 billion.

108. VeriFone's management's lack of credibility has also damaged its reputation within the business community and the credit markets. Potential and current customers are aware that the Company's ability to perform on contracts is now in doubt, as evidenced by the Company's admitted decreased ability to compete with its rivals. VeriFone's customers are less likely to choose to patronize the Company due its problems providing quality service and its track record of misrepresenting the true state of its operations. VeriFone's ability to raise equity capital or debt on favorable terms in the future is now impaired, causing the Company to be likely to incur higher costs of capital and debt because the deficient internal controls and improper statements caused by defendants have materially increased the perceived risks of investing and lending money to the Company.

109. VeriFone has been, and will continue to be, severely damaged and injured by defendants' misconduct. As a direct and proximate result of defendants' conduct, VeriFone has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in incentive compensation and benefits paid to defendants that

breached their duties to the Company;

b. costs incurred in investigating and defending VeriFone and certain former officers and directors in the currently pending securities class action;

c. costs incurred due to a potential settlement or adverse judgment in connection with the currently pending securities class action;

d. costs incurred investigating and remedying the Company's internal control deficiencies;

e. substantial loss of market capital; and

f. any fines that are a result of the Company's violations of the federal securities laws.

110. In addition, VeriFone's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company only recently resolved claims related to the massive accounting fraud that occurred during 2007. It is now apparent that the Company has yet again engaged in systematic use of misleading accounting and disclosures, placing in serious doubt the credibility and motives of the Board.

111. The actions complained of herein have irreparably damaged VeriFone's corporate image and goodwill. For at least the foreseeable future, VeriFone will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that VeriFone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112. Plaintiff brings this action derivatively in the right and for the benefit of VeriFone to redress injuries suffered, and to be suffered, by VeriFone as a direct result of breaches of fiduciary duty by the individual defendants. VeriFone is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113. The Board of VeriFone at the time this action was filed consisted of the eight Director Defendants: Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler.

Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the VeriFone Board would be futile, and therefore, excused. This is because despite knowing; consciously disregarding; or either recklessly or negligently not knowing that the Company suffered from severely inadequate internal controls, the Director Defendants concealed this fact from the public, declined to institute functioning internal controls, and then permitted the Company to issue misleading and untruthful disclosures. By participating in this course of conduct, the Director Defendants exposed the Company to damage and injury. Consequently, the Director Defendants face a substantial risk of liability for breaches of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore is excused.

**Demand Is Excused Because A Majority Of The Board Faces A Substantial Likelihood Of Liability**

114. The Director Defendants permitted the Company to function with inadequate internal controls and make inaccurate public statements that conveyed a misleading picture of VeriFone's business in the face of material adverse facts that the Director Defendants knew; consciously disregarded; or were either reckless or negligent in not knowing. These facts include that the Company suffered from severely deficient internal controls over a wide range of functions related to financial reporting, and that the Company's financial results were subject to improper manipulation. Thus, the Director Defendants exposed the Company to serious damage and injury. The Director Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Any demand on the Board is, thus, excused as futile.

115. Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler, seven of the eight Director Defendants, were members of the Board of Directors in the aftermath of the major accounting scandal in 2007 and 2008, they signed Forms 10-K for the intervening years acknowledging that the Company had a history of deficient internal controls, and they consented to a permanent injunction against improper financial reporting and internal controls in 2009. These Director Defendants, due to their experience with the foregoing and in particular, their consent to

the permanent injunction in the SEC action, had personal knowledge of the scale of harm a lack of controls over accounting and disclosure would cause the Company. These seven Director Defendants affirmatively represented that they would ensure the Company's internal controls were adequate so long as they were on the Board and they declined to do so. As a result, they exposed the Company to severe damage and injury. Consequently, defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. These defendants are seven of the nine members of VeriFone's Board. Thus, demand on the Board is futile, and therefore excused.

116. Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler – seven of the eight Director Defendants -- signed the Company's December 23, 2011, and Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler – all eight Director Defendants – signed the Company's December 19, 2012, and December 19, 2013 Forms 10-K, which included misleading statements regarding the Company's internal controls and untrue certifications under Sarbanes-Oxley. Accordingly, demand is futile as to defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler.

117. Defendants Alspaugh, Henske, and Stiefler are members of the Audit Committee, and, at times relevant hereto, defendant Denend was, too. Among other things, the Audit Committee of the Board is responsible for oversight responsibility relating to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; and (iii) the performance of the Company's internal audit function. All four of Alspaugh, Henske, Denend, and Stiefler were members of the Audit Committee at times when the Audit Committee was failing to adequately discharge its responsibilities. Defendants Alspaugh, Henske, Denend, and Stiefler failed to ensure that the Company's internal controls functioned properly. These four defendants also failed to ensure that the Company's internal audit process was sufficient to prevent false disclosures and remedy deficient internal controls. Although the charter of the VeriFone Board's Audit Committee specifically tasks the Audit Committee with oversight related to internal controls, these four defendants presided over a complete lack of

accountability and a culture where widespread and pervasively inadequate internal controls were permitted to continue unabated for years. Further, after the departure of defendant Bergeron in March 2013, the statements of defendant McGinn in his role of Interim-CEO clearly demonstrate that the Board was aware that misleading and inaccurate public statements were made by VeriFone representatives. Yet, Alspaugh, Henske, Denend, and Stiefler declined to modify the Company's internal controls or investigate the wrongdoing Due to these defendants' breaches of their duties, any demand upon them is futile.

