United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SOFIA ZOUMBOULAKIS, Derivatively on Behalf of Nominal Defendant VERIFONE SYSTEMS, INC., <br><br>     Plaintiff, <br><br>  v. <br><br> RICHARD A. MCGINN, ROBERT W. ALSPAUGH, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, WENDA HARRIS MILLARD, EITAN RAFF, JEFFREY E. STIEFLER, DOUGLAS G. BERGERON, ROBERT DYKES, and CHARLES R. RINEHART, <br><br>     Defendants, <br><br>  and <br><br> VERIFONE SYSTEMS, INC., <br><br>     Nominal Defendant | Case No. 5:13-CV-02379-EJD <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** <br><br> **[Re: Docket No. 36]** |

**I.    Introduction**

Presently before the Court is Defendants' Motion to Dismiss Plaintiff Sofia Zoumboulakis's ("Plaintiff") Amended Shareholder Derivative Complaint ("AC", Docket Item No. 24) on behalf of Nominal Defendant VeriFone Systems, Inc. ("VeriFone").  Docket Item No. 36. Defendants are Richard A. McGinn ("McGinn"), Robert W. Alspaugh ("Alspaugh"), Leslie G.

1
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1   Denend ("Denend"), Alex W. Hart ("Hart"), Robert B. Henske ("Henske"), Wenda Harris Millard
2   ("Millard"), Eitan Raff ("Raff"), Jeffrey E. Stiefler ("Steifler") (collectively, "Director
3   Defendants"), Douglas G. Bergeron ("Bergeron"), Robert Dykes ("Dykes"), Charles R. Rinehart
4   ("Rinehart") and Nominal Defendant VeriFone (collectively, "Defendants").

Per Civil Local Rule 7-1(b), the motion was taken under submission without oral argument. Having fully reviewed the parties' pleadings, Defendants' Motion to Dismiss the AC will be GRANTED with leave to amend.

## II.     Factual and Procedural Background

This is a shareholders' derivative action brought on behalf of Nominal Defendant VeriFone against current and former VeriFone officers and directors. VeriFone is a technology company which "develops, sells, and services electronic payment processing technology." Dkt. No. 24 ¶ 2. VeriFone is incorporated under the laws of the state of Delaware. Id. ¶ 14. Defendants McGinn, Alspaugh, Denend, Hart, Henske, Millard, Raff, Steifler, Bergeron, Dykes, Rinehart were members of VeriFone's Board of Directors ("the Board"), members of VeriFone's Audit Committee, members of VeriFone's Corporate Governance and Nominating Committee, Chief Executive Officers ("CEO"), and/or Chief Financial Officers ("CFO") of the company. The facts leading to this suit, as outlined in Plaintiff's AC, are below.

In 2009, VeriFone was charged by the Securities and Exchange Commission ("SEC") with accounting fraud occurring in 2007 and 2008. Id. ¶ 2. VeriFone submitted to a permanent injunction barring further violations of federal securities law, specifically as related to internal controls and financial disclosures. Id. At the time, Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler were all members of the Board and consented to the injunction. Id. ¶ 115.

In addition, a suit was filed against VeriFone which consolidated a number of securities class actions. Id. ¶ 2. See In re VeriFone Holdings, Inc. Sec. Litig., C 07-06140 MHP, 2009 WL 1458211 (N.D. Cal. May 26, 2009). VeriFone resolved the suit by paying over $90 million to the class. Dkt. No. 24 ¶ 2. Defendants Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler were all members of the Board at the time this settlement occurred. Id. ¶ 8.

2

Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

VeriFone's business is divided into two primary areas: system solutions and services. Id. ¶ 2. In 2011, VeriFone began increasing its services segment from 20% of its business to a projected 50% by 2015. Id. ¶ 3. The transition involved a number of acquisitions of smaller companies. Id. Plaintiff alleges it was difficult for investors to determine what portion of VeriFone's overall growth was attributed to the acquisitions, as opposed to "organic" growth. Id. However, VeriFone representatives made a number of statements projecting 10-15% organic growth. Id. ¶ 4.

On December 14, 2011, following a quarter-end press release, VeriFone's then-CEO, Bergeron, stated in a conference call that VeriFone was "on our way towards . . . 50% services revenue by the end of fiscal year 2015." Id. ¶ 36. He also stated "[g]rowth rates have accelerated, [and] margins are expanding." Id. On March 5, 2012, in a conference call following the quarter-end press release, Bergeron stated that VeriFone expected "monthly revenue to increase sequentially throughout the year" and that VeriFone was developing its recent acquisition of Hypercom, and expected to "sell a lot of [Hypercom products]." Id. ¶ 41.

On March 8, 2012, Defendant McGinn sold VeriFone stock for a total of $663,640. Id. ¶ 102. On April 30, 2012, Deutsche Bank released a report which advised VeriFone investors to sell VeriFone stock (NYSE: "PAY") due to VeriFone's "poor financial disclosures, lower true organic growth, future business risks and rich valuation." Id. ¶ 44. The report also stated that Deutsche Bank analysts "believe[d] 'true' organic growth [was] being overstated by the company." Id. That day, VeriFone stated in a press release that its method of calculating organic growth was the same as that "prescribed by the vast majority of investors and Wall Street analysts," and reaffirmed its expectation of 10-15% organic growth rates for the 2012 fiscal year and long term. Id. ¶ 45.

