1  BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
   Alan R. Plutzik (Cal. Bar No. 077785)
2  2125 Oak Grove Road, Suite 120
   Walnut Creek, CA  94598
3  Telephone:  (925) 945-0200

4  HARWOOD FEFFER LLP
5  Robert I. Harwood
   Samuel K. Rosen
6  Benjamin I. Sachs-Michaels
   488 Madison Avenue
7  New York, NY 10022
   Telephone:  (212) 935-7400
8
9  LIFSHITZ LAW FIRM
   Joshua M. Lifshitz
10  821 Franklin Avenue
   Suite 209
11  Garden City, NY 11530
   Telephone:  (516) 493-9780
12
   Attorneys for Plaintiff
13  SOFIA ZOUMBOULAKIS

14              UNITED STATES DISTRICT COURT
15            NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOFIA ZOUMBOULAKIS, Derivatively on Behalf of Nominal Defendant VERIFONE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> RICHARD A. MCGINN, ROBERT W. ALSPAUGH, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, WENDA HARRIS MILLARD, EITAN RAFF, JEFFREY E. STIEFLER, DOUGLAS G. BERGERON, ROBERT DYKES, and CHARLES R. RINEHART, <br><br> Defendants, <br><br> and <br><br> VERIFONE SYSTEMS, INC., <br><br> Nominal Defendant. | Case No. 13-cv-2379-EJD <br><br> THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> DEMAND FOR JURY TRIAL |

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT, AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

1

Plaintiff Sofia Zoumboulakis ("Plaintiff"), by and through her undersigned attorneys, brings this third amended shareholder derivative complaint (the "Complaint") for the benefit of nominal defendant, VeriFone Systems, Inc. ("VeriFone" or the "Company"), against certain current and former members of VeriFone's Board of Directors (the "Board") and certain of its former executive officers seeking to remedy defendants' breaches of fiduciary duties, abuse of control, unjust enrichment, and violations of §14(a) of the Securities Exchange Act of 1934.[1]

## NATURE AND SUMMARY OF THE ACTION

1.     VeriFone develops, sells, and services electronic payment processing technology. From the time it went public in 2005 until at least 2013, VeriFone was plagued by serious internal control deficiencies.  In 2009, the Company was formally charged by the U.S. Securities and Exchange Commission (the "SEC") with a massive accounting fraud during 2007 that overstated operating income by 129% and subsequently required a significant financial restatement in 2008. According to the SEC's complaint, a mid-level manager had made multiple unsupportable adjustments after VeriFone's internal reporting showed preliminary quarterly numbers to be lower than expected.  The improper accounting adjustments allowed the Company to announce quarterly financial results in line with previous guidance.  The SEC alleged that proper controls should have been in place to "prevent the person responsible for forecasting financial results from making adjustments which allowed the Company to meet the forecasts."

2.     In 2008, while VeriFone's management continued to confront the aftermath of these deficient internal controls, defendant Robert Dykes ("Dykes") was hired as Chief Financial Officer ("CFO") and a Senior Vice President of VeriFone.

3.     In November 2009, VeriFone consented to the entry of a Final Judgment in the SEC action.  The Final Judgment permanently enjoined the Company, its management, employees, "servants," and "all persons in active concert or participation with any of them" from violating Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Action, 15 U.S.C. § 78m.   The

---

[1]     Plaintiff filed her initial shareholder derivative complaint in this action on May 24, 2013 (ECF No. 1) and her amended complaint on January 21, 2014 (ECF No. 24).

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

2

permanent injunction required the Company to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were executed with management's authorization, transactions were recorded in compliance with generally accepted accounting principles ("GAAP"), and that recorded numbers were verified routinely. At the time that VeriFone consented to the entry of the Final Judgment, defendants Robert W. Alspaugh ("Alspaugh"), Alex W. Hart ("Hart"), Robert B. Henske ("Henske"), and Eitan Raff ("Raff"), four of VeriFone's nine current directors, were on the Board, and, critically, these four defendants were included in the Final Judgment's permanent injunction as "servants" of VeriFone and/or "all persons in active concert or participation" with the Company.

4.     Although defendants were undeniably aware that VeriFone's deficient controls had permitted improper manual adjustments to the Company's internal results, they failed to institute sufficient controls. Upon information and belief, from the beginning of 2012 through the beginning of 2013, defendant Dykes repeatedly pressured subordinate employees to inflate revenue, prematurely recognize revenue, and otherwise improperly recognize revenue in order to bring the Company's quarterly results in line with previously forecast guidance. Yet again, the Company's internal controls failed to prevent "the person responsible for forecasting financial results from making adjustments which allowed the Company to meet the forecasts."

5.     In light of the 2009 Final Judgment, the Director Defendants (defined herein) were on notice of red flags alerting them to the Company's internal controls deficiency in this respect. Yet, during 2012, when numerous financial analysts raised the alarm that VeriFone's accounting did not appear proper, the Director Defendants caused the Company to issue a press release specifically responding to these accusations. Remarkably, the Director Defendants ignored these renewed red flags, continued to certify the Company's internal controls as effective, made no changes to internal controls, and permitted the wrongdoing to continue.

6.     In February 2013, the Company abruptly announced that defendant Dykes had purportedly "retired." However, evidence (discussed below) indicates that, in fact, defendant Dykes was terminated: at last something awakened the Director Defendants from their slumber and they fired Dykes for his wrongdoing.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

3

7.      Not surprisingly, two weeks after the new CFO was appointed and defendant Dykes had been removed, the Company disclosed very poor preliminary results for its first fiscal quarter of 2013.  The results were significantly below guidance and the Company subsequently repeatedly lowered its forecasts for the rest of 2013 as its reported revenue continued to drop.   However, VeriFone never acknowledged the truth: defendant Dykes had been cooking the books and once he was gone, no one inflated reported revenue in order to attain previously forecast quarterly guidance.  Instead, the Company provided a litany of excuses for the poor results, primarily related to macro-economic factors.  The financial press and analysts immediately saw through this charade and various articles and analyst reports were published questioning the Company's explanation for the poor results.  As detailed herein, the Company ultimately suffered a massive drop in the price of its common stock, lost ground against competitors, and lost credibility in the marketplace.

8.      Prior to filing this action, Plaintiff made no demand on the Board because making such a demand would be a futile and useless act.  While the Director Defendants, Alspaugh, Hart, Henske, Raff, and Wenda Harris Millard ("Millard"),[2] themselves may or may not have actually manipulated the Company's financial results, their termination of defendant Dykes for doing so is effectively their admission that in the wake of the SEC's Final Judgment they failed to correct the very same internal controls that caused the restatement in 2008.

9.      Thereafter, the financial press repeatedly questioned the integrity of the Company's accounting.  Ultimately, the Director Defendants acknowledged that Dykes had done the Company harm when they terminated him.  The five Director Defendants, Alspaugh, Hart, Henske, Raff, and Millard therefore breached their fiduciary duties by failing to institute functioning controls when they were undeniably aware since 2009 that those controls were deficient.  They breached their fiduciary duties by letting nearly a year elapse between April 2012 when financial analysts began to publicly question VeriFone's accounting until February when they terminated defendant Dykes.

10.     Further, as alleged in detail below (*infra* ¶¶ 84-89), VeriFone's current Chief Executive Officer ("CEO"), Paul Galant, is beholden to the Director Defendants who have

---

[2]      Defendants Alspaugh, Hart, Henske, and Raff all served on VeriFone's Board since prior to the SEC judgment.  Defendant Millard joined the Board in 2012.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

4

exercised their discretion over his compensation to pay him over *$23 million* during the fifteen month period between October 2013 and January 2015, and who also have the discretion to use their subjective judgment to control his future compensation, as well as his continued employment as CEO.  As a result, because six of VeriFone's nine current directors could not consider a demand for action against themselves and their fellow directors in a disinterested and independent fashion, demand on VeriFone's current Board would be futile and is excused.