118. Defendants Alspaugh, Hart, McGinn, and Raff are the members of the Corporate Governance and Nominating Committee. According to its charter, the Corporate Governance and Nominating Committee is responsible for, among other things, overseeing the evaluation of the Board and management and assessing the adequacy of the Company's Corporate Governance Guidelines. However, defendants Alspaugh, Hart, McGinn, and Raff presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and declining to require truthful evaluations of management and the Board, and/or declining to act on evaluations truthfully describing the extent of managerial and directorial complicity in the Company's deficient controls. In so doing, these three defendants breached their fiduciary duties and any demand upon them is futile.

119. Defendant McGinn was primarily employed as the interim CEO of VeriFone from March 2013 to October 2013. In that capacity, as detailed above, McGinn made public statements acknowledging that the Company's previous public statements had been inaccurate and misleading. Yet, while serving as interim CEO, defendant McGinn took no action to commence an investigation of the wrongdoing, conduct a comprehensive audit of the Company's internal controls, or hold those responsible accountable. Directors who breached their duties continue to serve on the Board, defendant Bergeron was permitted to leave VeriFone with an excessively generous compensation package, and the Company has still not come clean about the extent of accounting wrongdoing during 2012 and 2013. Further, as also discussed above, defendant McGinn reaped over $600,000 in proceeds from a stock sale made at a time that the true state of VeriFone was being concealed from the public, but was known to him. As a result, defendant

McGinn breached his fiduciary duties by failing to take effective action to institute functioning controls over the Company that for six months he was charged with running. Due to defendant McGinn's substantial likelihood of his liability in connection with his breaches of fiduciary duties, demand on him is futile

120. All eight Director Defendants have failed to take action against those who are responsible for permitting VeriFone to function without effective accounting controls since its very inception as a public company, including themselves. No legal action has been taken against defendant Bergeron or defendant Dykes. While the Director Defendants have permitted defendant Bergeron to leave the Company without full and truthful disclosure of his role in wrongdoing at VeriFone, they have provided him with millions of dollars' in severance compensation. The Director Defendants have thus demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Moreover, the Director Defendants have thus far attempted to deny the serious accounting problems that occurred in the 2012, and have not sought to make corporate governance changes or hold necessary parties responsible. Thus, demand on the Board is futile and therefore excused

121. All of the Director Defendants, Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler, also breached their duty of loyalty by declining to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures. As a result of the conduct of defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler's, the Company has now been seriously harmed. As a result, demand is futile as to the entire Board.

122. The wrongdoing detailed herein violates the fiduciary duties owed by VeriFone's directors and is incapable of ratification.

**Demand Is Excused Because a Majority of the Board Lacks Independence**

123. In addition to being interested as a result of their threat of personal liability, defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler are incapable of objectively considering a pre-suit demand against each other because they have a longstanding history of business relationships amongst each other and have collectively demonstrated an

unwillingness to hold their friends and associates liable for breaches of fiduciary duties.

124. Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler have all served together on the VeriFone Board since 2008. As a result, these defendants were aware of the lack of functioning internal controls during 2007 and defendant Bergeron's role in making misleading statements on behalf of the Company. These defendants were on the Board when the Company settled the 2009 SEC action. As demonstrated by the allegations above, after defendant Bergeron left VeriFone, defendant McGinn and the Company's new CFO, Marc Rothman, both publicly acknowledged that the state of VeriFone's operations was not what defendants Bergeron and Dykes had consistently represented until their departures. Thus, although Plaintiff believes these defendants were aware of the misstatements at all times, as of approximately February or March 2013, defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler undeniably had direct knowledge that Bergeron and Dykes had made repeated misleading and inaccurate statements about VeriFone's business. Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler knew that: (a) the Company's internal controls had not functioned properly; and (b) defendants Bergeron and Dykes had breached their fiduciary duties. However, defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler failed to sue either Bergeron or Dykes or seek any type of clawback of previously paid or currently owed incentive compensation, failed to modify the Company's internal controls or publicly admit their material weaknesses, and permitted Bergeron to leave the Company with his reputation intact and an extremely generous compensation package. As a result, defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler have demonstrated that they are unable to consider a demand for litigation in a disinterested and independent manner because they declined to exercise their fiduciary duties when the opportunity to do so was repeatedly presented.

125. When this action was commenced, defendant McGinn was the interim CEO of VeriFone. As a result, it was unable to independently consider a demand for litigation in a disinterested and independent manner because of the conflict between his competing responsibilities as an employee of the Company and as a director. As a result, demand is excused as to defendant McGinn.

126. As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they have refused to do thus far, and will not do in the future. A majority of the Director Defendants are exposed to potential liability for operating VeriFone without the internal controls over financial reporting that would have detected and prevented material weaknesses and inaccurate representations detailed herein. Thus, demand on the Director Defendants is futile, and therefore, excused.