On May 16, 2012, Bergeron stated in a conference call that VeriFone would continue to grow in emerging markets at rates of 20-30%, which would contribute to overall organic growth of 10-15% in the 2012 and 2013 fiscal years. Id. ¶ 47. On May 24, 2012, Bergeron stated in a conference call that VeriFone was "solidly behind [its] annual 10% to 15% organic growth rate." Id. ¶ 52. He also stated VeriFone continued to see good demand in Europe. Id.

1   Between February and May 2012, Defendant Raff made five sales of VeriFone stock, for
2   total proceeds of $1,631,063. Id. ¶ 102. In March and May 2012, Defendant Rinehart made sales
3   of VeriFone stock for total proceeds of $1,887,935. Id.

4   On September 5, 2012, in a conference call, VeriFone's then-CFO, Dykes, stated that
5   VeriFone was "still a mid-teens growth Company." Id. ¶ 57. On December 13, 2012, VeriFone
6   issued a press release regarding its quarter-end and 2012 full year results. Id. ¶ 61. The release
7   stated that non-Generally Accepted Accounting Principles ("non-GAAP") net revenue for the fiscal
8   year 2012 was $1.886 billion, a 44% increase over fiscal year 2011. Id. The press release also
9   stated that net income per diluted share was $2.74, a 43% increase over fiscal year 2011. Id. This
10  press release further stated that VeriFone anticipated non-GAAP net revenue between $490 and
11  $500 million, and non-GAAP net income per share between $0.70 and $0.73 for the first quarter of
12  2013. Id. ¶ 61.

13  Regarding this press release, Bergeron stated in a conference call that VeriFone expected "a
14  material positive impact on growth rates and margins in 2014" as a result of their investments in
15  services. Id. ¶ 62. He also stated that "[t]he foundations built in 2012 [would] drive continued
16  outsized returns for [VeriFone's] shareholders in 2013 and beyond." Id.

17  On February 20, 2013, VeriFone issued a press release regarding preliminary results for the
18  first quarter of 2013, stating that it expected non-GAAP net revenue between $425 and $430
19  million and non-GAAP net income per share between $0.47 and $0.50 for the first quarter of 2013.
20  Id. ¶ 68. These results were significantly lower than the guidance given in the December 13, 2012
21  press release. Id. ¶ 62. VeriFone attributed the lowered results to: (1) weak macro-economic
22  conditions in Europe, (2) missed revenue opportunities due to focus on long-term service
23  initiatives, (3) increased deferred revenue for shipments to customers in the Middle East and Africa
24  which did not meet first quarter revenue recognition requirements, (4) lower than expected revenue
25  from Brazil, and political and economic uncertainty in Venezuela, and (5) delayed customer
26  projects and a canceled Washington, D.C. taxi project. Id. ¶ 68. Bergeron stated that the results
27  were impacted by "external headwinds and internal challenges," but noted that VeriFone
28  "expect[ed] to resume year-over-year net revenue growth in the mid- to high-single digits

1  beginning in fiscal 2014." Id.  After this press release, VeriFone stock dropped almost 50% in

2  price, to its lowest point in nearly three years. Id. ¶ 71.

3        On March 5, 2013, Bergeron stated in a conference call following the release of VeriFone's

4  first quarter 2013 results that, "[i]n retrospect, we found that a number of our issues in the quarter

5  and in the last few quarters were, indeed, self-inflicted." Id. ¶ 74.  He noted that approximately

6  $23 million in revenue from the Middle East and Africa had been deferred, which "[i]n retrospect,

7  [could] only be attributed to poor sales planning and execution." Id.  VeriFone's new CFO, Mark

8  Rothman ("Rothman")[1], noted that the decision to defer the revenue "was consistent with the

9  Company's long-standing revenue recognition policy and requirements under GAAP, and was not

10  a change in accounting policy or practice," and that no changes to accounting policies were

11  planned in the near future. Id.  Bergeron also stated that VeriFone had been "living in a quasi state

12  of denial" regarding the macroeconomic conditions in Europe. Id.  In regards to the Hypercom

13  integration, Bergeron stated that it had caused a loss in market share, due to "a few revenue

14  dissynergies . . . and some underinvestment." Id.

15        On March 11, 2013, in its quarterly Form 10-Q filed with the SEC, VeriFone admitted it

16  had conducted illegal business dealings in Iran. Id. ¶ 78.  On the same day, VeriFone announced

17  that Bergeron was resigning as CEO, and named Defendant McGinn as Interim CEO.[2] Id. ¶ 79.

18  On March 15, 2013, VeriFone filed a Form 8-K stating that Bergeron was terminated "without

19  cause," and would be paid $1 million per year in severance and benefits for the next two years. Id.