11.     Defendants permitted the Company to function without effective internal controls over financial reporting while simultaneously assuring the public that the Company's internal controls functioned properly.  By their actions, defendants breached their fiduciary duties, violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder, and defendants Douglas G. Bergeron ("Bergeron") and Dykes were unjustly enriched, seriously harming VeriFone.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     This Court additionally has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff is a citizen of Canada, and each defendant is a citizen of the United States.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because VeriFone has a substantial presence in California and is headquartered in San Jose, California.  Moreover, each defendant has had extensive contacts with California as a director and/or officer of VeriFone or otherwise, which makes the exercise of personal jurisdiction over them proper.

## THE PARTIES

### A.  Plaintiff

15.     Plaintiff is an owner and holder of VeriFone common stock and has been continuously at times relevant hereto.

### B.  Defendants

16.     Nominal defendant VeriFone is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 2099 Gateway Place, San Jose, California.  According to its public filings, VeriFone is a leading global provider of payment solutions that enable secure electronic payment transactions and other services at the point of sale.  The Company's principal operating subsidiary, VeriFone, Inc., was incorporated in 1981, and shortly thereafter introduced the first-ever check verification and credit authorization device used by merchants in a commercial setting.

17.     Defendant Alspaugh has served as a director of VeriFone since 2008.  Defendant Alspaugh was at relevant times, and is currently, the Chairman of VeriFone's Audit Committee and a member of its Corporate Governance and Nominating Committee.

18.     Defendant Hart has served as a director of VeriFone since 2006.  Defendant Hart was at relevant times, and is currently, the Chairman of the Board and the Chair of VeriFone's Corporate Governance and Nominating Committee.

19.     Defendant Henske has served as a director of VeriFone since 2005.  Defendant Henske was at relevant times, and is currently, a member of VeriFone's Audit Committee, is an Audit Committee financial expert, and is the Chair of the Company's Compensation Committee.

20.     Defendant Millard has served as a director of VeriFone since 2012.  Defendant Millard was at relevant times, and is currently, a member of VeriFone's Compensation Committee.

21.     Defendant Raff has served as a director of VeriFone since 2007.  Defendant Raff was at relevant times, and is currently, a member of VeriFone's Corporate Governance and Nominating Committee.

22.     Defendant Jeffrey E. Stiefler ("Stiefler") served as a director of VeriFone from 2008 to 2014.  During the wrongdoing alleged herein, Stiefler was a member of the Company's Audit

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

6

and Compensation Committees.

23.     Defendant Richard A. McGinn ("McGinn") served as a director of VeriFone from 2008 to March 2014 and served as its interim CEO from March 2013 to October 1, 2013.

24.     Defendant Leslie G. Denend ("Denend") served as a director of VeriFone from 2005 to 2014.   Defendant Denend was the Chair of VeriFone's Compensation Committee and was a member of its Audit Committee at relevant times.

25.     Defendant Bergeron is a former director and officer of the Company.   Bergeron served as the Company's CEO and a director since the Company was formed in July 2002 until he abruptly resigned on March 12, 2013.   Upon Bergeron's resignation, the Company agreed to pay him $1 million per year for a two-year period in his severance agreement and stated that his dismissal was without cause.

26.     Defendant Dykes is a former officer of the Company.   Dykes served as an Executive Vice President and the CFO since September 2008 until the Company announced he "retired" in May, 2013.

27.     Defendant Charles R. Rinehart ("Rinehart") served as a director of VeriFone from May 2006 until June 27, 2012, and as non-executive Chairman from March 2008 until June 27, 2012.   Defendant Rinehart also served as a member of the Audit Committee during the Relevant Period.

28.     Defendants Alspaugh, Hart, Henske, Millard, and Raff, the defendants who are current directors of VeriFone, are collectively referred to herein as the "Director Defendants."   The Director Defendants currently comprise five of nine directors on VeriFone's Board.

## DEFENDANTS' DUTIES

29.     By reason of their positions as officers, directors, and/or fiduciaries of VeriFone and because of their ability to control the business and corporate affairs of VeriFone, defendants owed VeriFone and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage VeriFone in a fair, just, honest, and equitable manner.   Defendants were and are required to act in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders equally and not in furtherance of

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

7

their personal interest or benefit. Each director and officer of the Company owes or owed to VeriFone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of its affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30. Defendants, because of their positions of control and authority as directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with VeriFone, each defendant had knowledge of material non-public information regarding the Company.

31. To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

    a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b. Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

    d. Exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32. According to the Charter of the Audit Committee, the Audit Committee members, Alspaugh, Henske, and Stiefler, and at certain times, Denend, were responsible for, among other things:

Providing assistance to the Board of Directors in fulfilling their oversight responsibility to the shareholders, potential shareholders, the investment

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

8

community, and others relating to: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditors.

33.     According to the Charter of the Corporate Governance and Nominating Committee, the Corporate Governance and Nominating Committee members, defendants Alspaugh, Hart, McGinn, and Raff, were responsible for, among other things:

a.  Identifying individuals believed to be qualified to become Board members, consistent with criteria approved by the Board, and to select, or recommend to the Board, the nominees to stand for election as directors at the annual meeting of stockholders;

b.  Identifying Board members qualified to fill vacancies on any committee of the Board (including the Committee) and to recommend that the Board appoint the identified member or members to the respective committee;

c.  Establishing procedures for the Committee to exercise oversight of the evaluation of the Board and management; and

d.  Developing and recommending to the Board a set of corporate governance principles applicable to the Company, and to review those principles at least once a year.

## VERIFONE'S HISTORY OF DEFICIENT INTERNAL CONTROLS

34.     On December 3, 2007, VeriFone announced that its financial results for the first, second, and third quarters of the 2007 fiscal year would need to be restated as a result of serious accounting irregularities.  On this news, the Company's share price plummeted from its previous close of $48.08 per share to $26.03 per share.  This drop in share price represented a one-day loss of over 45% and the destruction of approximately $1.8 billion in market capitalization.

35.     On August 19, 2008, VeriFone issued its restated financials for the three quarters in question.  The restated results increased the total cost of net revenues by $7.7 million,[3] $11.5 million, and $8.4 million, during the first, second, and third quarters, respectively.  The adjustments to the first quarter numbers resulted in an overall decrease in operating income from $11.8 million to a loss of $602,000.  Second quarter operating income was reduced from $17.7

---

[3]     Cost of revenue means the total cost of manufacturing and delivering a product or service.

million to $7.5 million, and third quarter operating income from $36.5 million to $21.8 million.  In all, operating income for the three quarters fell from the originally reported $65.6 million to the restated $28.6 million.  VeriFone's results had been overstated by an aggregate *129%*.

36.     On September 1, 2009, the SEC filed a complaint in this Court against the Company and VeriFone's former supply-chain controller, Paul Periolat ("Periolat") in connection with the 2007 restatement, *SEC v. VeriFone Holdings, Inc., and Paul Periolat*, No. 5:09-cv-04046.  According to the SEC, VeriFone's massive restatement was due to Periolat having made unsupportable adjustments after the Company's internal reporting showed preliminary quarterly results substantially lower than expected.  Periolat's accounting adjustments allowed the Company to announce quarterly financial results in line with previous guidance.  The complaint stated: "Periolat was able to make the adjustments, in part due to VeriFone's lack of adequate internal controls."  *SEC v. VeriFone*, Complaint, ECF No. 1, at ¶ 3.

37.     Periolat accomplished the improper accounting adjustments through "manual entries to VeriFone's corporate records."  *Id.* at 18.  The Complaint stated:

> Periolat was able to make his unwarranted adjustments because VeriFone had few internal controls to prevent them.  Neither Periolat's supervisor nor any other senior manager reviewed Periolat's work.  *Nor were there proper controls in place to prevent the person responsible for forecasting financial results from making adjustments which allowed the company to meet the forecasts.*

*Id.* at ¶ 21.  VeriFone's internal controls were inadequate and permitted "the adjustments made by a mid-level controller who was able to make multi-million [dollar] entries which grossly distorted the Company's true financial results."  *Id.* at ¶ 27.