127. VeriFone's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of VeriFone. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by VeriFone against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of VeriFone, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, such insurance coverage exists for this action, which is brought derivatively, and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile, and therefore, excused.

## COUNT I

## BREACH OF FIDUCIARY DUTY

128. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129. Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VeriFone's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

130. Defendants' conduct set forth herein was due to their knowing; conscious; or reckless breach of the fiduciary duties they owed to the Company. Defendants intentionally or recklessly, breached or disregarded their fiduciary duties to protect the rights and interests of VeriFone.

131. In breach of their fiduciary duties owed to VeriFone, defendants willfully participated in, and caused, the Company's unnecessary expenditure of its corporate funds, and failed to properly oversee VeriFone's business, rendering them personally liable to the Company for breaching their fiduciary duties.

132. As a direct and proximate result of defendants' breaches of their fiduciary obligations, VeriFone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**

**ABUSE OF CONTROL**

133. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence VeriFone, for which they are legally responsible.

135. As a direct and proximate result of defendants' abuse of control, VeriFone has sustained significant damages.

136. As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, VeriFone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT III**

**AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934**

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statements filed in 2012 and 2013, and possibly previous proxy statements, violated §14(a) and Rule 14a-9 because they included the materially false and misleading financial statements.

139. The proxy statements were false and misleading when issued because they failed to disclose (among other things) that the Company's controls over accounting and financial disclosure were deficient and contained financial statements that were false and misleading.

140. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statements were materially false and misleading.

141. The misrepresentations and omissions in the proxy statements were material to Company shareholders in voting on the proxy statements. The proxy statements were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting and the wasteful granting of excessive severance compensation to defendant Bergeron.

142. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statements.

**COUNT IV**

**AGAINST THE DEFENDANTS FOR UNJUST ENRICHMENT**

143. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144. By their wrongful acts and omissions, including illicit insider stock sales, defendants were unjustly enriched at the expense of, and to the detriment of, VeriFone

145. Plaintiff seeks restitution from each of defendants, on behalf of VeriFone, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by each of

defendants, as a result of their wrongful conduct and breaches of fiduciary duties.

## COUNT V

## AGAINST THE INSIDER SELLING DEFENDANTS FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE SECTIONS 25402 AND 25502.5

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein

147. At the time of the stock sales detailed above, defendants McGinn, Raff, and Rhinehart, by reason of their high executive and/or directorship positions at the Company, had access to highly material information regarding the Company's true financial state and the true state of its internal controls, as set forth herein. While in possession of this material, adverse, and non-public information, these three defendants collectively sold tens of thousands of shares of VeriFone stock for millions of dollars in proceeds.

148. At the time of the stock sales of defendants McGinn, Raff, and Rhinehart, the true condition of VeriFone was concealed from the public. Had the true condition of VeriFone been known to the public, the market price for VeriFone shares would have been significantly reduced.

149. Defendants McGinn, Raff, and Rhinehart had actual knowledge of the material, adverse, nonpublic information detailed above and thus sold their VeriFone common stock in violation of California Corporations Code Section 25402.

150. Pursuant to California Corporations Code Section 25502.5, defendants McGinn, Raff, and Rhinehart are liable to VeriFone for damages in an amount equal to up to three times the difference between the price at which VeriFone common stock was sold by them, and the market value that VeriFone common stock would have had at the time of the sale if the adverse information had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

151. At all relevant times, VeriFone common stock has been held by more than 500 shareholders of record. VeriFone has assets in excess of $1 million.

152. Plaintiff, on behalf of VeriFone, has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A. Declaring that plaintiff may maintain this action on behalf of VeriFone and that plaintiff is an adequate representative of the Company;

B. Declaring that the Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to VeriFone;

C. Determining and awarding to VeriFone the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D. Directing VeriFone and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VeriFone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of VeriFone to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E. Awarding VeriFone restitution from defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: January 21, 2014

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
Alan R. Plutzik (Cal. Bar No. 077785)
aplutzik@bramsonplutzik.com
Michael S. Strimling (Cal. Bar No. 96135)
mstrimling@bramsonplutzik.com
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0200

By: _s/ Robert I.Harwood_
Robert I. Harwood

HARWOOD FEFFER LLP
Robert I. Harwood
Samuel K. Rosen
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
(212) 935-7400

LIFSHITZ LAW FIRM
Joshua M. Lifshitz
821 Franklin Avenue
Suite 209
Garden City, NY 11530
(516) 493-9780

Attorneys for Plaintiff

**VERIFICATION**

I, Sofia Zoumboulakis, hereby declare as follows:

I am a shareholder of Verifone Systems, Inc. and have continuously so owned Verifone Systems, Inc. common stock during the relevant period. I have reviewed the foregoing Amended Shareholder Derivative Complaint For Breach Of Fiduciary Duty And Abuse Of Control ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

I declare under penalty of perjury pursuant to the laws of this jurisdiction that the foregoing is true and correct and that this verification was executed at Markham, Ontario.

December 20, 2013

Sofia Zoumboulakis