20  ¶ 80.

21        On June 5, 2013, following a press release regarding VeriFone's second quarter results,

22  McGinn stated that the fiscal year 2013 results had been impacted by "significant short-term

23  challenges." Id. ¶ 85.  He also stated that VeriFone's "beliefs about productivity improvements

24  and R&D ha[d] proven not to be correct," specifically noting that a lack of R&D investment had

---

[1] On February 4, 2013, Dykes resigned from his post as CFO. Id. ¶ 66.

[2] On September 23, 2013, VeriFone announced that Paul Calant would join the company as CEO beginning October 1, 2013. Id. ¶ 99.

caused some VeriFone customers to move to competitors, delayed product releases, and created a "poor track record of completing those products." Id.

On September 5, 2013, following a press release regarding VeriFone's third quarter results, McGinn stated that VeriFone had lost customers in Canada to a competitor due to "[a]n old issue with a long tail." Id. ¶ 96. He also stated that VeriFone had not invested enough or properly. Id.

Throughout 2011 through 2013, VeriFone made a variety of required filings with the SEC. VeriFone filed annual Form 10-K's and quarterly Form 10-Q's which stated that internal controls were effective. Id. ¶¶ 38, 43, 54, 59, 64, 86, 97. VeriFone also filed annual definitive proxy statements in 2012 and 2013 which stated that released financial statements had been reviewed by the Audit Committee[3] and that the Corporate Governance and Nominating Committee had complied with all duties required in its charter.[4] Id. ¶¶ 49, 82.

Plaintiff filed a shareholder derivative complaint on May 24, 2013. See Docket Item No. 1. On January 21, 2014, Plaintiff filed the AC, alleging the following five bases of liability against the various Defendants: (1) breach of fiduciary duty, (2) abuse of control, (3) violation of section 14(a) of the Securities Exchange Act of 1934, (4) unjust enrichment, and (5) violation of California Corporations Code sections 25402 and 25502.5. Dkt. No. 24. At the time the action was filed, the Board consisted of the eight Director Defendants: Alspaugh, Denend, Hart, Henske, McGinn, Millard, Raff, and Stiefler. Id. ¶ 113. Plaintiff did not make a demand on the Board prior to filing the action. Id.

---

[3] Defendants Alspaugh, Denend, Henske, and Stiefler were at all relevant times members of the Audit Committee. Id. ¶ 117. The Audit Committee's Charter states that it is responsible for oversight of (1) VeriFone's financial statements, (2) VeriFone's compliance with legal and regulatory requirements, (3) qualification and independence of independent auditors, and (4) performance of VeriFone's internal audit functions. Id. ¶ 30.

[4] Defendants Alspaugh, Hart, McGinn and Raff were members of the Corporate Governance and Nominating Committee at all relevant times. Id. ¶ 31. The Corporate Governance and Nominating Committee was responsible for (1) identifying and selecting or recommending nominees to stand for election as directors at annual stockholder meetings, (2) identifying and recommending Board members to fill committee vacancies, (3) establishing procedures for oversight and evaluation of the Board and management, and (4) developing, recommending and reviewing corporate governance principles. Id.

6
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

On March 7, 2014, Defendants filed a Motion to Dismiss Plaintiff's AC. Dkt. No. 36. On April 23, 2014, Plaintiff filed an Opposition to Defendants' Motion (Docket Item No. 38) and Defendants filed a Reply to Plaintiff's Opposition (Docket Item No. 39).

### III. Legal Standard

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). Moreover, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." Twombly, 550 U.S. at 556-57.

Rule 23.1(b) of the Federal Rules of Civil Procedure governs the federal pleading standards for shareholder derivative actions. Prior to bringing a derivative suit, a shareholder must first make a demand for action on the corporation's directors. See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 989 (9th Cir. 1999) abrogated on other grounds by S. Ferry LP, No.2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). This is commonly referred to as the "demand requirement." See Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984) overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). The demand requirement exists "to insure that a stockholder exhausts his intracorporate remedies, and . . . provide a safeguard against strike suits" and thus acknowledging "the fundamental precept that directors manage the business and affairs of corporations." Aronson, 473 A.2d at 811-12. Exceptions to the demand requirement of Rule 23.1(b)(3) are generally governed by the law of the state where the corporation is incorporated. See Kamen v. Kemper Fin. Servs., 500 U.S. 90, 108-09 (1991). Rule 23(b)(3) requires that the complaint "state with particularity: (A) any effort made by the plaintiff to obtain the desired action from the directors or comparable authority. . . and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).

7

Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

## IV. Discussion

A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation. Aronson, 473 A.2d at 811 (Del. 1984). Pursuant to Rule 23.1, which governs derivative actions, a shareholder's complaint must state with particularity "any effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1. Rule 23.1 imposes a higher standard of pleading than Rule 8(a).