38.      On November 12, 2009, VeriFone consented to a Final Judgment in order to resolve the SEC's enforcement action.  *SEC v. VeriFone*, Complaint, ECF No. 19.  In the Final Judgment, "VeriFone, and its agents, servants, employees and attorneys-in-fact, and all persons in active concert or participation with any of them, who receive actual notice of this Final Judgment, by personal service or otherwise, and each of them," were permanently enjoined from violating: (a) Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), by failing to file periodic reports in conformity with the SEC's reporting and disclosures regulations and such other information, as

necessary, so that the quarterly reports are not misleading; (b) Section (b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), by failing to keep books, records, or accounts accurately reflecting the transactions and dispositions of the assets of the Company; and (c) Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B), by failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

A. Transactions are executed in accordance with management's general or specific authorization;

B. Transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets;

C. Access to assets is permitted only in accordance with management's general or specific authorization; and

D. The recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Final Judgment at 3.

39.    At the time VeriFone consented to the Final Judgment, defendants Alspaugh, Hart, Henske, and Raff were members of the Board, had actual notice of the Judgment, and were specifically included in the Judgment's permanent injunction as "servants" of VeriFone and/or "all persons in active concert or participation" with the Company.

**DEFENDANT DYKES CAUSED IMPROPER MANUAL ADJUSTMENTS TO VERIFONE'S RESULTS IN ORDER TO MEET QUARTERLY GUIDANCE**

40.    By letter dated August 12, 2008, VeriFone offered defendant Dykes the position of CFO and Senior Vice President of VeriFone.[4]   The offer letter described defendant Dykes' compensation as CFO, his bonus eligibility, and stated: "You are also eligible to receive a severance payment equal to six months base salary if your employment is terminated by VeriFone for reasons other than Cause."   The employment offer was signed as acknowledged and accepted by defendant Dykes on August 20, 2008.

---

[4]    The letter was attached as Exhibit 10.1 to VeriFone's Form 8-K filed with the SEC on September 3, 2008, announcing the hiring of defendant Dykes.

41.     Attached to the same Form 8-K as Exhibit 10.2 was defendant Dykes' severance agreement.  The agreement stated that if Dykes' employment was terminated by VeriFone "other than for Cause" or pursuant to a change in control, VeriFone would pay Dykes earned payments to the date of termination and "a lump-sum cash amount equal to [Dykes'] annual base salary during the 6-month period immediately prior to […] the date of termination."  The agreement defined the term "Cause" this way:

> "Cause" means (i) the commission of a felony, (ii) willful conduct tending to bring VeriFone or any Related Entity into substantial public disgrace or disrepute, (iii) substantial and repeated failure to perform duties of the office held by Executive as reasonably directed by the Board, (iv) gross negligence or willful misconduct with respect to VeriFone or any Related Entity or any of their customers or suppliers involving willful dishonesty or fraud, (v) any material breach by Executive of his material obligations under this Agreement or any material written policies of VeriFone or any Related Entity or (vi) the Executive's disqualification or bar by any governmental or self-regulatory authority from serving as an officer of VeriFone or any Related Entity or in any of the capacities contemplated by this Agreement.

42.     As VeriFone's CFO, defendant Dykes was responsible for, among other things, producing VeriFone's financial guidance and forecasts of future revenues.  At times relevant to the allegations herein, defendant Dykes routinely issued forecasts of VeriFone's growth during investor conference calls and in other public statements.

43.     Upon information and belief, at least between December 2010 and March or April 2013, defendant Dykes caused subordinate employees to act improperly by prematurely recognizing revenue in order to meet quarterly guidance.  On more than one occasion, defendant Dykes specifically directed subordinate employees, at times in writing, to book revenue in violation of GAAP that was either being prematurely recognized or that should not have been booked as revenue at all.

44.     Upon information and belief, in order to meet aggressive guidance forecasts, defendant Dykes implemented an improper accounting change to permit VeriFone to recognize gross revenues from certain transactions in VeriFone's tax payment business when the revenues should have been recognized as net revenues.  This tactic had the effect of inflating quarterly

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

12

revenue by millions of dollars and was done in order to meet quarterly guidance.  At other times when this accounting change did not produce the desired results, the policy was abandoned.

45.     On April 30, 2012, Deutsche Bank released an analyst report advising investors to sell their VeriFone stock and questioning the Company's accounting practices.  The report stated in part:

> *In our view, organic growth is being inflated through acquisitions…. Given poor financial disclosures*, lower true organic growth, future business risks and rich valuation, we are no longer comfortable recommending investors hold PAY shares.
>
> * * *
>
> *In our view, Verifone has bought organic growth through acquisitions by cannibalizing the acquisitions' products, thereby lowering original revenue estimates of the acquired companies.*

(Emphasis added.)   In response to this analyst report, the Company issued a press release specifically addressing the analyst report and claiming that its accounting was reliable.

46.     On November 29, 2012, Wedbush analysts issued a research report on VeriFone that noted the Company's "*poor quality of earnings and opaque view into past and future growth rates*" and faulted VeriFone's "opaque reporting."   In this context, the analyst's reference to opaque reporting means that the company's reported earnings and growth appeared questionable without the ability to verify the numbers.

47.     On February 4, 2013, the Company filed a Form 8-K announcing that defendant Dykes had supposedly announced that he planned to "retire."   The accompanying press release quoted defendant Bergeron thanking defendant Dykes for his service at VeriFone.

48.     Upon information and belief, defendant Dykes did not retire, but was terminated. Exhibit 10.4 to the February 4, 2013 Form 8-K was the Separation Agreement between VeriFone and defendant Dykes.   According to the Separation Agreement, effective February 28, 2013, defendant Dykes was no longer expected to report for work at VeriFone.   However, his official employment termination date would be May 1, 2013.   During the time period between February 28 and May 1 (referred to by the agreement as the "Transition Period"), defendant Dykes would not hold any formal position responsibilities at the Company and would not be required to report to any

VeriFone office.  The agreement stated "[y]ou will retain regular active employee status and receive a base salary of *$1.00 per month* during the Transition Period."  (Emphasis added.)

49.     Under the Separation Agreement, defendant Dykes was not only paid $1.00 per month for the final two months of his employment, but he was forced to forfeit *all* cash severance - hundreds of thousands of dollars - in order to maintain his right to outstanding equity awards vesting between February and May 2013, equity awards to which he would have been automatically entitled had he simply retired.  According to the Separation Agreement, VeriFone permitted Dykes' outstanding unvested equity awards to continue to vest on their normal schedule until May 2013 "in exchange for" the cash severance owed to him.

50.     This "exchange" demonstrates that Dykes did not retire as defendants claim, but was fired.  Pursuant to the Company's 2006 Equity Incentive Plan (the "Incentive Plan"), to which defendant Dykes was subject, when a VeriFone executive retires, he is entitled to awards that have vested as of the date of retirement.  The Incentive Plan makes clear that a retirement occurs when a covered executive's employment ends.  Dykes' separation agreement, in turn, makes clear that his employment ended on May 1, 2013.  Had Dykes actually retired he would have been entitled to awards vested when his employment ended on May 1, 2013.  In the Separation Agreement, Dykes agreed to forfeit hundreds of thousands of dollars in cash, as well as six months paid health benefits, *as consideration* for continued vesting of his equity awards *on their normal schedule and only through his termination date*.  This was automatically owed to him had he retired.

51.     Therefore, defendant Dykes did not retire as the defendants caused the Company to claim publicly.  He was fired for accounting manipulation.  In exchange for the other defendants' agreement not to refer to his departure as a termination, he was forced to forego his cash severance.  This arrangement permitted defendant Dykes to avoid explaining in future job interviews why he was terminated from VeriFone and it permitted the other defendants to attempt to avoid the public scrutiny and potential liability that would have resulted from their admission that VeriFone's financial statements were being manipulated.

52.     Also on February 4, 2013, VeriFone disclosed that Marc Rothman ("Rothman") had been hired to replace defendant Dykes.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

14

1  53.    Two weeks later, on February 20, 2013, the Company uncharacteristically issued

2  "preliminary results" for the first quarter of 2013.  Now that defendant Dykes was no longer able to

3  manipulate the Company's reported revenue, the true condition of VeriFone began to be revealed.