Defendants seek dismissal of Plaintiff's AC because she failed to make a demand on the Board prior to filing this suit, and argue that demand is not excused. Plaintiff concedes that she failed to make demand on the Board prior to filing this suit, but contends that demand is excused. It is undisputed that as VeriFone is incorporated in Delaware, the question of whether demand is excused is governed by Delaware law. See Kamen, 500 U.S. at 108-09 ("[A] court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the [s]tate of incorporation.").

Under Delaware law, "directors of a corporation and not its shareholders manage the business and affairs of the corporation, and accordingly, the directors are responsible for deciding whether to engage in derivative litigation." Levine v. Smith, 591 A.2d 194, 200 (Del. Ch. 1991) (internal citation omitted) (overruled on other grounds by Brehm, 746 A.2d 244). Because directors are empowered to manage or direct the business affairs of the corporation, a shareholder seeking to bring a derivative action must first make a demand on that corporation's board of directors, giving the board an opportunity to examine the alleged grievance to determine whether pursuing the action is in the best interest of the corporation. Aronson, 473 A.2d at 812. The right of a shareholder to prosecute a derivative suit is limited to situations where the shareholder has demanded that the directors pursue the claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making impartial decisions regarding such litigation. Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993) (quoting Levine, 591 A.2d at 200).

Demand on a board of directors is excused if the plaintiff pleads sufficient facts to show that demand would have been futile. Aronson, 473 A.2d at 814. Under Delaware law, failure to make a demand may be excused if a plaintiff can raise a reasonable doubt that (1) a majority of the board is disinterested or independent, or (2) the challenged act was a product of the board's valid exercise of business judgment. Id.; Rales, 634 A.2d at 934 (Del. 1993). For the first prong, a plaintiff must plead sufficient facts to raise reasonable doubt regarding the disinterest or independence of at least half of the board members. See Beneville v. York, 769 A.2d 80, 86 n.14 (Del. Ch. 2000).

Here, Plaintiff does not contest a specific action or decision of the board. Instead, Plaintiff argues that demand was futile because at least four of the eight Board members were either interested or not independent. Defendants contend that Plaintiff has failed to plead particularized facts to raise reasonable doubt as to half the Board members' disinterest or independence at the time the action was filed. Thus, Defendants argue that demand is not excused, and Plaintiff's AC should be dismissed.

### A. Disinterest of Board Members

Directorial interest exists whenever divided loyalties are present, where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not on the corporation or its stockholders. Rales, 634 A.2d at 936; Aronson, 473 A.2d at 812. A plaintiff can raise reasonable doubt regarding the disinterest of a director by demonstrating "that the director will personally benefit or suffer as a result of the lawsuit." In re InfoUSA, Inc. S'holders Litig., 953 A.2d 963, 985 (Del. Ch. 2007). Reasonable doubt regarding the disinterest of a director is raised when the plaintiff establishes that the director faces a "substantial likelihood" of personal liability regarding the subject of the complaint. Rales, 634 A.2d at 936; Aronson, 473 A.2d at 815. This is a high standard to meet. InfoUSA, 953 A.2d at 990. A defendant's actions must be "so egregious that a substantial likelihood of director liability exists." Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995). Mere threat of personal

liability alone is insufficient to raise reasonable doubt as to a defendant's disinterest. Aronson, 473 A.2d at 815.

Plaintiff relies on her ability to show a substantial likelihood of liability in challenging the disinterest of the individual board members. Plaintiff asserts three cognizable bases where various defendants face a substantial likelihood of liability: (1) failure to address the inadequacy of VeriFone's internal controls, (2) issuing misleading statements, and (3) insider trading. Defendants contend that Plaintiff has failed to plead particularized facts to establish a substantial likelihood of liability under any of these theories.

As a threshold matter, Defendants argue that the Director Defendants are protected by the exculpatory clause in VeriFone's Certificate of Incorporation which immunizes them from any personal liability for breaches of their fiduciary duties.[5] Here, Plaintiff alleges only that Defendants breached their fiduciary duties of good faith and loyalty.[6] However, under Delaware law, an exculpatory clause only protects a director from liability for the breach of its fiduciary duty of care. See Emerald Partners v. Berlin, 726 A.2d 1215, 1224 (Del. 1999). As Plaintiff does not allege Defendants breached their duty of care, the existence of an exculpatory clause is inapplicable to Defendants' Motion to Dismiss.[7]

---

[5] Under Delaware Code Title 8 section 102(b)(7), directors may be immunized from liability for breach of fiduciary duties to the corporation or its stockholders, so long as it is not (1) for breach of the director's duty of loyalty, (2) for bad faith acts or omissions involving intentional misconduct or knowing violation of the law, (3) under § 174 (liability of directors for unlawful payment of dividend or stock purchase), or (4) a transaction where the director derived an improper personal benefit. Del. Code Tit. 8 § 102(b)(7).

[6] Some courts consider the duty to act in good faith to be a subsidiary of the duty of loyalty. See, e.g., Stone ex rel. AmSouth Bancorporation v. Ritter, 911 A.2d 362, 369-70 (Del. 2006).