4  The preliminary results were significantly below guidance: non-GAAP net revenues in the range of

5  $425 million to $430 million and non-GAAP net income per share between $0.47 and $0.50.

6  Three months earlier, the Company had forecast non-GAAP net revenues for the first quarter in the

7  range of $490 million to $500 million and non-GAAP net income per diluted share between $0.70

8  and $0.73.

9  54.    The Company's press release announcing the preliminary results blamed a variety

10  of factors, none of which were viewed as credible by the financial press and analysts.  On February

11  21, 2013, *Reuters* published an article titled "Verifone shares nearly halve, analysts query

12  management," stating in part:

13      *Several analysts suggested that VeriFone's new chief financial officer had taken a*
14      *more conservative accounting approach at the company*, which already faces a
    court case for a past accusation of reckless accounting.

15      * * *

16      The company will likely be sold, SunTrust Robinson Humphrey analyst Andrew
17      Jeffrey wrote in a note, cutting his rating on the stock to "neutral" from "buy".
    "*Management credibility has been lost*," he said. "Market share losses are deeper
18      and more persistent than we had previously believed."

19      * * *

20      Deutsche, which rates the stock a "sell", slashed its price target to $15 from $27.
21      The brokerage said past acquisitions had masked what was happening at the
    company and that it had long been wary of its "*aggressive accounting recognition*."
22      "The recent CFO retirement/resignation and the first-quarter revenue recognition
23      requirements could also suggest *accounting red flags in prior quarters*," Deutsche
    said, noting the latest quarter's accounts had been signed off by the new CFO.

24  (Emphasis added.)

25  55.    On February 22, 2013, *Seeking Alpha* published an article titled "VeriFone Now a

26

27  Falling Knife," stating in part:

28

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF
CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

15

VeriFone management seems to appreciate that results like these require some explanation, but I'm not entirely sure I accept the reasons they've offered.

Management mentioned weak conditions in Europe. Fair enough - we all know that conditions in Europe are pretty tough. *But why, then, is Europe-based Ingenico not seeing the same trouble?*

VeriFone management also talked about a new accounting policy regarding revenue recognition that meant revenue from new distributors in the Mideast and Africa was not recognized this quarter. With a new CFO on board that, too, is a credible explanation. *Unfortunately, it also feeds into one of the more persistent bear stories about VeriFone – that the company has been a little too aggressive with its accounting in the past (including its calculation of organic growth). If management was overstating past revenue growth, that could explain why the business has seemingly hit such a hard wall now.*

(Emphasis added.)

56.     On March 5, 2013, the Company issued a press release announcing its complete first quarter 2013 results substantially the same as the preliminary results released on February 20, 2013.  The press release also contained the Company's full year and second quarter 2013 guidance: (a) for the full year, net revenues in the range of $1.8 billion to $1.83 billion and net income per diluted share in the range of $1.90 to $2.10; and (b) for the second quarter, net revenues in the range of $435 million to $450 million and net income per diluted share in the range of $0.45 to $0.50.

57.     As 2013 progressed without defendant Dykes to manipulate reported revenue, the public picture of VeriFone continued to deteriorate.  Ultimately the Company reported *a net loss of $2.73 per share for the full year 2013* – a far cry from the $2.10 net income per diluted share that had been forecast previously.

## VERIFONE'S MISLEADING DISCLOSURES

58.     Because VeriFone's CFO was engaged in manipulating the Company's revenue numbers, VeriFone's quarterly and annual financial disclosures, guidance, and proxy statement issued between December 2011 and February 2013 were misleading and inaccurate because reported revenue and income per share numbers were being manipulated in order to achieve quarterly guidance.  Yet, defendants Bergeron and Dykes certified these misleading statements

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

16

under the Sarbanes-Oxley Act of 2002 ("SOX") and the Director Defendants certified other public statements regarding the Company's internal controls over financial disclosure even though the Company's internal controls were inadequate.

59.   On December 14, 2011, the Company released its results for the fourth quarter and full year of 2011.  Among other things, the press release stated:

> Non-GAAP net revenues for Q4 FY11 were $416 million, compared to $317 million in the previous quarter and $276 million for the comparable period of 2010 ("Q4 FY10"), a 51% year-over-year increase. Q4 FY11 marked the sixth straight quarter that the growth rate exceeded 20% year-over-year, excluding the contribution from the Hypercom business acquired in August.
>
> Non-GAAP net revenues for the full year ended October 31, 2011, were $1,310 million, a 31% increase over the $1,002 million result for the full year ended October 31, 2010. GAAP net revenues were $411 million for Q4 FY11, $317 million for the prior quarter and $276 million for Q4 FY10. For FY11, GAAP net revenues totaled $1,304 million, a 30% increase over the $1,002 million total for FY10.
>
> * * *
>
> Non-GAAP net income per diluted share for Q4 FY11 was $0.53, compared to $0.49 in the prior quarter and $0.40 for Q4 FY10, a 33% year-over-year increase. Non-GAAP net income per diluted share for the full year ended October 31, 2011, was $1.92, a 45% increase over the $1.32 figure for the full year ended October 31, 2010. GAAP net income per diluted share for the latest quarter was $1.84, compared to $0.28 in the prior quarter and $0.55 in Q4 FY10. GAAP net income per diluted share was $2.92 for FY11 and $1.13 for FY10.
>
> * * *
>
> ### Guidance for First Quarter 2012 and Full Year
>
> VeriFone has updated its guidance assuming the pending Point acquisition closes at the end of this month. For the first fiscal quarter ending January 31, 2012, VeriFone expects to report net revenues in the range of $415 million to $420 million. Non-GAAP net income per diluted share is projected to range from $0.50 to $0.52. For the full year of fiscal 2012, VeriFone expects to report net revenues in the range of $1.90 billion to $1.92 billion. Non-GAAP net income per diluted share is expected to range from $2.53 to $2.60 in FY12.

(Emphasis added.)

60.   On December 23, 2012, the Company filed its Form 10-K with the SEC for the year

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

17

ended October 31, 2011.  The Form 10-K was signed by Director Defendants Alspaugh, Hart, Henske, and Raff as well as defendants Denend, McGinn, Stiefler, Bergeron, and Dykes.  The Form 10-K stated:

> Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

61.     On March 5, 2012, the Company released its results for the first quarter of 2012. The press release stated in part:

> Non-GAAP net revenues for Q1 FY12 were $425 million, compared to $416 million in the previous quarter and $284 million for the comparable period of fiscal 2011 ("Q1 FY11"), a 50% year-over-year increase. GAAP net revenues were $420 million for the latest quarter, $411 million for the prior quarter and $284 million for Q1 FY11.
>
> * * *
>
> Non-GAAP net income per diluted share for Q1 FY12 was $0.58, compared to $0.53 in the prior quarter and $0.43 for Q1 FY11, a 35% year-over-year increase. GAAP net income per diluted share for the latest quarter was a $0.03 loss, compared to $1.84 income in the prior quarter and $0.35 income in Q1 FY11.
>
> * * *
>
> **Guidance for Second Quarter 2012 and Full Fiscal Year**
>
> VeriFone has updated its guidance. For the second fiscal quarter ending April 30, 2012, VeriFone expects to report non-GAAP net revenues in the range of $465 million to $470 million. Non-GAAP net income per diluted share is projected to range from $0.59 to $0.60. For the full year of fiscal 2012, VeriFone expects to report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

62.     On March 12, 2012, the Company filed its Form 10-Q with the SEC for the quarter. Among other things, the Form 10-Q assured investors that the Company's internal controls were sufficient.

63.     On April 30, 2012, the same day that Deutsche Bank publicly questioned

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

18

1   VeriFone's accounting practices, discussed above, the Company issued a press release reaffirming

2   its previously released guidance and specifically responding the Deutsche Bank report.  The press

3   release stated in part:

4       VeriFone Reaffirms Organic Growth Estimates

5       SAN JOSE, Calif.--(BUSINESS WIRE) -- Apr. 30, 2012 -- VeriFone Systems, Inc.
    (NYSE: PAY), issued the following statement regarding a report on organic growth

6       calculations that was disseminated this morning from Deutsche Bank.