[7] Plaintiff argues that the relevance of a section 102(b)(7) exculpatory clause is an affirmative defense which may not be considered on a motion to dismiss, however this is incorrect. See Abbott Labs., 325 F.3d at 810 ("Generally, when the validity of a waiver clause is not contested and where the plaintiffs allege only a breach of the duty of care . . . the waiver provision may be considered and applied in deciding a motion to dismiss."). Nonetheless, as Plaintiff does not allege a breach of the duty of care, the exculpatory provision is irrelevant to Defendants' present Motion to Dismiss.

10
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

### 1. Internal Control Issues

Plaintiff argues that the Director Defendants were on notice of serious internal control problems, but disregarded their fiduciary duties when the problems continued under their direction. She further alleges that the Director Defendants were at least negligent in not recognizing that VeriFone was suffering from severely inadequate internal controls and concealed that fact from investors. Thus, Plaintiff argues that the Director Defendants face a substantial risk of liability for breaches of good faith and loyalty and demand is therefore excused.

When the alleged shareholder losses arise from a decision made directly by the board, directors are liable if the "decision was ill advised or negligent." In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996). However, when directors delegate corporate functions to officers or employees, directors instead have a duty of "oversight," governed by the Caremark standard, which requires the plaintiff establish that the directors acted without good faith "as evidenced by a sustained or systematic failure of a director to exercise reasonable oversight" of the activities leading to the corporate losses. Id. at 971. In pleading a Caremark claim to establish demand futility, a plaintiff must plead with particularity sufficient facts to show a substantial likelihood that half or more of the board was not acting in good faith, or at minimum was "conscious of the fact that they were not doing their jobs." Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003).

Defendants argue that Plaintiff's claim that the Director Defendants failed to properly oversee and address the internal control inadequacies is governed by Caremark. Plaintiff argues that her allegations are not Caremark claims, as they are based on Defendants' own decisions to consciously disregard their obligations to ensure properly functioning internal controls, rather than the oversight of officers or employees. Plaintiff notes that following the 2009 SEC action, seven[8] of the eight Director Defendants consented to a permanent injunction against improper financial reporting and internal controls. Thus, Plaintiff asserts that the Director Defendants affirmatively represented that they would ensure VeriFone's internal controls were adequate, but failed to address those problems even though they were on notice of serious internal control problems.

---

[8] Defendants Alspaugh, Denend, Hart, Henskey, McGinn, Raff and Stiefler.

11

Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

As Plaintiff does not assert Defendants were directly responsible for implementing and maintaining VeriFone's internal controls, but rather asserts that Defendants were either negligent in not knowing about the alleged internal control deficiencies or knew about them and failed to address them, the Court agrees with Defendants that Plaintiff is asserting an oversight claim, governed by the Caremark standard. See Caremark, 698 A.2d at 971. Further, Plaintiff fails to plead particularized facts to demonstrate that the internal control issues addressed in the 2009 SEC action were the same as those which lead to the present action. Moreover, Plaintiff does not plead any facts to support an allegation that Defendants violated the 2009 SEC settlement agreement, nor that there is a pending SEC action against VeriFone.[9] Thus, the Court finds that Plaintiff's asserted claims regarding internal control problems are oversight claims governed by the Caremark standard, and Plaintiff must plead with particularity facts to support a substantial likelihood that Defendants acted in bad faith in failing to address the internal control issues.

"Evaluating director action under the bad faith standard is a contextual and fact specific inquiry and what a defendant knows and understands is, of course, relevant to such an inquiry." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 128 n.63 (Del. Ch. 2009). Plaintiff asserts that VeriFone suffered from "inadequate" or "deficient" internal controls, but fails to plead with particularity specific aspects of the internal controls that were inadequate, or how these alleged deficiencies impacted the financial statements allegedly leading to Plaintiff's losses. Plaintiff must show a substantial likelihood that the directors were at least "conscious of the fact that they were not doing their jobs." See Guttman, 823 A.2d at 506. Plaintiff alleges that Defendants "consciously disregarded" their obligations to ensure properly functioning controls under the 2009 SEC settlement agreement. However, Plaintiff does not plead sufficient facts to

---

[9] The cases cited by Plaintiff to support her assertion that the Director Defendants "consciously disregarded" their duties to ensure adequate internal controls were situations where the company was found to have violated a compliance or settlement agreement prior to the shareholder derivative litigation. In Abbott Labs, the defendants entered into – and later violated – a Voluntary Compliance Plan with the FDA to comply with regulations. In re Abbott Labs. Derivative S'holders Litig. 325 F.3d 795, 800 (7th Cir. 2003). In Pfizer, the company had entered into settlement agreements with the government regarding its illegal kickbacks and off-labeling marketing practices, which it was later found to be violating. In re Pfizer Inc. S'holder Derivative Litig., 722 F. Supp. 2d 453, 455 (S.D.N.Y. 2010).