7       VeriFone uses a methodology of calculating organic growth prescribed by the vast

8       majority of investors and Wall Street analysts: excluding revenue of all acquired
    companies, large and small, until 12 months after acquisition.

9

10      Deutsche Bank is choosing to include in its calculation the revenue of acquired
    companies as if VeriFone had owned them for the entire current and year-ago

11      period. We believe this does not reflect the true organic results of VeriFone's
    business and we reaffirm our expectations for 10-15% organic growth rates for

12      fiscal year 2012 and long-term.

13      64.   On May 17, 2012, the Company filed its definitive proxy statement on Schedule

14  14A with the SEC in contemplation of the VeriFone Annual Meeting of Stockholders, to be held

15  on June 27, 2012.  The proxy statement incorporated by reference all of the Company's public

16  filings over the previous year.  In soliciting votes for the Board's director nominees, the proxy

17  statement disclosed that bonus compensation for VeriFone's named executives was derived in part

18  from the Company's financial achievement during the previous year as stated in its publicly filed

19  financial statements.  In reliance in part on the Company's reported results, defendant Bergeron

20  received over $14 million, and defendant Dykes received over $3 million, in total compensation

21  during the year ended October 31, 2011.  The proxy also statement stated the following in part:

22      REPORT OF THE CORPORATE GOVERNANCE AND NOMINATING
    COMMITTEE

23

24                        * * *

25      As part of its duties, in September 2011, the Corporate Governance and Nominating

26      Committee reviewed the Committee's charter and VeriFone's Corporate
    Governance Guidelines to determine whether any changes to the charter or the

27      guidelines were deemed necessary or desirable by the Committee. After completing
    this review, the Committee recommended to the Board that no amendments to these

28      documents needed to be made at that time. In March 2011, the Corporate

Governance and Nominating Committee also completed its review of existing director compensation guidelines and recommended certain changes to the Board based on such review.

The Committee also conducted an evaluation of its own performance that included an evaluation of its performance compared with the requirements of the charter of the Committee. *During fiscal 2011, the Corporate Governance and Nominating Committee performed all of its duties and responsibilities under the Corporate Governance and Nominating Committee Charter.*

\* \* \*

REPORT OF THE AUDIT COMMITTEE

\* \* \*

In the performance of its oversight function, the Audit Committee has considered and discussed the audited financial statements with management and the independent registered public accounting firm. *The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as currently in effect.* In addition, the Audit Committee has discussed with the independent registered public accounting firm the auditors' independence from VeriFone and its management, including the matters in the written disclosures and letter required by applicable requirements of the Public Company Accounting Oversight Board, a copy of which the Audit Committee has received. All non-audit services performed by the registered public accounting firm must be specifically pre-approved by the Audit Committee or a member thereof.

In reliance on the reviews and discussions referred to above, and subject to the limitations on the role and responsibilities of the Audit Committee referred to above and in the Audit Committee charter, the Audit Committee recommended to the Board the inclusion of the audited financial statements in VeriFone's Annual Report on Form 10-K for the fiscal year ended October 31, 2011, as filed with the Securities and Exchange Commission.

65.     The 2012 proxy statement was misleading and inaccurate because it failed to disclose that the members of the Audit Committee and the Corporate Governance and Nominating Committee had failed to discharge their responsibilities, the Company's internal controls over accounting and public disclosure were inadequate and conveyed a misleading picture of the Company's business as described in the financial statements incorporated by reference in the proxy statement, and defendant Bergeron was being paid millions of dollars in incentive compensation based on overstated false financials that he was personally engaged in creating.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

20

66.     On May 24, 2012, the Company released its results for the second quarter of 2012. Among other things, the press release stated:

> Non-GAAP net revenues for Q2 FY12 were $479 million, compared to $425 million in the previous quarter and $293 million for the comparable period of fiscal 2011 ("Q2 FY11"), a 64% year-over-year increase. GAAP net revenues were $472 million for the latest quarter, $420 million for the prior quarter, and $292 million for Q2 FY11.
>
> In Q2 FY12, non-GAAP net revenues excluding revenues from businesses acquired in the past 12 months increased 15% from the year-ago quarter. Hypercom-brand non-GAAP net revenues increased $8 million sequentially to $81 million in Q2 FY12.
>
> *     *     *
>
> Non-GAAP net income per diluted share for Q2 FY12 was $0.64, compared to $0.58 in the prior quarter and $0.46 for Q2 FY11, a 39% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.13 income, compared to a $0.03 loss in the prior quarter and $0.27 income in Q2 FY11.
>
> *     *     *
>
> **Guidance for Third Quarter 2012 and Full Fiscal Year**
>
> For the third fiscal quarter ending July 31, 2012, VeriFone expects to report non-GAAP net revenues in the range of $495 million to $500 million. Non-GAAP net income per diluted share is projected to range from $0.68 to $0.70. For the full year of fiscal 2012, VeriFone expects to report non-GAAP net revenues in the range of $1.900 billion to $1.925 billion. Non-GAAP net income per diluted share is expected to range from $2.60 to $2.66 in FY12.

(Emphasis added.)

67.     On June 11, 2012, the Company filed its Form 10-Q with the SEC for the quarter. Among other things, the Form 10-Q assured investors that the Company's controls were sufficient.

68.     On June 27, 2012, the Company filed a Form 8-K with the SEC disclosing the results of the shareholder votes solicited in the May 2012 Proxy Statement. Defendants Alspaugh, Bergeron, Denend, Hart, Henske, McGinn, Raff, and Stiefler were re-elected to the Board, the Company's shareholders approved executive compensation in an advisory vote, and the stockholders ratified the selection of Ernst & Young as the Company's independent auditor. The

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

21

reelection of these eight defendants was an essential causal link in their continued breaches of fiduciary duties as detailed herein.  Any reasonable investor would have found the true state of the Company's finances and its internal controls, particularly in light of the permanent injunction against improper financial reporting, to be material information in deciding whether or not to vote for the reelection of these eight defendants and the ratification of the Company's independent auditor.

69.     On September 5, 2012, the Company released its results for the third quarter of 2012.  The press release stated the following in part:

> Non-GAAP net income per diluted share for Q3 FY12 was $0.75, compared to $0.64 in the prior quarter and $0.49 for the three months ended July 31, 2011 ("Q3 FY11"), a 53% year-over-year increase. GAAP net income per diluted share for the latest quarter was $0.34, compared to $0.03 in the prior quarter and $0.28 in Q3 FY11.

> Non-GAAP net revenues for Q3 FY12 were $493 million, compared to $479 million in the previous quarter and $317 million for Q3 FY11, a 56% year-over-year increase. GAAP net revenues were $489 million for the latest quarter, $472 million for the prior quarter and $317 million for Q3 FY11.

> In Q3 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 16% from the year-ago quarter and 21% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 9% both unadjusted and at constant currency, while international Organic non-GAAP net revenues grew 21% from the year-ago quarter and 28% at constant currency.

> * * *

> **Guidance for Fourth Quarter 2012, Fiscal Year 2012 and Fiscal Year 2013**

> For the fourth fiscal quarter ending October 31, 2012 ("Q4 FY12"), Latin America non-GAAP net revenues, which are reported separately, are expected in the range of $65 million to $75 million, approximately $25 million less than the run rate of recent quarters due to isolated events, and are expected to rebound to $90 million to $95 million in the first quarter of fiscal 2013.

> VeriFone expects to report total non-GAAP net revenues for Q4 FY12 in the range of $495 million to $500 million and non-GAAP net income per diluted share in the range of $0.75 to $0.77. Such numbers imply full fiscal year 2012 non-GAAP net revenues of $1.893 billion to $1.898 billion and non-GAAP net income per diluted share of $2.73 to $2.75.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

22

The company expects FY13 non-GAAP revenue of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share of $3.25 to $3.30.