1    establish that Defendants were on notice regarding the specific internal control issues which
2    allegedly caused Plaintiff's losses, and has failed to prove Defendant's failure to act in good faith.
3    　　　　Plaintiff argues that by virtue of their membership in the Audit Committee, Defendants
4    Alspaugh, Denend, Henske, and Stiefler are liable for failing to ensure VeriFone's internal controls
5    were functioning properly. The Audit Committee is tasked with oversight responsibility for
6    VeriFone's internal control functions. Dkt. No. 24 ¶ 117. Plaintiff asserts the Defendants in the
7    Audit Committee failed to ensure that internal controls were sufficient to prevent false disclosures,
8    and presided over a culture where widespread and pervasively inadequate internal controls
9    continued unabated for years. However, Plaintiff has failed to plead with particularity which
10   specific internal controls were not functioning properly. Furthermore, the Audit Committee charter
11   states explicitly that the members are tasked with "oversight responsibility," thus their actions are
12   subject to the Caremark standard. Plaintiff has failed to plead sufficient factual detail to raise a
13   substantial likelihood that the Audit Committee members acted in bad faith in failing to address the
14   alleged internal control issues, and Plaintiff's assertions are merely conclusory. See Citigroup, 964
15   A.2d at 128 n.63 ("Directors of a committee charged with oversight of a company's risk have
16   additional responsibilities to monitor such risk; however, such responsibility does not change the
17   standard of director liability under Caremark and its progeny, which requires a showing of bad
18   faith.").
19   　　　Therefore, the Court finds that under the Caremark standard, Plaintiff has not shown with
20   particularity a substantial likelihood that Director Defendants acted in bad faith in failing to address
21   the alleged internal control problems.

### 2. Issuance of Misleading Statements

23   　　In her Opposition, Plaintiff alleges that Defendants are liable for making misleading
24   statements regarding (a) VeriFone's growth, (b) the performance of VeriFone's acquisitions, (c)
25   VeriFone's performance in Europe, Latin America and North America, and (d) VeriFone's internal
26   controls. Plaintiff argues that all eight Director Defendants had knowledge of the misleading
27   statements, and failed to issue corrective disclosures. Thus, Plaintiff asserts the Director
28   Defendants face a substantial likelihood of liability for breaching their fiduciary duties by

13
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

knowingly disseminating misleading information to shareholders. Plaintiff also asserts Defendants face a substantial likelihood of liability for signing and submitting misleading filings with the SEC. Plaintiff further argues that Defendants Alspaugh, Denend, Henske, and Stiefler face a substantial likelihood of liability for issuing false and misleading statements to shareholders as members of the Audit Committee. See InfoUSA, 953 A.2d at 990 ("[S]hareholders are entitled to honest communication from directors, given with complete candor and good faith. Communications that depart from this expectation, particularly where . . . the directors involved issued the communication with the knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders. Such violations are sufficient to subject directors to liability in a derivative claim.").

### a. Growth

A number of times, VeriFone represented projected 10-15% organic growth rates. See Dkt. No. 24 ¶¶ 45, 47, 52. Plaintiff asserts that these projected growth rates were inaccurate and misleading because they were overstated and because Defendants failed to disclose various risks and issues that would ultimately impact VeriFone's growth.

Defendants argue that the statements made regarding growth rates were forward-looking projections, and that Plaintiff has failed to plead any facts to show that Defendants knew they were misleading at the time. Defendants point out that subsequent statements made by Bergeron noted that problems were identified "in retrospect" or "with hindsight," and that Bergeron never acknowledged that any prior statement was false when made.

Plaintiff has failed to meet the high standard required to establish a substantial likelihood of liability for Defendants' dissemination of misleading statements regarding VeriFone's projected growth. Plaintiff does not plead sufficient factual detail to give rise to a substantial likelihood that Defendants had knowledge that the organic growth projections were misleading at the time they were issued, nor that they had knowledge of the risks which would ultimately impact growth rates and intentionally concealed them from shareholders.

#### b. Performance of Acquisitions

Plaintiff asserts that Bergeron's December 14, 2011 statement concerning VeriFone's takeover of Hypercom ("significant operating synergies") was misleading, as Bergeron later stated on March 5, 2013 that VeriFone had "lost market share for sure since the Hypercom acquisition" due to "a few revenue dissynergies, and some of [which] was self-inflicted through some poor management as to resources and some underinvestment," showing that the integration of Hypercom was not going as smoothly as originally stated. Dkt. No. 24 ¶¶ 36, 74. Bergeron also stated that the acquisition of Point had led VeriFone towards a goal of "50% services revenue by the end of fiscal year 2015." Id. ¶ 36. Plaintiff states this was also misleading and inaccurate.

However, the Court finds that Plaintiff fails to plead sufficient facts to demonstrate that Defendants knew or should have known of the risks and integration problems at the time the allegedly misleading statements were made. Thus, she has failed to raise a substantial likelihood of liability for Defendants' issuance of allegedly misleading statements regarding the performance of VeriFone's acquisitions.