70.     On September 10, 2012, the Company filed its Form 10-Q with the SEC for the quarter.  Among other things, the Form 10-Q assured investors that the Company's controls were sufficient.

71.     On December 13, 2012, the Company released its results for the fourth quarter and full year of 2012.  The press release stated in relevant part:

Non-GAAP net income per diluted share for Q4 FY12 was $0.76, compared to $0.75 in the prior quarter and $0.53 for the three months ended October 31, 2011 ("Q4 FY11"), a 43% year-over-year increase. Non-GAAP net income per diluted share for the full year ended October 31, 2012 ("FY12") was $2.74, a 43% year-over-year increase over the $1.92 figure for the full year ended October 31, 2011 ("FY11"). GAAP net income per diluted share for the latest quarter was $0.24, compared to $0.34 in the prior quarter and $1.84 in Q4 FY11. GAAP net income per diluted share was $0.59 for FY12 and $2.92 for FY11.

Non-GAAP net revenues for Q4 FY12 were $489 million, compared to $493 million in the previous quarter and $416 million for Q4 FY11, an 18% year-over-year increase. Non-GAAP net revenues for FY12 were $1.886 billion, a 44% increase over the $1.310 billion result for FY11. GAAP net revenues were $485 million for the latest quarter, $489 million for the prior quarter and $411 million for Q4 FY11. For FY12, GAAP net revenues totaled $1.866 billion, a 43% increase over the $1.304 billion total for FY11.

In Q4 FY12, Organic non-GAAP net revenues, which exclude net revenues from businesses acquired in the past 12 months, increased 4% from the year-ago quarter and 8% at constant currency, which assumes currency exchange rates remained the same from a year ago. North America Organic non-GAAP net revenues grew 22% both unadjusted and at constant currency, while international Organic non-GAAP net revenues declined 3% from the year-ago quarter but increased 2% at constant currency. Organic non-GAAP net revenues increased 11% in FY12 compared to FY11 and 14% at constant currency. For FY12, North America Organic non-GAAP net revenues grew 4% from FY11 both unadjusted and at constant currency, while international Organic non-GAAP net revenues grew 15% from FY11 and 20% at constant currency.

* * *

*Guidance for First Quarter 2013 and Fiscal Year 2013*

For the first fiscal quarter ending January 31, 2013, VeriFone expects to report total non-GAAP net revenues in the range of $490 million to $500 million and non-

GAAP net income per diluted share in the range of $0.70 to $0.73.

For the full year of fiscal 2013, the company continues to expect to report total non-GAAP net revenues in the range of $2.05 billion to $2.10 billion and non-GAAP net income per diluted share in the range of $3.25 to $3.30. Free cash flow, defined as cash flow from operations as presented under GAAP less capital expenditures, is expected in the range of $285 million to $315 million.

72.     On December 19, 2012, the Company filed its Form 10-K with the SEC for the fiscal year ended October 31, 2012.  The Form 10-K was signed by Director Defendants Alspaugh, Hart, Henske, Millard, Raff, as well as defendants Denend, McGinn, and Stiefler, Bergeron, and Dykes.  Among other things, the Form 10-K assured investors that VeriFone's internal controls functioned properly:

Management assessed our internal control over financial reporting as of October 31, 2012, the end of our fiscal year. Management based its assessment on the framework established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment.

Based on our assessment, management has concluded that our internal control over financial reporting was effective as of the end of the fiscal year to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles. We reviewed the results of management's assessment with the Audit Committee of our Board of Directors.

73.     Each of the foregoing public disclosures was misleading because they inaccurately stated that the Company's internal controls were sufficient when the reported revenue results were in fact the product of improper manipulation.

**REASONS WHY DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

74.     By their consent to the permanent injunction in the SEC Final Judgment in November 2009, defendants: (a) agreed to ensure that the Company's internal controls were adequate; and (b) knew that if they allowed or caused such controls to be inadequate, VeriFone would be severely harmed.  In particular, the Director Defendants knew that VeriFone's internal control deficiencies had permitted unsupported manual accounting entries and the manipulation of

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

24

reported revenue in order to achieve previously issued guidance.

75.     At times relevant to the allegations herein, the defendants knew or consciously disregarded that VeriFone's internal controls over accounting, financial reporting, and disclosure were inadequate and not properly functioning, thereby failing to prevent the routine issuance of misleading and inaccurate statements regarding the Company's operations and prospects.

76.     Defendants breached their fiduciary duties by declining to ensure that the Company's internal controls functioned properly even though they were presented with a parade of red flags alerting them that the exact same internal control deficiencies that led to the restatement in 2008, the SEC action, and the SEC's Final Judgment continued unabated.

## DAMAGES TO THE COMPANY

77.     As a result of defendants' wrongdoing, VeriFone suffered from severely deficient internal controls and disseminated misleading public statements concerning the Company's business prospects and financial condition.  This lack of internal controls and misleading financial disclosures harmed VeriFone's credibility, corporate image, and goodwill, as reflected by the drop in VeriFone stock as a result of the wrongdoing complained of herein from over $54 per share in April 2012 to less than $16 per share in the summer of 2013.

78.     VeriFone's management's lack of credibility also damaged its reputation within the business community and the credit markets.  VeriFone's ability to raise equity capital or debt on favorable terms in the future was impaired, causing the Company to be likely to incur higher costs of capital and debt because the deficient internal controls and improper statements caused by defendants materially increased the perceived risks of investing and lending money to the Company.

79.     VeriFone has been, and will continue to be, severely damaged and injured by defendants' misconduct.  As a direct and proximate result of defendants' conduct, VeriFone has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

          a.     costs incurred in incentive compensation and benefits (in certain instances based on overstated, false financial results) paid to defendants that breached their duties to the Company;

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

25

1          b.      costs incurred investigating and remedying the Company's internal control

2   deficiencies;

3          d.      substantial loss of market capital; and

4          e.      any fines that are a result of the Company's repeated violations of the federal

5                  securities laws.

6          80.    In addition, VeriFone's business, goodwill, and reputation with its business partners,

7   regulators, and shareholders have been gravely impaired.  The Company only recently resolved

8   claims related to the massive accounting fraud that occurred during 2007.  It is now apparent that

9   the Company continued, through at least February 2013, to suffer from the same internal control

10  deficiencies that it did in 2007.

11         81.    The actions complained of herein have irreparably damaged VeriFone's corporate

12  image and goodwill.  For at least the foreseeable future, VeriFone will suffer from what is known

13  as the "liar's discount," a term applied to the stocks of companies that have been implicated in

14  illegal behavior and have misled the investing public, such that VeriFone's ability to raise equity

15  capital or debt on favorable terms in the future is now impaired.

16                     **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

17         82.    Plaintiff brings this action derivatively in the right and for the benefit of VeriFone to

18  redress injuries suffered, and to be suffered, by VeriFone as a direct result of breaches of fiduciary

19  duty by the individual defendants.  VeriFone is named as a nominal defendant solely in a derivative

20  capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not

21  otherwise have.

22         83.    The current Board of VeriFone consists of the following nine directors: Director

23  Defendants Alspaugh, Hart, Henske, Raff, Millard, non-defendant outside directors Karen Austin,

24  Jonathan Schwartz, and Jane J. Thompson, and CEO-director Paul Galant ("Galant").  Plaintiff has

25  not made any demand on the Board to institute this action because a pre-suit demand on the Board

26  would have been futile, and therefore is excused.  This is because a majority of the Board could not

27  disinterestedly and independently respond to a demand for action.  As detailed herein, VeriFone's

28  current CEO is not independent of the Director Defendants and could not disinterestedly consider

taking action against them.  Further, Director Defendants Alspaugh, Hart, Henske, Millard and Raff could not disinterestedly consider a demand for action because they face a substantial likelihood of liability.  This is because, despite knowing that the Company suffered from severely inadequate internal controls, defendants Alspaugh, Hart, Henske, Raff, and Millard consciously permitted the Company to conceal this fact from the public, consciously declined to institute functioning internal controls, and then consciously permitted the Company to issue misleading and untruthful disclosures.  Due to these defendants' conscious decisions not to act, defendants Alspaugh, Hart, Henske, Raff, and Millard breached their duties of good faith and loyalty and caused the Company to be damaged and injured.  Because six of the nine current directors of VeriFone could not disinterestedly and independently consider a demand for action, demand on the Board is futile, and therefore is excused.