#### c. Performance in Europe, Latin America, and North America

On May 24, 2012, Bergeron stated that demand in Europe was not changing, and the VeriFone continued seeing "good demand." Dkt. No. 24 ¶ 52. However, on February 20, 2013, when VeriFone released its lower-than-projected first quarter results, its press release stated that the lowered results were due in part to "weak macro-economic conditions in Europe." Id. ¶ 68. Thus, Plaintiff asserts that the previous statement was misleading. Plaintiff notes that Bergeron stated that VeriFone was "perhaps . . . living in a quasi state of denial," thus arguing that he admitted that the Board knew the statements were misleading at the time they were made. Id. ¶ 74.

Defendants argue that Bergeron stated that the discovery of the economic conditions in Europe was only made in hindsight, and thus the statements were not misleading or false at the time they were made. The Court does not find that Bergeron's statement that VeriFone was "perhaps . . . living in a quasi state of denial" is equivalent to admitting the statements made were known by Defendants to be untruthful at the time.

1    Similarly, Plaintiff argues that McGinn's statement that Canadian customers had been lost
2    due to "an old issue with a new tail" was an indication that Defendants' positive statements
3    regarding North American business were inaccurate when made. However, the Court finds
4    McGinn's statement insufficient to prove that the statements were untruthful at the time made.
5    Thus, the Court finds that Plaintiff fails to plead sufficient facts to meet the high standard of
6    establishing a substantial likelihood of liability for Defendants.

### d. Internal Controls

Plaintiff asserts that Defendants failed to disclose to investors that internal controls were inadequate, thus rendering statements made regarding their financial projections misleading. As discussed above, Plaintiff has failed to clearly identify which internal controls were inadequate or that Defendants had knowledge of their inadequacies. Thus, the Court concludes Plaintiff does not establish a substantial likelihood of liability for Defendants' alleged misleading statements regarding VeriFone's internal controls or the resulting financial projections.

### e. SEC Filings

Plaintiff alleges that seven of the Director Defendants signed the December 23, 2011 Form 10-K and all eight signed the Forms 10-K released on December 19, 2012 and 2013, each of which contained allegedly misleading statements regarding VeriFone's internal controls. However, Plaintiff has failed to plead sufficient facts to establish that the statements filed with the SEC were misleading or false, or that the Director Defendants had knowledge of the statements' falsity at the time they signed them. See Jones ex rel. CSK Auto Corp. v. Jenkins, 503 F. Supp. 2d 1325, 1337 (D. Ariz. 2007) (finding that the fact that the defendants had reviewed the allegedly false SEC filings prior to signing them was insufficient to show that the defendants had consciously disregarded the risk that they contained errors). Thus, the Court does not find that Plaintiff has established a substantial likelihood of liability for Defendants' filing allegedly misleading statements with the SEC.

### f. Misleading Proxy Statements

Plaintiff further alleges that Defendants filed proxy statements in 2012 and 2013 that included materially false and misleading statements, thus violating section 14(a) of the Securities

16
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

1   Exchange Act ("SEA").  Rule 14a-9, promulgated under section 14(a) of the SEA, prohibits

2   issuance of a statement or proxy statement which "at the time and in the light of the circumstances

3   under which it is made, is false or misleading with respect to any material fact, or which omits to

4   state any material fact necessary in order to make the statements therein not false or misleading."

5   17 C.F.R. § 240.14a-9(a).  Plaintiff states that the 2012 and 2013 proxy statements are actionable

6   because Defendants should have known that the statements failed to disclose that the Audit

7   Committee and the Corporate Governance and Nominating Committee failed to discharge their

8   responsibilities adequately, and that VeriFone's controls over accounting and financial disclosures

9   were deficient and contained financial statements that were false and misleading.  Thus, Plaintiff

10  asserts the Director Defendants face a substantial likelihood of liability under § 14(a) for issuing

11  misleading proxy statements.

12         The Court finds that Plaintiff has failed to plead sufficient factual detail to demonstrate a

13  substantial likelihood that the Committee members failed to discharge their duties, or show that

14  VeriFone's controls were inadequate, or that the financial statements were false or misleading at

15  the time made.  Thus, Plaintiff fails to establish a substantial likelihood of Director Defendants'

16  liability under section 14(a).

17              **3. Insider Trading**

18         Plaintiff alleges that Defendants McGinn, Raff and Rinehart each sold stock with "actual

19  knowledge" that the true condition of VeriFone was being concealed from the public, therefore

20  violating California Corporations Code section 25402, and leading to substantial likelihood of

21  liability.

22         California Corporations Code section 25402 makes it unlawful for a director or officer of

23  the issuing corporation "to purchase or sell any security of the issuer in this state at a time when he

24  knows material information about the issuer gained from [his position] which would significantly

25  affect the market price of that security and which is not generally available to the public, and which

26  he knows is not intended to be so available, unless he has reason to believe that the person selling

27  to or buying from him is also in possession of the information."  Cal. Corp. Code § 25402.