**Demand Is Excused Because A Majority Of The Board Could Not Disinterestedly And Independently Consider A Demand For Action**

CEO Galant Is Not Independent Of Director Defendants Alspaugh, Hart, Henske, Raff, And Millard

84.     Mr. Galant is hopelessly conflicted due to his dual roles at VeriFone as CEO and a director.  In his role as CEO, Mr. Galant was compensated over *$23 million* from his appointment as CEO in October 2013 through the end of 2014.  Due to the generosity or patronage of the Director Defendants who sit on the Board and the Compensation Committee, Mr. Galant was paid $20,428,883 in 2013 and $3,099,585 in 2014.  Mr. Galant is completely reliant on the continued goodwill of the Director Defendants for his financial windfall over the previous years and for his continued access to these stunning sums of money.  Indeed, Mr. Galant could be said to "owe" the Director Defendants for this incredibly generous compensation, which was approximately *$1.66 million per month* through the end of 2014.  As described in VeriFone's most recently filed proxy statement, the "Board and Compensation Committee oversee [the Company's] executive compensation program."  Because the Director Defendants comprise the majority of the Board they completely control whether Mr. Galant will continue to be compensated so highly in the future.

85.     Mr. Galant is subject to an employment agreement that, among other things, sets

1  certain elements of his compensation.  As also described in VeriFone's most recently filed proxy

2  statement, "in order to structure a competitive compensation package for Mr. Galant, the

3  Compensation Committee… determined it appropriate to include one-time make-whole

4  components," including a one-time cash bonus of *$2.25 million*.  This agreement was approved by

5  the Compensation Committee which was comprised of four directors, including Director

6  Defendants Henske and Millard.  Defendant Henske was, and is, the Chairman of the

7  Compensation Committee.  This $2.25 million "bonus" was thereafter ratified by the Board,

8  majority comprised of the Director Defendants.  Mr. Galant is unable to disinterestedly and

9  independently consider a demand to investigate and sue the Director Defendants because they are

10  directly responsible for conferring a discretionary $2.25 million cash bonus on him.  Through no

11  fault of his own, Mr. Galant is conflicted: were he, in his role as director, to vote to investigate

12  and/or sue the Director Defendants he would jeopardize his ability to receive such payments, or

13  even remain as CEO in the future.

14       86.     The proxy statement further discloses that Mr. Galant's compensation is set by the

15  Compensation Committee, which "exercises its own judgment," at meetings during which Mr.

16  Galant is not present.  In 2014, the Compensation Committee awarded Mr. Galant a base salary of

17  $800,000 plus other compensation including short-term incentive compensation, which is also set

18  by the Compensation Committee, half-comprised of defendants Henske and Millard.  Each year,

19  the Compensation Committee uses its own "subjective evaluation" to set Mr. Galant's short-term

20  incentive compensation, and in 2014, "the Compensation Committee exercised its discretion to

21  adjust Mr. Galant's short-term incentive compensation payout… upwards by 20%."  Additionally,

22  in 2014 the Compensation Committee conferred on Mr. Galant a "one-time special award of

23  $500,000" based on the Committee's "subjective evaluation" of his performance.  These payments

24  were thereafter ratified by the Board which is majority comprised of Director Defendants.  Mr.

25  Galant could not disinterestedly and independently consider a demand for action against the very

26  people who he not only has to thank for his 2014 compensation, but who have "discretion" to

27  exercise "subjective" "judgment" over his future compensation.

28       87.     The Compensation Committee and Board, neither of which could act without the

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF
CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

28

votes of the Director Defendants who comprise at least half of the voting directors in both cases, not only control Mr. Galant's amount of compensation, they also establish the performance targets that dictate whether he can attain his incentive compensation in the future: "[t]he Compensation Committee establishes the performance targets for the [named executive officers] at the beginning of the fiscal year based on our operating plan approved by the Board at that time."

88.     Further, as a matter of corporate governance, Mr. Galant's continued service as CEO is at the pleasure of the Board.  Because the Director Defendants are a majority of VeriFone's Board, they are in a position to terminate Mr. Galant or permit him to continue in his role as they see fit.

89.     In light of the foregoing, Mr. Galant could not disinterestedly and independently consider a demand for to investigate and/or sue the Director Defendants.  Mr. Galant is beholden to the Director Defendants to use using their discretion and subjective judgment to grant him over $23 million in compensation during 2013 and 2014.  Further, were Mr. Galant, in his capacity as a director, to vote to investigate and/or sue the Director Defendants he would be imperiling his continued employment as VeriFone's CEO and his future compensation because the amount of his future compensation and his continued employment are both completely reliant on the continued goodwill of the Director Defendants.  As a result, demand is excused as to Mr. Galant.

The Director Defendants Could Not Disinterestedly And Independently Consider A Demand For Action Because They Face A Substantial Likelihood Of Liability

90.     Director Defendants Alspaugh, Hart, Henske, Millard, and Raff permitted the Company to function with inadequate internal controls and make inaccurate public statements that conveyed a misleading picture of VeriFone's business in the face of material adverse facts that the Director Defendants knew and consciously disregarded.   These facts include that the same inadequate internal controls that caused the 2008 financial restatement were never repaired and continued to be inadequate at least until February 2013.  Even now, it is unclear that these internal controls have been strengthened.  Thus, the five Director Defendants exposed the Company to serious damage and injury.  The Director Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

29

1    demand.  Any demand on the Board is, thus, excused as futile.

2    91.    Defendants Alspaugh, Hart, Henske, and Raff were members of the Board of

3    Directors in the aftermath of the restatement in 2008, they signed Forms 10-K for the intervening

4    years acknowledging that the Company had a history of deficient internal controls, and they

5    consented to the SEC Final Judgment issuing a permanent injunction against improper financial

6    reporting and internal controls in 2009.  These Director Defendants, due to their experience with

7    the foregoing and in particular, their consent to the permanent injunction in the SEC action,

8    specifically knew that VeriFone lacked proper controls to prevent manual manipulation of internal

9    financial reporting and "to prevent the person responsible for forecasting financial results from

10   making adjustments which allowed the company to meet the forecasts."  However, they declined to

11   take action to strengthen these internal controls, and when presented with renewed red flags, such

12   as analyst statements that the Company's accounting was being manipulated, they failed to take

13   action again.  As a result, they exposed the Company to severe damage and injury.  Consequently,

14   defendants Alspaugh, Hart, Henske, and Raff face a substantial risk of liability for breach of good

15   faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus,

16   demand on the defendants Alspaugh, Hart, Henske, and Raff was futile, and therefore excused.

17   92.    Defendants Alspaugh, Hart, Henske, and Raff signed the Company's December 23,

18   2011, and Alspaugh, Hart, Henske, Millard, and Raff signed the Company's December 19, 2012

19   Forms 10-K, which included misleading statements regarding the Company's internal controls and

20   untrue certifications under Sarbanes-Oxley.  These Director Defendants were sufficiently on notice

21   of VeriFone's past internal control deficiencies that they were required to specifically satisfy

22   themselves that the Company's recently inadequate internal controls were functioning properly.