28

1        However, Plaintiff fails to plead particularized facts to support her assertion that
Defendants knew of any material non-public information. Moreover, Plaintiff makes no allegation that the contested stock sales were made due to alleged insider information. Further, Plaintiff does not plead any facts to show that the contested stock sales were unusual from previous trading practices. Even if sales were made while the Defendants were allegedly in possession of insider information, that fact alone is not sufficient to deem them interested. See In re Verisign, Inc., Derivative Litig., 531 F. Supp. 2d 1173, 1190-91 (N.D. Cal. 2007) ("[T]here is no per se rule that makes a director 'interested' based solely on generalized allegations that he or she sold company stock while in possession of material, non-public information.").

Furthermore, Plaintiff's insider trading allegations are asserted only against two Board members, McGinn and Raff, and thus insufficient alone to establish a substantial likelihood of liability for at least half of the board.

### B. Independence

A director is deemed "not independent" if he "is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind." In re Oracle Corp. Derivative Litig., 824 A.2d 917, 920 (Del. Ch. 2004).

Plaintiff asserts three bases upon which she can raise a reasonable doubt regarding various Defendants' independence: (1) the Director Defendants' longstanding business relationships, (2) McGinn's dual status as employee and director while serving as VeriFone's interim CEO, and (3) the Director Defendants' lack of insurance protection under VeriFone's liability insurance's "insured versus insured exclusion." Defendants contend that none of these bases is sufficient to raise reasonable doubt regarding any Director's independence for demand futility analysis purposes.

#### 1. Business Relationships

Plaintiff states that Defendants Alspaugh, Denend, Hart, Henske, McGinn, Raff, and Stiefler were not independent because of their history of business relationships amongst each other. However, generalized assertions regarding longstanding business relationships alone are insufficient to show a lack of independence. See Beam ex rel. Martha Stewart Living Omnimedia,

18

Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Inc. v. Stewart, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.").

Plaintiff supports her assertion by stating that the above Defendants were unwilling to hold their friends and associates liable for breaches of fiduciary duties. Plaintiff states that all Director Defendants had direct knowledge that Bergeron and Dykes had made repeated misleading and inaccurate statements about VeriFone's business, but failed to sue either, gave Bergeron a generous compensation package upon his resignation, and failed to change VeriFone's internal controls. However, Plaintiff has failed to sufficiently plead that Defendants had "direct knowledge" that either Bergeron or Dykes made misleading statements, so neither Defendants' failure to sue Bergeron or Dykes, nor Bergeron's severance package support her assertion of Defendants' lack of independence. Similarly, Plaintiff has failed to plead sufficient facts to establish that Defendants knew or should have known the internal controls were inadequate, and thus their failure to change them does not support her assertion of Defendants' lack of independence.

Thus, the Court finds that the Director Defendants' business relationships fail to raise reasonable doubt as to their independence.

### 2. McGinn's Status as CEO

Plaintiff further alleges that there is reasonable doubt as to McGinn's independence because of his dual position as interim CEO and director. However, the Court is hesitant to find that dual interim CEO and director status automatically raises reasonable doubt as to independence.[10]

---

[10] The authority relied upon by Plaintiff focuses heavily on employee-directors' interest in maintaining employment. Here, McGinn was serving as Interim CEO, a temporary position, and thus it cannot directly be inferred that he had the same level of interest in maintaining his employment as the employee-directors in the cases cited by Plaintiff. See Mizel v. Connelly, CIV. A. 16638, 1999 WL 550369 (Del. Ch. July 22, 1999) (noting that the Chief Operating Officer and Vice President, who were also board members, each derived their principal income from their employee status, and would be reluctant to take action adverse to the CEO); Rales, 634 A.2d at 937 (finding reasonable doubt as to two employee-directors because of their substantial interest in maintaining their employment and the significant influence exerted over them by the company's Board and Executive Committee); In re Tyson Foods, Inc., 919 A.2d 563, 583 (Del. Ch. 2007) (finding that the CEO-director could reasonably be inferred to be not independent because his significant compensation depended on "continued good favor" of the other directors in the family run business, who had already been deemed "interested").

19
Case No. 5:13-CV-02379-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Furthermore, even if the Court found Plaintiff had sufficiently raised reasonable doubt as to McGinn's independence, this only implicates one of eight Director Defendants.

### 3. Insured v. Insured Exclusion

Plaintiff argues that as the Director Defendants would not be protected by VeriFone's liability insurance had they sued themselves (under the so-called "insured versus insured exclusion"), but are covered if the suit is brought derivatively, Defendants would not have brought suit even had demand been made.

However, the "insured versus insured exclusion" is not a sufficient basis alone to raise reasonable doubt regarding directors' independence and thus excuse demand. See, e.g., Jones ex rel. CSK Auto, 503 F. Supp. 2d at 1341 (noting that the "insured versus insured exclusion" is "routinely rejected" by courts as a basis for pleading demand futility). Therefore, the Court rejects Plaintiff's argument that demand was excused based on VeriFone's liability insurance coverage.

### V. Conclusion

As no demand was made on the Board prior to filing this action and Plaintiff has failed to plead sufficient particularized facts to show demand futility, Defendants' Motion to Dismiss will be GRANTED with leave to amend.

**IT IS SO ORDERED**

Dated: August 7, 2014

_____
EDWARD J. DAVILA
United States District Judge