23   This they failed to do.  Accordingly, demand is futile as to defendants Alspaugh, Hart, Henske,

24   Millard, and Raff.

25   93.    Defendants Alspaugh and Henske were members of the Audit Committee during the

26   time of the wrongdoing alleged herein.  Among other things, the Audit Committee of the Board is

27   responsible for oversight responsibility relating to: (i) the integrity of the Company's financial

28   statements; (ii) the Company's compliance with legal and regulatory requirements; and (iii) the

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF
CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

30

performance of the Company's internal audit function.  Both of Alspaugh and Henske were members of the Audit Committee at times when the Audit Committee was failing to adequately discharge its responsibilities.  Defendants Alspaugh and Henske knew of the precise deficiencies in VeriFone's internal controls raised by the SEC in its enforcement action and in the Final Judgment, but they declined to take action to repair these internal controls and they failed to take action when presented with red flags in 2012 regarding the same controls.  Although the charter of the VeriFone Board's Audit Committee specifically tasks the Audit Committee with oversight related to internal controls, these two defendants presided over a complete lack of accountability and a culture where widespread and pervasively inadequate internal controls were permitted to continue unabated for years.  Due to these defendants' breaches of their duties, any demand upon them is futile.

94.   Defendants Alspaugh, Hart, and Raff were the members of the Corporate Governance and Nominating Committee.  According to its charter, the Corporate Governance and Nominating Committee is responsible for, among other things, overseeing the evaluation of the Board and management and assessing the adequacy of the Company's Corporate Governance Guidelines.  However, defendants Alspaugh, Hart, and Raff presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and declining to require truthful evaluations of management and the Board, and/or declining to act on evaluations truthfully describing the extent of managerial and directorial complicity in the Company's deficient controls.  In so doing, these three defendants breached their fiduciary duties and any demand upon them is futile.

95.   Defendants Henske and Millard were and are members of the Compensation Committee.  According to its charter, the Compensation Committee's purpose includes approving and reviewing the compensation and performance of the Company's CEO, making recommendations to the Board regarding non-CEO compensation, and making recommendations to the Board with respect to any severance or termination payments.  However, defendants Henske and Millard presided over an utter failure of corporate governance by permitting the Company to suffer from a widespread and pervasive deficiency of internal controls for years, and approving defendant Bergeron's sizable severance package, as well as the continued and excessive

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

31

compensation of defendant Dykes during his tenure as CFO.  Further, defendant Millard and defendant Henske were members of the Compensation Committee during 2013 when defendant Dykes was terminated.  As a result, defendants Millard and Henske were responsible for making recommendations to the board regarding the severance agreement with defendant Dykes in which he forewent his cash severance "in exchange" for access to stock awards.  Due to their membership on the Compensation Committee and role in negotiating the terms of Dykes' departure, defendants Henske and Millard knew of defendant Dykes' wrongdoing and the agreement to refer to his departure as a retirement, and thus consciously concealed the truth of Dykes' wrongdoing and VeriFone's deficient internal controls from investors. In so doing, these two defendants breached their fiduciary duties and any demand upon them is futile.

96.     All five of the Director Defendants failed to take legal action against those who were responsible for permitting VeriFone to function without effective accounting controls since its very inception as a public company, including themselves.  No legal action has been taken against defendant Bergeron or defendant Dykes.  While the Director Defendants permitted defendant Dykes to leave the Company without full and truthful disclosure of his role in wrongdoing at VeriFone, they failed to seek clawbacks of previously paid bonus compensation and/or salary.  The Director Defendants failed to improve the same defective internal controls after the departure of defendant Dykes even though when they terminated him they could not have been unaware that the controls were deficient, enabling his illicit conduct.  The Director Defendants thus demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein.  Thus, demand on the Director Defendants, who comprise a majority of the current Board, is futile and therefore excused.

97.     Each Director Defendant also breached their duty of loyalty by declining to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.  As a result of their conduct, the Company has now been seriously harmed and demand is futile as to the entire Board.

98.     The wrongdoing detailed herein violates the fiduciary duties owed by VeriFone's

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF
CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

32

directors and is incapable of ratification.

## COUNT I

## BREACH OF FIDUCIARY DUTY

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VeriFone's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

101.    Defendants' conduct set forth herein was due to their knowing; conscious; or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of VeriFone.

102.    In breach of their fiduciary duties owed to VeriFone, defendants willfully participated in, and caused, the Company's unnecessary expenditure of its corporate funds, and failed to properly oversee VeriFone's business, rendering them personally liable to the Company for breaching their fiduciary duties.

103.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, VeriFone has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

## ABUSE OF CONTROL

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence VeriFone, for which they are legally responsible.

106.    As a direct and proximate result of defendants' abuse of control, VeriFone has sustained significant damages.

107.    As a direct and proximate result of defendants' breaches of their fiduciary

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

33

obligations of candor, good faith, and loyalty, VeriFone has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT III

### AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934

108. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed in 2012 violated §14(a) and Rule 14a-9 because they included by reference the materially false and misleading financial statements.

110. The proxy statement was false and misleading when issued because it failed to disclose (among other things) that the Company's controls over accounting and financial disclosure were deficient and, as a result, contained financial statements that were false and misleading.

111. In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

112. The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The proxy statement was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting and the wasteful granting of excessive severance compensation to defendant Bergeron.

113. The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

34

**COUNT IV**

**AGAINST DEFENDANTS DYKES AND BERGERON FOR UNJUST ENRICHMENT**

114.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.   By their receipt of millions of dollars in salary and bonus compensation, as well as millions of dollars in severance payments in the case of defendant Bergeron, while breaching their fiduciary duties, defendants Bergeron and Dykes were unjustly enriched at the expense of, and to the detriment of, VeriFone

116.   Plaintiff seeks restitution from each of defendants, on behalf of VeriFone, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by each of defendants, as a result of their wrongful conduct and breaches of fiduciary duties.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of VeriFone and that Plaintiff is an adequate representative of the Company;

B.   Declaring that the Director Defendants have breached their fiduciary duties to VeriFone;

C.   Determining and awarding to VeriFone the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.   Directing VeriFone and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VeriFone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.   a proposal to strengthen the Board's supervision of operations and develop

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

35

1   and implement procedures for greater shareholder input into the policies and guidelines of

2   the Board;

3          2.      a provision to permit the shareholders of VeriFone to nominate at least three

4   candidates for election to the Board;

5          3.      a proposal to ensure the establishment of effective oversight of compliance

6   with applicable laws, rules, and regulations;

7   E.      Awarding VeriFone restitution from defendants, and each of them;

8   F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

9   attorneys' and experts' fees, costs, and expenses; and

10  G.      Granting such other and further equitable relief as this Court may deem just and

11  proper.

12                              **JURY DEMAND**

13         Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

14  Dated: January 20, 2016              BRAMSON, PLUTZIK, MAHLER &
                                         BIRKHAEUSER, LLP
15                                       Alan R. Plutzik (Cal. Bar No. 077785)
16                                       aplutzik@bramsonplutzik.com
                                         Michael S. Strimling (Cal. Bar No. 96135)
17                                       mstrimling@bramsonplutzik.com
                                         2125 Oak Grove Road, Suite 120
18                                       Walnut Creek, CA  94598
                                         Telephone:  (925) 945-0200
19
20                                       HARWOOD FEFFER LLP
                                         By:  _/s/ Robert I.Harwood_____
21                                       Robert I. Harwood
                                         rharwood@hfesq.com
22                                       Samuel K. Rosen
                                         srosen@hfesq.com
23                                       Benjamin I. Sachs-Michaels
24                                       bsachsmichaels@hfesq.com
                                         488 Madison Avenue
25                                       New York, NY 10022
                                         (212) 935-7400
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LIFSHITZ LAW FIRM
Joshua M. Lifshitz
joshualifshitz@gmail.com
821 Franklin Avenue
Suite 209
Garden City, NY 11530
(516) 493-9780

*Attorneys for Plaintiff*

THIRD AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF
CONTROL, UNJUST ENRICHMENT AND VIOLATIONS OF §14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

37

## VERIFICATION

I, **Sofia Zoumboulakis**, hereby declare as follows:

I am a shareholder of Verifone Systems, Inc. and have continuously so owned Verifone Systems, Inc. common stock during the relevant period. I have reviewed the foregoing Third Amended Shareholder Derivative Complaint For Breach Of Fiduciary Duty, Abuse Of Control. And Violations Of §14(A) Of The Securities Exchange Act Of 1934 ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

January 14, 2016

_____
Sofia Zoumboulakis